**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | Pursuant to L. R. 5.1(c), Plaintiffs note they are requesting **emergency relief** against agency action taking effect at **12 a.m., January 6, 2026**.<br><br>Civil Action No. 1:25-cv-13939 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION TO POSTPONE JANUARY 6, 2026, EFFECTIVE DATE OF AGENCY ACTION**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................... ii

TABLE OF AUTHORITIES .......................................................................................................... iii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND .............................................................................................................................. 2

    A.   Statutory Framework and Related Agency Practices for TPS Periodic Reviews. .......... 2

    B.   South Sudan's Initial TPS Designation and Ensuing Periodic Reviews. ....................... 4

    C.   Termination of South Sudan's TPS Designation. ........................................................... 5

STANDARD OF REVIEW .............................................................................................................. 5

ARGUMENT .................................................................................................................................... 6

   I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ......................................... 6

    A.   This Court Has Jurisdiction Over Plaintiffs' APA Claims. ........................................... 6

    B.   Defendants' Periodic Review Violated the APA. .......................................................... 7

    C.   Defendants' Periodic Review Was Arbitrary and Capricious Because It Departed from
          Past Agency Practices. ................................................................................................. 13

    D.   Defendants' Periodic Review Was Contrary to Constitutional Right. ......................... 14

   II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT EMERGENCY
   POSTPONEMENT. ................................................................................................................. 17

   III. THE BALANCE OF THE HARDSHIPS AND THE EQUITIES FAVOR
      PLAINTIFFS. .......................................................................................................................... 19

CONCLUSION ............................................................................................................................... 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson ex rel. Dowd v. City of Bos.*,
375 F.3d 71 (1st Cir. 2004)................................................................15

*Bolling v. Sharpe*,
347 U.S. 497 (1954)........................................................................14

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
996 F.3d 37 (1st Cir. 2021)...........................................................14, 15

*Centro Presente v. DHS*,
332 F. Supp. 3d 393 (D. Mass. 2018) .............................................16

*Doe v. Noem*,
784 F. Supp. 3d 437 (D. Mass. 2025) .........................................18, 19

*Doe v. Noem*,
No. 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025)...................................6

*Doe v. Trump*,
766 F. Supp. 3d 266 (D. Mass. 2025) ...............................................5

*Enyart v. Nat'l Conf. Of Bar Exam'rs, Inc.*,
630 F.3d 1153 (9th Cir. 2011) .........................................................19

*Make the Road New York v. Noem*,
1:25-cv-00190-JMC, No. 25-5320 (D.C. Cir., Nov. 22, 2025) ........5

*McNary v. Haitian Refugee Cent., Inc.*,
498 U.S. 479 (1991).........................................................................6

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016).............................................................16

*Nat'l Educ. Ass'n-New Hampshire v. NH Att'y Gen.*,
No. 25-CV-293-LM, 2025 WL 2807652 (D.N.H. Oct. 2, 2025)...........19

*Nat'l TPS All. v. Noem*, (*NTPSA II*)
2025 WL 2233985 (N.D. Cal. July 31, 2025)................................15, 16

*Nat'l TPS All. v. Noem*,
773 F. Supp. 3d 807 (N.D. Cal. Mar. 31, 2025) (*NTPSA I*)............16, 20

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
   407 F. Supp. 2d 323 (D. Mass. 2005) ...................................................................19

*New York v. McMahon*,
   784 F. Supp. 3d 311 (D. Mass. 2025) ...............................................................18, 19

*Nken v. Holder*,
   556 U.S. 418 (2009)............................................................................................17, 19

*Public Service Co. v. Town of West Newbury*,
   835 F.2d 380 (1st Cir. 1987) .....................................................................................18

*Ramos v. Nielsen*,
   336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v.
   Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th
   1010 (9th Cir. 2023)...............................................................................................3, 8

*Rhode Island Coal. Against Dom. Violence v. Bondi*,
   794 F. Supp. 3d 58 (D.R.I. 2025)................................................................................5

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...........................................................3, 6, 7, 15

*Sampiao v. Hyde*,
   No. 1:25-CV-11981-JEK, 2025 WL 2607924 (D. Mass. Sept. 9, 2025)................................20

*Trump v. Hawaii*,
   585 U.S. 667 (2018)...................................................................................................15

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
   587 F.3d 464 (1st Cir. 2009) .....................................................................................18

*Valentin v. Town of Natick*,
   707 F. Supp. 3d 88 (D. Mass. 2023) ........................................................................16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)........................................................................................15, 16, 17

*Washington v. Davis*,
   426 U.S. 229 (1976)...................................................................................................14

**Statutes**

5 U.S.C. § 704..................................................................................................................6

5 U.S.C. § 705..............................................................................................................1, 5

5 U.S.C. § 706(2)(A).....................................................................................................7, 10

5 U.S.C § 706(2)(B) ................................................................................14

5 U.S.C. § 706(A) ..................................................................................11

5 U.S.C. § 706(D–F) ................................................................................7

6 U.S.C. § 557 ..........................................................................................2

8 U.S.C. §§ 1254a(a)(1), (d)(4) ................................................................2

8 U.S.C. § 1254a(b)(1) ..........................................................................2, 3

8 U.S.C. §§ 1254a(b)(1)(A), (C) ..............................................................2

8 U.S.C. § 1254a(b)(2)(A) ......................................................................10

8 U.S.C. § 1254a(b)(3)(A) ......................................................2, 6, 7, 9, 11

8 U.S.C. § 1254a(b)(3)(B) ..............................................................3, 7, 13

8 U.S.C. § 1254a(b)(3)(C) ........................................................................6

8 U.S.C. § 1254a(b)(5)(A) ........................................................................6

8 U.S.C. § 1254a(d)(3) ..............................................................................3

8 U.S.C. § 1254a(f)(2) ............................................................................20

## Other Authorities

101 Cong. Rec. H25811 (daily ed. Oct. 25, 1989) ....................................2

76 Fed. Reg. 63,629, 63,630–31, 63,635 (Oct. 13, 2011) ........................4

78 Fed. Reg. 1,866 (Jan. 9, 2013) ............................................................4

85 Fed. Reg. 69,344, 69,346–47 (Nov. 2, 2020) ......................................4

87 Fed. Reg. 12,190 (Mar. 3, 2022) ..........................................................4

88 Fed. Reg. 60,971, 60,974–79, 60,975 (Sep. 6, 2023) ......................4, 12

90 Fed. Reg. 19,217, 19,222 (May 6, 2025) ..............................................5

90 Fed. Reg. 20,309, 20,311 (May 13, 2025) ..........................................13

90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025) ..............................................13

90 Fed. Reg. 45,398, 45,401 (Sept. 22, 2025) ........................................13

90 Fed. Reg. 50,484 & n.13–15, 50,485 (Nov. 6, 2025) ......................................................5, 11–13

H.R. Rep. No. 100–627 (1988) ......................................................................................................2

## INTRODUCTION

South Sudan is currently suffering from a number of compounding humanitarian crises: ongoing armed conflict (verging on another civil war), severe flooding, a cholera outbreak, mass population displacement, and acute food insecurity, just to name a few. In the midst of this ongoing crises, Defendants seek to imminently terminate Temporary Protected Status ("TPS") for at least 232 South Sudanese recipients and 73 applicants who have lived in the U.S. for years as members of the community. Absent prompt intervention by this Court, these individuals face immediate removal pursuant to a fatally defective periodic review process that violates established law. Making matters worse, Defendants have eliminated Plaintiffs' ability to pursue any other immigration relief ahead of the January 5, 2026, termination date by instituting blanket pauses on all processing from South Sudanese applicants.

Plaintiffs—four South Sudanese TPS holders and the interest organization African Communities Together ("ACT")—seek emergency postponement of the South Sudan TPS termination decision under Section 705 of the Administrative Procedure Act ("APA"). For the reasons set forth herein, Plaintiffs are likely to succeed in demonstrating that the periodic review underlying Defendants' termination decision violated the APA, including in reference to the equal protection guarantees of the Fifth Amendment. Moreover, emergency relief is warranted here given the severe and irreparable harm that Plaintiffs face if termination were to take effect so soon, including: (1) immediate loss of immigration status and related access to federal and state benefits; (2) deportation proceedings and related confinement within the U.S.; (3) forced removal to South Sudan or other countries where their lives and safety are at risk; (4) forced separation from community members and family in the U.S.; and (5) considerable emotional terror.

1

The TPS designation for South Sudan is currently set to expire **at 12 a.m. on January 6, 2026**. Plaintiffs respectfully ask this Court to preserve the status quo by postponing termination, at least for the minimum duration needed for the Parties to submit further briefing and, if needed, for the Court to hold a hearing.[1]

## BACKGROUND

A.    **Statutory Framework and Related Agency Practices for TPS Periodic Reviews.**

Congress created the TPS program in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil" and to replace the prior practice of ad hoc presidential action and to insulate related agency decision-making from domestic political whims.[2] While a country is designated for TPS, beneficiaries receive employment authorization and protection from immigration removal and related confinement within the U.S. 8 U.S.C. §§ 1254a(a)(1), (d)(4).

The statute allows the Secretary of Homeland Security, *see* 6 U.S.C. § 557, to designate a country for TPS if any of three conditions applies, two of which are clearly applicable here: (1) ongoing armed conflict that poses a serious threat to the safety of returning nationals and (2) extraordinary and temporary conditions preventing the safe return of nationals. *See id.* § 1254a(b)(1)(A), (C). Congress strictly limited the Secretary's discretion during the periodic review process. *Id.* § 1254a(b)(3)(A). The Secretary must "consul[t] with appropriate agencies of

---

[1] Exhibit supporting this memorandum of law are attached to the accompanying Declaration of Golnaz Fakhimi. For any citations herein to an exhibit that includes a parenthetical with a shorthand identification of the material the exhibit encompasses, that shorthand is introduced in the Fakhimi Declaration. The Fakhimi Declaration reflects counsel's attempts to confer with attorneys from the U.S. Attorney's Office for the District of Massachusetts, to which no response was received ahead of the filing of the underlying motion and this accompanying memorandum of law.

[2] *See* H.R. Rep. No. 100–627, at 4 (1988); 101 Cong. Rec. H25811, 25837–38 (daily ed. Oct. 25, 1989) (statement of Reps. Sander Levine and Bill Richardson) (debating the immediate precursor to the TPS statute).

the Government," "review the conditions in the foreign state," and determine whether conditions for TPS designation "continue to be met." *Id.* The "appropriate agencies" include U.S. Citizenship and Immigration Services ("USCIS") and the U.S. Department of State. *See* Ex. 6 at 15–16 (GAO Report) (describing agency practices for periodic reviews).[3] Customarily, USCIS has managed and coordinated the TPS periodic review process for the Secretary by soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country conditions report and recommendation from the State Department. *See* Ex. 6 at 15–21. *see also, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019). After considering the materials it receives, USCIS has customarily prepared for the Secretary a detailed recommendation called a "Director Memo." *See, e.g.*, *Saget*, 375 F. Supp. 3d at 299–300.

Only after consulting appropriate agencies and reviewing available and objective evidence of country conditions may the Secretary "terminate the [TPS] designation by publishing notice in the Federal Register" if (and only if) she "determine[s]" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B). Termination is ordinarily effective 60 days after the notice is published, but the Secretary can postpone the effective date "to provide for an orderly transition." *Id.* § 1254a(d)(3). For the twelve most recent TPS terminations that preceded the Trump Administration's second term in office, spanning two decades, the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period. *See* Ex. 7 (Transition-periods Chart); Ex. 15 at ¶ 12 (Reichlin-Melnick Decl.). Only four TPS terminations occurred without any such transition period, and each of those

---

[3] *See also* *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).

terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less. *Id.*

## B.    South Sudan's Initial TPS Designation and Ensuing Periodic Reviews.

The DHS Secretary first designated South Sudan for TPS in November 2011.[4] The notice identified several conditions warranting TPS designation, including: escalating intercommunal armed conflict, targeted attacks on civilians, mass displacement related to the armed conflict, mass food insecurity, and lack of access to drinking water. *Id.*

Since the initial designation, DHS Secretaries for Presidents of both parties extended and/or redesignated South Sudan for TPS nine times, each time citing evidence of ongoing armed conflict, human rights abuses, and humanitarian catastrophe preventing the safe return of South Sudanese nationals from the diaspora.[5] Extensions and/or redesignations resulted from the first two periodic reviews post-dating the official end of South Sudan's civil war: the first in 2020[6] and the second in 2023, extending and redesignating TPS for South Sudan through 2025.[7] The Secretaries tied both decisions to evidence of (1) ongoing armed conflict short of full-blown civil war and (2) of other extraordinary and temporary circumstances making return unsafe.[8]

---

[4] *See* Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629, 63,630-31(Oct. 13, 2011).

[5] *See generally, e.g.*, Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629, 63,635 (Oct. 13, 2011) (initial designation, during the civil war); Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866 (Jan. 9, 2013); Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344 (Nov. 2, 2020) (after formal end of civil war); Extension and Redesignation of South Sudan for Temporary Protected Status, 87 Fed. Reg. 12,190 (Mar. 3, 2022) (same); Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971 (Sep. 6, 2023) (same).

[6] Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344, 69,346–47 (Nov. 2, 2020).

[7] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971, 60,974–79 (Sept. 6, 2023).

[8] *See* nn. 5–7, *supra.*

###### C.    Termination of South Sudan's TPS Designation.

In May 2025, Defendant Noem announced that South Sudan's TPS designation had automatically extended for an additional six months due to insufficient information regarding current country conditions and the "national interest" a determination.[9] On November 6, 2025, however, Defendants issued a notice in the Federal Register terminating South Sudan's TPS designation on January 5, 2026 (the "Termination"), and providing recipients and applicants only 60 days to try to plan for their futures.[10]

## STANDARD OF REVIEW

In considering a motion to postpone the effective date of agency action under Section 705 of the APA, courts apply the same four-factor test governing the adjudication of preliminary injunctions and temporary restraining orders. *Rhode Island Coal. Against Dom. Violence v. Bondi*, 794 F. Supp. 3d 58, 65 (D.R.I. 2025). Plaintiffs are therefore entitled to relief if they show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to them if denied the postponement; and that (3) the balance of the hardships and (4) the public interest favor Plaintiffs. *Id*. at 66; *see also Doe v. Trump*, 766 F. Supp. 3d 266, 277–78 (D. Mass. 2025). The Court's power to stay agency action under Section 705 is distinct from its injunctive power under the Judiciary Act of 1789 and operates directly "on the legal source of authority for an agency to act at all" rather than "simply insulat[ing] certain parties from enforcement measures." *Make the Road New York v. Noem*, 1:25-cv-00190-JMC, 2025 WL 3563313, *35 (D.C. Cir., Nov. 22, 2025), at *75–7.

---

[9] Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,222 (May 6, 2025).
[10] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025).

## ARGUMENT

This Court should grant emergency postponement of the Termination. Plaintiffs' APA claims challenging the review process underlying the Termination are likely to succeed on their merits; plaintiffs will face severe and irreparable harm, including deadly harm, if the postponement is not granted; and the balance of the equities and the public interest favor them.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    This Court Has Jurisdiction Over Plaintiffs' APA Claims.

The Court has jurisdiction to review the periodic review process underlying the Termination as a final agency action. *See* 5 U.S.C. § 704. The TPS statute contains a narrow jurisdiction-stripping provision that precludes "judicial review of any *determination* of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The operative word in that provision is "determination," which the Supreme Court has interpreted to mean "*a single act* rather than a group of decisions or a practice or procedure employed in making decisions." *McNary v. Haitian Refugee Cent., Inc.,* 498 U.S. 479, 492 (1991) (emphases added). The "determination" in the TPS statute is "whether conditions" in a given country meet or "continue to" meet the "conditions for such designation." 8 U.S.C. § 1254a(b)(3)(A); *see also id.* § 1254a(b)(3)(C).  Here, Plaintiffs are not challenging the "determination" itself, but rather the defective periodic review process that led to the determination.

Every court to consider the scope of Section 1254a(b)(5)(A) has found that it does not bar judicial review of the underlying periodic review process. *See e.g, Doe v. Noem*, No. 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025); *id*. Dkt. 21 at 11–12 (consolidating cases.); *see also Saget*, 375 F. Supp. 3d at 330–33. The point of such challenges is not to dispute the wisdom of termination as an outcome but rather to simply hold the Defendants to their statutory and Constitutional

obligations within the periodic review process.

**B.    Defendants' Periodic Review Violated the APA.**

The APA authorizes courts to set aside and hold unlawful agency actions, findings, or conclusions that are contrary to law. *See* 5 U.S.C. § 706(2)(a). Defendants' actions during the periodic review of South Sudan's TPS designation were contrary to law in several ways.

**1.    Defendants Made a Preordained Decision to Terminate TPS for South Sudan as Part of an Overarching, Politically Motivated Initiative to Systematically Restrict Access to TPS.**

By law, the Secretary's decision to extend or terminate TPS designations must be made *after*, and based on, "consultation with appropriate agencies" and a "review [of] the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). Congress's directive that the Secretary "shall review the conditions in the foreign state," *id.*, "evinces Congressional intent that the Secretary undertake a periodic review grounded in fact—*i.e.,* based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith." *Saget,* 375 F. Supp. 3d at 346. Finally, the TPS statute requires the Secretary to publish "the true and factual basis for termination" in the Federal Register. *Id.* at 346–47; *see also* 8 U.S.C. § 1254a(b)(3)(B), 5 U.S.C. § 706(D–F). When periodic review procedures violate these statutory mandates, they are "not in accordance with the law." *Saget,* 375 F. Supp. 3d at 345–46.

Defendants' statements and actions make clear that the decision to terminate TPS for South Sudan was a predetermined action to serve the politically motivated objective of gutting access to TPS and resulted from a woefully deficient periodic review process. *See generally* Compl. ¶¶ 114–20 (detailing statements and actions of Administration officials expressing or reflecting their intent to systematically take away TPS and insinuating it to be or describing it as "illegal"); *see, also, e.g.*, Exs. 9–12, 25–26, 52–75 (same). Indeed, President Trump campaigned on a

message that if elected, he would end humanitarian immigration programs across the board, including by "revok[ing] TPS." Ex. 58. At her confirmation hearing, Defendant Noem asserted that TPS "had been abused and manipulated" and that extensions "will no longer be allowed." Ex. 9 at 27.

Once in office, Defendant Noem followed through on her promises of gutting access to TPS by terminating designations for eleven countries in as many months: South Sudan, Ethiopia, Cameroon, Haiti, Syria, Afghanistan, Nepal, Burma, Nicaragua, Honduras, and Venezuela. Defendant Noem approached the periodic reviews from an overarching, political motive to shrink "the *TPS system*." Ex. 11 (emphasis added). And she celebrated her TPS terminations as a strategy to put an end to an "immigration *scheme*[]" she disfavors. *Id.* (emphasis added). In order to accomplish the goal of systematically shrinking access to TPS, DHS issued new guidance specifying that periodic reviews of TPS designations should "[f]ocus on conditions described in the original designation," *NTPSA II*, Dkt. 176-2 at 1693; *see generally* Exs. 16–26—while disregarding subsequent conditions relevant to the grounds for the designation, in an unexplained return to a rule found unlawful during the prior Trump Administration.[11] *See generally* Compl. ¶¶ 121–39.

Hewing to the suspect new guidance, Defendants have wildly distorted the periodic review process to cherry pick supposedly "positive improvements" in country conditions—*see, e.g.,* Ex. 20 at 2 (reflecting explicit goal of terminating South Sudan's TPS designation to be justified based

---

[11] *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

on "improvements" in conditions)[12]—while disregarding entire categories of negative country conditions that do not suit their goal of terminating TPS. This has resulted in country conditions assessments that ignore and directly contradict the U.S. State Department's "Do Not Travel" advisories to the public. *Compare, e.g.*, *id.* (skewed deliberations reflecting goal of terminating South Sudan's designation); 90 Fed. Reg. 50484 *with* Exs. 30–43 (detailing available and objective evidence of unsafe conditions in South Sudan but not considered during its periodic review). In the rush to undermine access to TPS, USCIS has recommended terminations *before* receiving any country-conditions materials to review. *NTPSA I,* 2025 WL 2578045 at *7 (concerning periodic review for Venezuela's TPS designation); Ex. 16 & Ex. 17 (reflecting that USCIS Decision Memo recommending termination for Nicaragua written before reviewing country conditions); Ex. 18 (same, as to Honduras). All of these procedural irregularities in the period review process smack of preordained and politically driven decision-making that violates the requirements of the TPS statute. Plaintiffs are therefore likely to succeed on the merits of their claims that they were contrary to law under the APA.

### 2. Defendants Did Not Consult with Appropriate Agencies.

As part of her periodic review of South Sudan's TPS designation, Defendant Noem was required to consult appropriate agencies. *See* 8 U.S.C. § 1254a(b)(3)(A); *see also* Ex. 6 (GAO

---

[12] *Id.* ("The DMs [Director Memos] **should include additional information that would support different decision outcomes**. For example, are there improvements that have been made in the country? What about information about fraud/abuse of the program? . . . There are some stats pending, but [it is not clear] where that will be added.") (emphases added).

Report) at 18–23 (detailing usual agency consultation process). For this and every other periodic review she has done, however, Defendant Noem failed to do so.

Courts have repeatedly found that Defendant Noem has failed to properly consult with other agencies in making TPS determinations. *See NTPSA I,* 2025 WL 2578045 at *7, *30 (Venezuela); Exs. 16 & 17 (Nicaragua). Indeed, the record reflects that USCIS—the subcomponent of DHS that heads and coordinates the periodic review process—has been recommending terminations *before* receiving any country-conditions materials to review. *NTPSA I*, 2025 WL2578045 at *7 (Venezuela); Exs. 16 & 17 (Nicaragua); Ex. 18 (Honduras).

For South Sudan, Defendant Noem's Termination notice did not specify any agency she consulted with or whether she followed even the customary practice of soliciting a country conditions report from USCIS. Indeed, as revealed in discovery during other litigation this year, DHS stopped receiving country conditions information from the State Department in the course of the TPS periodic review process in or around March 2025. *See generally* Exs. 16–25. The failure to properly consult appropriate agencies, including the State Department and USCIS, violates the TPS statute, is contrary to law under the APA, and warrants emergency postponement of Defendants' imminent Termination.

### 3. Defendants Did Not Consider Available and Objective Evidence of Ongoing Armed Conflict.

Defendant Noem's failure during her periodic review to consider available and objective evidence of ongoing armed conflict in South Sudan violated 8 U.S.C. § 1254a(b)(2)(A) and was therefore contrary to law, *see* 5 U.S.C. § 706(2)(A). Her Termination reflects that her periodic review of South Sudan's armed-conflict basis for TPS found that "there is inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization" but glossed over this solely because "return to full-scale civil war, to date has

10

been avoided." [13] The Termination fails to explain Defendant Noem's departure from the Department's explicit prior findings that armed conflict short of "full-scale civil war" is relevant to periodic review of an armed-conflict-based designation when there are related and gross human rights abuses, including violence against civilians, gender-based violence, grave violations against children, and mass displacements. [14] The Termination did not address these factors. [15] But objective, available evidence shows that these conditions still persist in South Sudan. *See, e.g.*, Exs. 30–37; *see also* Compl. ¶¶ 77–83.

In light of the foregoing, the U.S. State Department continues to maintain a Level 4 "Do Not Travel" advisory for South Sudan due to "crime, kidnapping, and *armed conflict*" and has stated that "*[a]rmed conflict* is ongoing and includes fighting between various political and ethnic groups. Weapons are readily available to the population." *See* Ex. 37 (Nov. 13, 2025, Dep't of State Advisory) (emphases added).

Defendant Noem's failure during her periodic review to consider or address the State Department's advisory or myriad other relevant evidence of ongoing armed conflict violated the TPS statute, 8 U.S.C. § 1254a(b)(3)(A), and was therefore contrary to law, *see* 5 U.S.C. § 706(A). Instead of examining objective evidence in consultation with relevant agencies, Defendant Noem's periodic review relied on the South Sudanese government's resumed acceptance of deportees from the U.S. to infer "South Sudan's willingness to ensure the safety and reintegration of its returning nationals." [16] But that inference is flatly contradicted by objective evidence of how the current South Sudanese government is a substantial source of grave harm to its nationals—*see, e.g.*, Exs.

---

[13] 90 Fed. Reg. 50,485.
[14] *Compare* 90 Fed. Reg. 50,485, *with* 88 Fed. Reg. 60,974; _____.
[15] 90 Fed. Reg. 50,484, 50,485.
[16] 90 Fed. Reg. at 50,485.

30–37—which the Termination did not address.[17] The inference also departs from the prior DHS Secretary's consideration in 2023 of South Sudanese governmental violence against its nationals as relevant to the periodic review of the armed-conflict basis for South Sudan's TPS designation.[18] The Termination does not explain why Defendant Noem departed from her agency's prior consideration of that factor.[19] All of these procedural infirmities render the periodic review violative of the TPS statute and contrary to law under the APA and require immediate postponement of the Termination.

### 4. Defendants Did Not Consider Available and Objective Evidence of Other Extraordinary Circumstances.

Defendant Noem's Termination reflects that her periodic review of South Sudan's TPS designation onan extraordinary-circumstances basis considered only evidence of two infrastructure grants from the World Bank; a $9 million grant for an internet project still in the development phase; a refugee-flow statistic from nearly four years ago; and the presence of a United Nations Mission that has existed since 2011.[20] The Termination does not explain why or how any of these developments has obviated the need to consider the factors that the prior periodic review considered—encompassing acute food insecurity; environmental and health concerns, including widespread flooding and disease outbreaks; and barriers to humanitarian access.[21] Available and objective evidence demonstrates these factors still apply. *See, e.g.*, Exs. 38–43; *see also* Compl. ¶¶ 91–95. All of these procedural infirmities within the periodic review of South

---

[17] 90 Fed. Reg. 50,484, 50,485.
[18] 88 Fed. Reg. 60,971, 60,974.
[19] 90 Fed. Reg. 50,484, 50,485.
[20] 90 Fed. Reg. 50,484, n. 13, 14, 15 (Nov. 6, 2025).
[21] *Compare* 90 Fed. Reg. 50,484, 50,485, *with* 88 Fed. Reg. 60,971, 60,975.

Sudan's designation violated the TPS statute, are contrary to law under the APA, and require immediate postponement of the Termination.

### 5.  Defendants Impermissibly Considered "National Interests."

The TPS statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation. 8 U.S.C. § 1254a(b)(3)(B). Nevertheless, Defendant Noem's Termination reflects that her periodic review of South Sudan's TPS designation found that the continued temporary presence of South Sudanese TPS beneficiaries in the United States is contrary to the "national interest," citing various purported examples.[22] One such example asserts that "a portion of the South Sudan Temporary Protected Status population has been subjects of administrative investigation for fraud, public safety and national security concerns."[23] It is impossible to know to what Defendant Noem is referring.  There is no citation; none of these individuals nor their alleged conduct is identified; nor are the circumstances of the claimed "administrative investigation" discernible. In fact, this allegation appears to be boilerplate language lifted directly from the termination notices for Syria, Afghanistan, and Haiti.[24] Because this reason for the Termination contravenes the TPS statute, it was contrary to law under the APA and warrants immediate postponement of the Termination.

### C.  Defendants' Periodic Review Was Arbitrary and Capricious Because It Departed from Past Agency Practices.

The Termination was published a mere 60 days prior to its effective date,[25] the minimum required under the statute, and a significant departure from established policy and practice of a

---

[22] 90 Fed. Reg. 50,484.
[23] *Id*.
[24] *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398, 45,401 (Sept. 22, 20250; Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025).
[25] 90 Fed. Reg. 50,484, 50,485

more orderly transition period of 6 month or longer. Ex. 7 (Transition-periods Chart); Ex. 15 at 12 (Reichlin-Melnick Decl.). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office—terminations that span two decades —the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period. *See* Ex. 7 (Transition-periods Chart); Ex. 15 at ¶ 12 (Reichlin-Melnick Decl.). Defendant Noem's unexplained departure from that practice here is arbitrary and capricious under the APA and warrants immediate postponement of the Termination.

Until 2025, no prior periodic review relied on U.S. domestic interests in considering termination of a TPS designation. Ex. 15 at ¶¶ 5, 8–11 (Reichlin-Melnick Decl.). The reliance of Defendant Noem on the putative "national interest" within her Termination notice for South Sudan's TPS constitutes a departure from past agency practice that is arbitrary and capricious under the APA and that warrants immediate postponement of the Termination.

### D.    Defendants' Periodic Review Was Contrary to Constitutional Right.

Under 5 U.S.C § 706(2)(B), agency action is contrary to constitutional rights when it violates the Constitution. Defendants' actions here violate the Fifth Amendment's Due Process Clause, which "contains an equal protection component" that prohibits federal government officials from discriminating on the basis of certain immutable characteristics, including race and national origin. *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).[5] Defendants' periodic review of South Sudan's TPS designation Termination violates Plaintiffs' equal protection rights because it was motivated by discriminatory animus and resulted in disparate impact upon noncitizens who are non-white and non-European.

Courts apply strict scrutiny to cases where a plaintiff establishes that a discriminatory purpose motivated a facially neutral government action. *Bos. Parent Coal. for Acad. Excellence Corp. v.*

*Sch. Comm. of City of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021) (citing *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 82–3 (1st Cir. 2004)).

The limited exception for deferential review adopted in *Trump v. Hawaii,* 585 U.S. 667 (2018), applies only to restrictions on entry *into* the United States and does not apply to challenges to periodic review of TPS designations by individuals already in the country. *See Saget,* 375 F. Supp. 3d at 367; *NTPSA I,* 2025 WL 2578045, at *35; *NTPSA II,* 2025 WL 2233985 at 14-15.

To establish an equal protection claim, plaintiffs must allege that "a discriminatory purpose [was] a motivating factor" in the challenged government action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Discriminatory purpose can be demonstrated by "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Evidence of discriminatory intent can include the sequence of events leading to a decision, departures from normal procedures or substantive conclusions, the background of a decision, and disparate impact. *Id*. at 266–67.

"Plaintiffs can establish a discriminatory purpose in one of two ways; (1) that a 'clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action[,]' or (2), 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021) (citing *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)) (internal quotations omitted). "Factors bearing on discriminatory intent may include 'the degree of disproportionate racial effect, if any, of the policy; the justification, or lack thereof, for any disproportionate racial effect that may exist; and the legislative or administrative historical background of the decision." *Id.* At 45. *Bos. Parent Coal for Acad. Excellence Corp.*, 996 F.3d at 45 (citing *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 83 (1st Cir. 2004)). Defendants' use

of "charged code words" may serve as "evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016) (internal citation omitted) (cited in *Valentin v. Town of Natick*, 707 F. Supp. 3d 88, 99 (D. Mass. 2023)).

Plaintiffs have—even before discovery—marshalled compelling evidence of discriminatory intent. As more fully described in the Complaint, both Defendant Noem and President Trump have repeatedly used charged code words in describing policy goals that dehumanize non-white, non-European noncitizens and lay bare their animus. The animus of Defendant Noem, President Trump, and others in his Administration has been particularly acute in reference to majority Black and African nations. *See* Compl. at ¶¶ 161, 163, 165, 167–71. President Trump has referred to such nations as "shithole countries" and described immigrants from those places as sub-human. *See* Compl. at ¶¶ 150, 159–62; Exs. 44–93 (evidencing animus, including multiple posts from the President explicitly denigrating immigrants.).

Further, the "historical background of the decision" shows that it is the latest in "a series of official actions taken for invidious purposes." *Arlington Heights,* 429 U.S. at 267. The decision to terminate TPS for South Sudan is the ninth out of eleven, in as many months, and courts have already found that the preceding terminations were motivated by the same improper animus. *NTPSA I*, 773 F. Supp. 3d at 855-866; *NTPSA II*, 2025 WL 2233985 at *14-17; *see also NTPSA I*, 2025 WL 2578045 at *35-36 (denying government's motion for summary judgment on equal protection claims). Defendant's abrupt, unacknowledged, and unreasoned shifts in policy when issuing the determination, *see* Compl. ¶¶ 101, 102, 107, also evince discriminatory motive. *Centro Presente*, 332 F. Supp. 3d at 415 (plaintiffs plausibly alleged that TPS terminations violated equal protection where terminations rested on an "unreasoned shift in policy). The periodic review

resulting in the termination of TPS for South Sudan—like the others leading to the other terminations before it—sounds squarely in racial and/or national origin animus.

Finally, the disparate "impact of the official action," and "whether it bears more heavily on one race," is obvious in this case, where the impact of the challenged action is felt overwhelmingly by non-white Africans. *Arlington Heights,* 429 U.S. at 266 (internal quotation marks omitted). The overall impact of the broader policy of terminating TPS for all non-white, non-European countries "bears more heavily" on those specific races and/or national origins. *Id.* Simultaneously with its blanket terminations of TPS for non-white, non-European countries, the Administration has encouraged admissions of white Afrikaners from South Africa. Ex. 49; and it has posted a series of charged images on social-media depicting fair-skinned white adults and children as emblematic of "Americans" and the "American dream." *See* Exs. 76–81; Compl. at ¶ 158, Figures A–F; *see also* Exs. 49 & 50 (preferencing of white refugees from South Africa); *but cf.* Exs. 94–96; Compl. ¶¶ 13, 163, 180, 185, 190; n. 163 (describing institution and expansion of entry bans to nationals of non-European countries who are majority non-white). The impact could not be more disparate.

This historical and contemporaneous evidence of decision-makers' animus towards non-white, non-European immigrants is more than sufficient to show that Plaintiffs are likely to succeed on the merits of their equal-protection based APA claim, or at the very least that there are "serious questions" going to the merits.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT EMERGENCY POSTPONEMENT.

The "most critical" factors of likelihood of success on the merits and irreparable harm are considered in tandem. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Further, "[d]istrict courts have

broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 485.

The substantial and imminent irreparable harm that Plaintiffs face beyond January 5, 2026, could not be clearer. First, Plaintiffs have established a clear certainty of irreparable harm because they allege cognizable violations of their constitutional rights. The First Circuit has held that a violation of Equal Protection is of "such qualitative importance as to be irremediable by any subsequent relief." *Public Service Co. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987).

Second, irreparable harm exists because the challenged government action would strip lawfully present individuals of their lawful status and force them "to choose between two injurious options: continue following the law and leave the country... or await removal proceedings." *Doe v. Noem*, 784 F. Supp. 3d 437, 465 (D. Mass. 2025). Unless the effective date of the Termination is postponed, Plaintiffs will imminently face arrest, detention, and deportation to South Sudan or to other countries where their lives could face harm, including deadly harm. Exs. 1–5; *cf.* Exs. 30–43 (evidence of unsafe conditions in South Sudan spanning ongoing armed conflict and other extraordinary circumstances).

Third, irreparable harm exists where the challenged action "may prevent" Plaintiffs from regaining their prior lawful status should the underlying legal challenge be resolved in their favor. A temporary gap in TPS status will render Plaintiffs who lack other immigration status "unlawfully present" and therefore ineligible for certain future immigration relief even if they prevail on the underlying claim. *Doe v. Noem*, 784 F.Supp. 3d at 465–66. All of this is compounded by the lack of any access to any other immigration benefit that Plaintiffs and others have.  This is because of the very short, 60-day wind-down period for the Termination, together with the blanket pauses on all asylum processing in the U.S. and on the processing of applications for other immigration

benefits from applicants in the U.S. who are nationals of South Sudan. Thus, Plaintiffs will not be able to obtain lawful status on alternative grounds that are available to them.  See Exs. 94 – 96.

Fourth, irreparable harm exists because the challenged action would cause Plaintiffs and their family members to "experience the fear, anxiety, and economic risk that results when a family member lacks lawful status in the United States." *Doe v. Noem*, 784 F.Supp. 3d at 465.

Fifth, the termination of TPS will immediately trigger the loss of Plaintiffs' lawful status to reside in the United States, and with it, their permission to work and their livelihoods. *See Nat'l Educ. Ass'n-New Hampshire v. NH Att'y Gen.*, No. 25-CV-293-LM, 2025 WL 2807652, at *24 (D.N.H. Oct. 2, 2025)("[l]oss of the ability to practice one's chosen profession is irreparable harm.") (citing *Enyart v. Nat'l Conf. Of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011). Plaintiffs will lose jobs and careers into which they have invested years. In many states, TPS holders will lose their drivers' licenses—losing both their mobility and their only state-issued identification. *See* Ex. 1-5. All of these injuries are severe and irreparable and weigh heavily in favor of postponement.

## III.    THE BALANCE OF THE HARDSHIPS AND THE EQUITIES FAVOR PLAINTIFFS.

The final considerations—the balance of hardships and public interest—merge when the government is a party. *Nken v. Holder,* 556 U.S. 418, 435 (2009). These considerations weigh heavily in favor of Plaintiffs.

"There is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *New York v. McMahon*, 784 F. Supp. 3d 311, 372 (D. Mass. 2025) (quotation omitted); *see also Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005) ("[T]he public has an important interest in making sure government agencies follow the law").

There is also a strong public interest in allowing Plaintiffs to retain TPS pending a final resolution of this case on the merits. The First Circuit has cautioned that in the immigration context "[u]nnecessary detention imposes substantial societal costs[,]" including "separate[ing] families and remov[ing] from the community breadwinners, caregivers, parents, sibling and employees." *Sampiao v. Hyde*, No. 1:25-CV-11981-JEK, 2025 WL 2607924 (D. Mass. Sept. 9, 2025) at *12. Plaintiffs face separation from their United States family and loved ones. If forcibly removed to South Sudan or other third countries where they face harm, TPS holders will likely experience worse health outcomes, malnutrition, poverty, threats to their life, and poor educational attainment, all of which are compounded by ongoing armed conflict and a myriad of sequelae.

Additionally, postponement of the termination is in the public interest. The Secretary's unlawful termination of South Sudan's TPS designation will impose significant economic costson the communities in the United States where South Sudan TPS holders currently live. TPS holders are employed at high rates, Ex. 14, and are ineligible for public assistance. *See* 8 U.S.C. § 1254a(f)(2). The termination would also inflict non-economic harm on those communities, given that "immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult." *NTPSA I*, 773 F. Supp. 3d at 841.

For all these reasons, the balance of hardships and the public interest strongly favors postponement of the termination of TPS for South Sudan.

## CONCLUSION

For all the foregoing reasons this Court should grant Plaintiffs' motion and immediately postpone the Termination of TPS for South Sudan, ahead of its January 5, 2026, termination date and its effective date of 12 a.m., January 6, 2026.

Dated: December 23, 2025                    Respectfully Submitted,

_/s/ Nargis Aslami_
Nargis Aslami
Golnaz Fakhimi (*pro hac vice* forthcoming)
Collin Poirot (*pro hac vice* forthcoming)
Abbey Rutherford (*pro hac vice* forthcoming)
**MUSLIM ADVOCATES**
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Golnaz@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

_/s/ Erick Crew_
Erik Crew (*pro hac vice* forthcoming)
**HAITIAN BRIDGE ALLIANCE**
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

_/s/ Mark H. Lynch_
Mark H. Lynch (*pro hac vice* forthcoming)
Stephen Petkis (*pro hac vice* forthcoming)
Paul Killebrew (*pro hac vice* forthcoming)
Ayana M. Lindsey (*pro hac vice* forthcoming)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
MLynch@cov.com
SPetkis@cov.com
PKillebrew@cov.com
ALindsey@cov.com

Sarah Leadem (*pro hac vice* forthcoming)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
SLeadem@cov.com

21

Michael E. Cunniff (*pro hac vice* forthcoming)
**COVINGTON & BURLING LLP**
30 Hudson Yards
New York, NY 10001
(212) 841-1000
MCunniff@cov.com

*Counsel for Plaintiffs African Communities Together, Mary Doe, David Doe, Peter Doe, Jacob Doe, and the Proposed Class*