# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | Civil Action No. 1:25-cv-13939-PBS<br><br>**Leave to File Excess Pages Granted on January 12, 2026** |

## PLAINTIFFS' CORRECTED REPLY IN FURTHER SUPPORT OF MOTION TO POSTPONE

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR APA CLAIMS. ......................................................................................................... 2

    A.    8 U.S.C. § 1254a Does Not Preclude This Court's Review. .................................. 3

    B.    Defendants Failed to Conduct the Periodic Review for South Sudan's TPS Designation in Accordance with the TPS Statute. .................................................. 7

        1.    Defendants' Decision to Terminate TPS Was Preordained and Improperly Influenced by Political Motivations to Systematically Restrict Access to TPS, Rendering it Contrary to Law. .............................. 7

        2.    Defendants Did Not Adhere to the TPS Statute's Requirements of Inter-Agency Consultation and Objective Review of Country Conditions. ................................................................................................ 9

        3.    Defendants' Reliance on National Interest Was Unlawful. ....................... 11

        4.    Defendants' Termination Was Contrary to Constitutional Right ............. 12

        5.    Defendants' Periodic Review Was Arbitrary and Capricious Because It Departed from Past Agency Practices. .................................... 20

II.    PLAINTIFFS HAVE SHOWN IRREPARABLE HARM AND THE BALANCE OF EQUITIES AND PUBLIC INTEREST ARE IN THEIR FAVOR. ........................... 21

III.   THIS COURT CAN GRANT THE REQUESTED RELIEF UNDER 5 U.S.C § 705 ............................................................................................................................. 24

    A.    Section 1254a Is Not Within the Ambit of Enumerated Provisions for Which 1252(f)(1) Restricts Non-Individual Injunctive Relief. ............................. 24

    B.    Postponement of Agency Action is Not Injunctive Relief Subject to the Limitations of 1252(f)(1). ...................................................................................... 25

    C.    The Appropriate Relief is Blanket Postponement Under 5 U.S.C. § 705. ............ 26

CONCLUSION ..................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
    786 F. Supp. 3d 237 (D. Mass. 2025) ....................................................................................10

*Arlington Heights. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...........................................................................................12, 14, 17

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
    996 F.3d 37 (1st Cir. 2021) ............................................................................................14

*CASA de Maryland, Inc. v. Trump*,
    355 F. Supp. 3d 307 (D. Md. 2018) ................................................................................13

*CASA, Inc. v. Noem*,
    792 F. Supp. 3d 576 (D. Md. 2025) ...................................................................24, 25, 26

*CASA, Inc. v. Noem*,
    No. 25-1484-TDC, 2025 WL 3514378 (D. Md. Dec. 8, 2025) ........................................12, 27

*Centro Presente v. DHS*,
    332 F. Supp. 3d 393 (D. Mass. 2018) ........................................................................4, 13, 17

*City of Rialto v. W. Coast Loading Corp.*,
    581 F.3d 865 (9th Cir. 2009) ...........................................................................................3

*Dep't of Comm. v. New York*,
    588 U.S. 752 (2019) .....................................................................................................7, 10

*DHS v. Regents of Univ. Of Calif.*,
    591 U.S. 1 (2020) ............................................................................................................13

*Espinoza v. Farah Mfg. Co., Inc.*,
    414 U.S. 86 (1973) ..........................................................................................................13

*FDA v. Wages & White Lion Invs., L.L.C.*,
    604 U.S. 542 (2025) ........................................................................................................20

*Fed. Educ. Ass'n v. Trump*,
    795 F. Supp. 3d 74 (D.D.C. 2025) ....................................................................................9

*Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
    554 U.S. 33 (2008) ..........................................................................................................25

*Gebhardt v. Nielsen*,
879 F.3d 980 (9th Cir. 2018) ............................................................5

*Haitian Evangelical Clergy Ass'n v. Trump*,
789 F.Supp.3d 255 (E.D.N.Y. 2025) ...............................................23, 26

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ..........................................................26

*Heckler v. Ringer*,
466 U.S. 602 (1984).........................................................................3

*Immigrant Assistance Project of AFL-CIO v. I.N.S.*,
306 F.3d 842 (9th Cir. 2002) ............................................................4

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .............................................................23

*Leiva–Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ...........................................................21

*Make the Rd. N.Y., v. Noem*,
No. 25-5320, slip op. (D.C. Cir. Nov. 22, 2025) ...................................26

*McNary v. Haitian Refugee Cent., Inc.*,
498 U.S. 479 (1991)......................................................................3, 4

*Merrill v. Milligan*,
142 S. Ct. 879 (2022)......................................................................5

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016)............................................................16

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ..........................................................................7

*MRNY v. Noem*,
No. 25-5320, slip. op. (D.C. Cir. Nov. 22, 2025) ............................26, 27

*Mulero-Carrillo v. Román-Hernández*,
790 F.3d 99 (1st Cir. 2015).............................................................18

*NAACP v. U.S. Dep't of Homeland Sec.*,
364 F. Supp. 3d 568 (D. Md. 2019)...................................................13

*Nat'l Archives & Recs. Admin. v. Favish*,
541 U.S. 157 (2004)........................................................................9

*National TPS Alliance v. Noem,*
    773 F. Supp. 3d 807 (N.D. Cal. 2025) ..............................................................12, 14

*National TPS Alliance v. Noem,*
    798 F. Supp. 3d 1008 (N.D. Cal. 2025) ...................................................................12

*National TPS Alliance v. Noem,*
    798 F. Supp. 3d 1108 (N.D. Cal. 2025) ..............................................................12, 17

*National TPS Alliance v. Noem,*
    No. 25-cv-05687-TLT, 2025 WL 2233985 (N.D. C.A. July 31, 2025)..................17

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.,*
    407 F. Supp. 2d 323 (D. Mass. 2005) ......................................................................22

*New York v. McMahon,*
    784 F. Supp. 3d 311 (D. Mass. 2025) ......................................................................22

*Nken v. Holder,*
    556 U.S. 418 (2009)..................................................................................................22

*NTPSA v. Noem,*
    150 F.4th 1000 (4th Cir. 2025) ................................................................................26

*Patel v. Garland,*
    596 U.S. 328 (2022)....................................................................................................4

*Plyler v. Doe,*
    457 U.S. 202 (1982)..................................................................................................13

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.,*
    798 F. Supp. 3d 77 (D. Mass. 2025) ........................................................................10

*Proyecto San Pablo v. I.N.S.,*
    189 F.3d 1130 (9th Cir. 1999) ....................................................................................4

*Ramos v. Louisiana,*
    590 U.S. 83 (2020)......................................................................................................5

*Ramos v. Nielsen,*
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) .................................................................4, 16

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020) ....................................................................................16

*Reilly v. U.S.,*
    863 F.2d 149 (1st Cir. 1988)........................................................................................6

*Reno v. Catholic Soc. Servs., Inc.*,
  509 U.S. 43 (1993) ........................................................................................4

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................... *passim*

*Sampiao v. Hyde*,
  799 F. Supp. 3d 14 (D. Mass. 2025) .............................................................22

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) .......................................................................26

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ....................................................................................27

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ................................................................... *passim*

*U.S. Bank Nat. Ass'n v. Village at Lakeridge, LLC*,
  138 S. Ct. 960 (2018) ...................................................................................6

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ....................................................................................18

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ...................................................................26

*Valentin v. Town of Natick*,
  707 F. Supp. 3d 88 (D. Mass. 2023) ...........................................................16

*Williams v. Jones*,
  11 F.3d 247 (1st Cir. 1993) .........................................................................26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................21

*Wong v. United States*,
  373 F.3d 952 (9th Cir. 2004) .......................................................................13

**Statutes**

5 U.S.C. § 705 ..............................................................................1, 24, 26, 27

5 U.S.C. § 706(1) ..........................................................................................26

5 U.S.C. § 706(2)(a) ........................................................................................6

5 U.S.C § 706(2)(B) ......................................................................................12

8 U.S.C. § 1158(b)(2)(A) ..........................................................................................23

8 U.S.C. § 1182 ......................................................................................................23

8 U.S.C. §§ 1221–32 ..........................................................................................24, 25

8 U.S.C. § 1252(f)(1) ......................................................................................24, 25, 26

8 U.S.C. § 1254a ............................................................................................... *passim*

8 U.S.C. § 1254a(b)(3)(A) ..................................................................................7, 10, 11

8 U.S.C. § 1254a(b)(5) ..............................................................................................4

8 U.S.C. § 1254a(b)(5)(A) ......................................................................................3, 5

8 U.S.C. § 1254a(c)(1)(A) ........................................................................................23

8 U.S.C. § 1254a(c)(2)(B) ........................................................................................23

8 U.S.C. § 1254a(c)(3) ............................................................................................23

**Other Authorities**

29 C.F.R. § 1606.1 ..................................................................................................13

101 Cong. Rec. H25811 (daily ed. Oct. 25, 1989)................................................20, 23

90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025)...........................................................8, 24

Exec. Order No. 14159, § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ..................1

H.R. Rep. 100-627 (1988)....................................................................................12, 19

## INTRODUCTION

Doe Plaintiffs Mary, David, Peter, and Jacob are Black nationals of South Sudan who have been living in the United States for years and are beneficiaries of Temporary Protected Status ("TPS"). They and other members of Plaintiff African Communities Together ("ACT") will face irreparable harms, including the risk of deadly harms, unless this Court postpones, under Section 705 of the Administrative Procedure Act ("APA"), Defendants' termination of TPS for South Sudan, while adjudication of Plaintiffs' claims continues to unfold through this litigation. Plaintiffs' claims in this suit challenge the unlawful processes and influences that infected Defendants' periodic review of South Sudan's TPS designation—the ninth of eleven such tainted reviews that Defendants have undertaken so far of TPS designations of countries whose nationals are not majority white or European-descended, including three other countries so far whose nationals are majority Black, two of which (Cameroon and Ethiopia) are African. *See generally* Pls' Mem. of Law in Supp. of Emergency Mot. to Postpone January 6, 2026, Effective Date of Agency Action, Dkt. 7-1 ("Mem."). No less than the President has publicly mischaracterized TPS as "illegal"; smeared its beneficiaries as "invaders," Exec. Order No. 14159, § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025), who are "poisoning the blood of our country"; and, as recently as December 9, 2025, tripled down on his prior references to TPS designated nations as "shithole countries." Dkt. 08-26 at 5-12.

Plaintiffs' underlying legal claims are likely to succeed because they rely on: Congress's procedural mandates for periodic reviews of TPS designations, spanning the TPS statute and the APA; the combination of the APA with the Constitutional guarantee of equal protection to all people in the U.S.; reasoned judicial decisions addressing procedural challenges to agency decision-making in comparable cases; longstanding agency practices concerning periodic reviews of TPS designations; and a wealth of evidence of pre-ordained, pretextual, politically influenced,

and otherwise discriminatory practices and influences that have been corrupting Defendants' periodic reviews, including such evidence as to Defendants' periodic review of South Sudan's TPS designation, specifically. *See generally* Mem.; Dkt. 8-8 at 1-39 (smoking gun evidence).

By contrast, Defendants' opposition to postponement turns on unsubstantiated assertions, unreasoned or inapposite judicial decisions, legal arguments that Courts have routinely rejected, and cases that support Plaintiffs' positions. *See generally* Defs.' Opp. to Pls' Mot. to Postpone, Dkt. 43 ("Opp."). Accordingly, Plaintiffs respectfully urge this Court to order postponement of the termination of TPS for South Sudan—in order to prevent Defendants' disregard for Congressional and Constitutional mandates from endangering Plaintiffs, hundreds of other South Sudanese TPS holders and applicants, and their U.S. citizen dependents and immediate relatives.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR APA CLAIMS.

Defendants' opposition to postponement misconstrues or ignores a lot about Plaintiffs' APA claims. Defendants raise a jurisdictional strawman concerning the TPS statute that Courts, including within this District, have overwhelmingly rejected. Defendants ignore Plaintiffs' glaring evidence that predetermined, pretextual, and politically driven procedures and influences— effectively steamrolling the procedural mandates of the TPS statute and the APA—contaminated the periodic review of South Sudan's TPS designation: one in an ever-growing string of tainted reviews by Defendant Noem so far, who has been at the helm of the U.S. Department of Homeland Security ("DHS"), where she serves at the pleasure of the President. Defendants assert the wrong legal standard as governing Plaintiffs' claims of the contaminant of discriminatory animus across their periodic reviews, and they misconstrue or otherwise ignore relevant, record evidence of such animus. Moreover, Defendants entirely fail to address DHS's break from past practices. And they

2

otherwise raise remedial strawmen that Courts have routinely rejected. All in all, Defendants' opposition falls flat, and Plaintiffs' arguments and evidence warrant postponement.

### A.    8 U.S.C. § 1254a Does Not Preclude This Court's Review.

8 U.S.C. § 1254a contains a narrow provision that precludes only "judicial review of any *determination* … with respect to the designation, or termination or extension of a designation, of a foreign state." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). More specifically, this means the "determination" of "whether conditions" in the designated country "continue to" implicate the statutory ground(s) for the country's TPS designation. Mem. 6 (citing 8 U.S.C. §§ 1254a(b)(3)(A), 1254a(b)(3)(C)). Defendants insist this is what Plaintiffs here impermissibly seek to challenge. Opp. 10–12. Not so.

Supreme Court precedent establishes that a jurisdictional bar like the one in the TPS statute only encompasses legal challenges to the substantive outcome of agency decision-making, where the plaintiffs are seeking judicial relief that requires *a different outcome from the agency*. *See, e.g.*, *Heckler v. Ringer*, 466 U.S. 602 (1984) (denying review of claim of unlawful policy of given agency action, where operative statute otherwise channeled review of individual instances of such agency action through given procedures that had not yet been exhausted); *accord City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 876 (9th Cir. 2009) (cited at Opp. 11) (same); *see also* Opp. 9, 11 (citing six additional cases broadly fitting this profile). By contrast, such a bar does not extend to challenges to the *practices or processes* that an agency used within its deliberations, where all the plaintiffs are seeking is judicial relief that wipes the slate clean and requires agency deliberations to comply with procedures mandated by law. *See McNary v. Haitian Refugee Cent., Inc.*, 498 U.S. 479, 492 (1991) (assuming jurisdiction of procedural challenge to immigration statute notwithstanding statutory bar of review of specified "determinations," noting that a "determination" is "a single act rather than a group of decisions or a practice or procedure

employed in making decisions."); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 56–58 (1993) ("*CSS*") (applying *McNary* to find jurisdiction over challenges to agency practice governing given immigration applications); *Immigrant Assistance Project of AFL-CIO v. I.N.S.*, 306 F.3d 842, 862– 63 (9th Cir. 2002) ("*IAP*") (finding cognizable a challenge to rule interpreting immigration statute); *Proyecto San Pablo v. I.N.S.*, 189 F.3d 1130, 1138 (9th Cir. 1999) (finding cognizable a challenge to pre-adjudication practices of federal immigration agency); *see also* Mem. 6–7.

Here, Plaintiffs are not seeking a judicial order that would require Defendants to reach an outcome different from termination of TPS for South Sudan (such as redesignation or extension of the designation). All Plaintiffs are seeking is a clean slate and a periodic review of South Sudan's TPS designation that comports with legally required procedures. Every court faced with a challenge like Plaintiffs'—disputing the procedural propriety of the periodic review of a TPS designation—has applied *McNary* and related cases in concluding it had subject matter jurisdiction to review such a challenge. Mem. 6 (citing *Doe v. Noem*, No. 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025); *id*. Dkt. 21 at 11–12 (consolidating cases); *Saget v. Trump*, 375 F. Supp. 3d 280, 330–33 (E.D.N.Y. 2019)); *see also, e.g.*, *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 417 (D. Mass. 2018).

Defendants ignore *McNary* and instead rely on *Patel v. Garland*, 596 U.S. 328 (2022), arguing that the phrase "any determination" is indefinitely broad. Opp. 8. But the language at issue in *Patel* has no overlap with the language in § 1254a, and the decision rests on words not in the TPS statute ("judgment" and "regarding") and an entirely different statutory history and context. *See Patel*, 596 U.S. at 336–40. The phrase "any determination … with respect to," 8 U.S.C. § 1254a(b)(5), "does not subsume 'any' [challenge to] general policies or practices," *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1104 (N.D. Cal. 2018) (emphasis omitted). When Congress wants

to include categorical preclusion language in a statute, it does so expressly. *See Saget*, 375 F. Supp. 3d at 331 (noting statute could have used "broader statutory language" to bar collateral challenges); *see also Gebhardt v. Nielsen*, 879 F.3d 980, 984–85 (9th Cir. 2018) (statute specifying that decisions were in Secretary's "sole and unreviewable discretion" barred review of non-constitutional claims). No such language appears in § 1254a(b)(5)(A).

Defendants' assertion of a jurisdictional bar within the APA that applies to discretionary agency decisions likewise falls flat. Opp. 8 n. 2. Defendants do not have lawful discretion to flout legally required procedures, including within their periodic reviews of TPS designations. And Defendants' invocation of the Supreme Court's stays of interim and final relief in procedural challenges against Defendants' termination of TPS for Venezuela, Opp. 2, does not otherwise tip the jurisdictional scales. Each stay decision was utterly devoid of reasoning, which the Supreme Court has noted is essential to giving a judicial decision precedential value in another case. *See Ramos v. Louisiana*, 590 U.S. 83, 104–05 (2020) (declining to find binding a decision of the Court from another case in which reasoning for the outcome varied across five justices and remarking that "[i]t is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases.") (quotations and citations omitted) (emphasis in original); *see also Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("To reiterate: The Court's stay order is not a decision on the merits"). Similarly, because the Ninth Circuit's stay against the postponement of the terminations of TPS for Honduras, Nicaragua, and Nepal was also devoid of reasoning—Defendants' invocation of it, Opp. 2, tips no jurisdictional scales here, either. Across these cases, the parties' briefing does not furnish meaningful clues about the reasoning on which the Courts may have relied because, unsurprisingly, the briefing ran the

gamut, spanning jurisdiction, the likelihood of merits success, the balance of equities between the parties, and the public interest.

Nor does Defendants' invocation of the Fourth Circuit's refusal to issue emergency postponement to plaintiffs in a case raising procedural challenges to the terminations of TPS for Afghanistan and Cameroon move the jurisdictional needle here. In that case, the District Court had denied postponement based on the insufficiency of those plaintiffs' evidence. *See* Opp. 2 (citing the appellate denial). Evidentiary sufficiency is subject to relatively deferential appellate review—*see, e.g.*, *U.S. Bank Nat. Ass'n v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018)—including with respect to whether related factual findings below may have reflected clear error, *see, e.g.*, *Reilly v. U.S.*, 863 F.2d 149, 166 (1st Cir. 1988) (trial judge's factual findings only reviewed for clear error). The posture of that case is inapposite to this one.

Notwithstanding overarching throughlines spanning cases challenging the overall corruption of Defendant's periodic reviews, Mem. 7–9, interim and final relief in the cases can implicate granular, fact-intensive factors with variances across the cases, including: the legal and factual grounds supporting TPS designations; the stated reasons for a termination and the particular procedural defects infecting a given periodic review; the ever-expanding context of further, suspect periodic reviews that Defendants have undertaken; the ever-expanding context of further expressions by or reflections of Defendants' discriminatory animus correlating to or coinciding with their defective reviews; and the specifics attendant to judicial weighing of hardships that TPS terminations present to beneficiaries of different TPS designations, including the given, ongoing country conditions that can be a source of harm and risk to given nationals.

**B.     Defendants Failed to Conduct the Periodic Review for South Sudan's TPS Designation in Accordance with the TPS Statute.**

The APA authorizes courts to set aside and hold unlawful agency actions, findings, or conclusions that are contrary to law. *See* 5 U.S.C. § 706(2)(a). Defendants' actions during the periodic review of South Sudan's TPS designation were contrary to law in several ways, Mem. 7–13, and their rebuttal arguments either misconstrue or ignore Plaintiffs' arguments and evidence, even relying on authorities that support Plaintiffs' positions. Opp. 14–20.

**1.     Defendants' Decision to Terminate TPS Was Preordained and Improperly Influenced by Political Motivations to Systematically Restrict Access to TPS, Rendering it Contrary to Law.**

Defendant Noem's decision to terminate TPS for South Sudan was a preordained action, improperly influenced by the politically motivated objective of gutting the TPS program entirely and was therefore contrary to law. Mem. 7–9. Defendants argue that there is nothing unlawful about an agency head implementing the administration's priorities and that Defendant Noem had discretion to weigh evidence, Opp. 17–18, but this argument lacks merit because Defendant Noem has no authority to "rel[y] on factors which Congress has not intended [her] to consider," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cited at Opp. 12), and was required to publish the true reasons for the decision to terminate TPS for South Sudan, *Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019) (cited at Opp. 11).

Defendant Noem was required to base her periodic review of conditions in South Sudan on "objective conditions in the [] country," "regardless of any government official's political motives." *Saget*, 375 F. Supp. 3d at 346; *see also* 8 U.S.C. § 1254a(b)(3)(A). However, Defendants' statements and actions make clear that the termination of TPS for South Sudan was part of a larger

initiative to terminate the TPS program altogether.[1] *See generally* Compl. ¶¶ 114– 20 (detailing statements and actions of Administration officials expressing or reflecting their intent to systematically take away TPS and insinuating it to be, or describing it as, "illegal"); Dkt. 8-6 at 74–169; Dkt. 8-7 at 1–4; Dkt. 8-8 at 47–51; ECF 8-17 at 4 to Dkt. 08-25 at 1–23; *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT (N.D. Cal. Dec. 31, 2025), Dkt. 197 at 39-41 (*NTPSA II SJ Order*). At her confirmation hearing, Defendant Noem claimed that TPS had "been abused and manipulated by the Biden [A]dministration," and suggested that TPS "extensions going forward" "will no longer be allowed," because "the program was intended to be temporary." Dkt. 08-06 at 101. Upon assuming her role as Secretary, Defendant Noem vowed to "follow" "directive[s]," Dkt. 8-7 at 4, given by the President, including the directive to "revoke [TPS]," Dkt. 8-20 at 2. She followed through on this promise, terminating TPS for eleven countries in steady succession, using an impermissible "outcome-determinative [periodic review] process," *Saget*, 375 F. Supp. 3d at 347, where the desired outcome is to terminate most, if not all, TPS terminations, *see, e.g.*, Dkt. 8-8 at 11–20.[2]

Despite what Defendants argue, these promises and Defendant Noem's follow-through go beyond simply having "preexisting views on government policy," Opp. 25, and instead contravene the TPS statute's mandate that the decision be based on available, objective evidence of relevant country conditions. Plaintiffs are therefore likely to succeed on the merits of their claim that

---

[1] The fact that South Sudan's TPS designation was automatically extended in May 2025 has no bearing on this—that automatic extension occurred because Defendant Noem "was provided with a non-current record from the Department of State that was signed November 6, 2024," which "prevented [her] from making an informed decision" by the statutory deadline. 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025).

[2] *Id.* at 13 ("The DMs [Director Memos] **should include additional information that would support different decision outcomes.** For example, are there improvements that have been made in the country? What about information about fraud/abuse of the program? . . . There are some stats pending, but [it is not clear] where that will be added.") (emphases added).

Defendants' decision to terminate TPS for South Sudan was contrary to law. Indeed, "TPS decisions that are 'preordained' or based on 'political influence,' rather than country conditions, violate the APA," *NTPSA II SJ Order* at 39–40, and contravene Congress's intent in enacting the TPS statute, *id.* at 44-45 ("In enacting the TPS statute [in 1990], Congress designed a system of temporary status that was predictable, dependable, and insulated from electoral politics.").

### 2. Defendants Did Not Adhere to the TPS Statute's Requirements of Inter-Agency Consultation and Objective Review of Country Conditions.

Because Defendants failed to engage in the required inter-agency consultation prior to making the termination decision or consider available and objective evidence of ongoing armed conflict and other extraordinary circumstances, the termination of TPS for South Sudan was contrary to law under the APA. Mem. 9–13. Here, Defendants fail to adequately address the evidence Plaintiffs provide in support of their argument and instead provide bare assertions that Defendant Noem complied with statutory mandates.

Defendants' contention that the termination decision was based on Defendant Noem's consultations with the appropriate government agencies is conclusory.[3] Opp. 26–27. Defendants provide no evidence to support this assertion, nor do they attempt to meaningfully rebut the evidence offered by Plaintiffs showing Defendants' failure to engage in the required inter-agency consultation. Mem. 15–16; Compl. at 37–40; Dkt. No. 8-08 at 1–7. As established in similar cases challenging TPS terminations for other countries, DHS stopped receiving country conditions

---

[3] Defendants' invocation of the "presumption of legitimacy" is incomplete: they fail to explain if and why "the presumption is applicable," *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004), and they do not meaningfully engage with the evidence offered by Plaintiffs such that the presumption, if even applicable, could be rebutted. Moreover, *National Archives* clearly states that the "presumption perhaps is less a rule of evidence than a general working principle." *Id.* And recent judicial decisions have been calling it into question. S*ee, e.g., Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 89-90 (D.D.C. 2025) (collecting cases).

reports in or around March 2025 from the State Department as part of the periodic TPS review process, *NTPSA II SJ Order* at 8, a core component of the requisite inter-agency consultation, Dkt. No. 8-06 at 2–65. Moreover, the State Department's issuance of a Level 4 "Do Not Travel" advisory for South Sudan is difficult to reconcile with Defendants' assertion that inter-agency consultations occurred. Defendant Noem's "failure to consult with the Department of State before deciding whether to terminate TPS directly conflicts with the TPS statute." *NTPSA II SJ Order* at 41; 8 U.S.C. § 1254a(b)(3)(A). When such incongruence is apparent from the record and the agency's unsubstantiated explanation is pretext for otherwise unlawful agency action, courts reject such unsubstantiated claims. *See, e.g.*, *Dep't of Comm.*, 588 U.S. at 783–85 (cited at Opp. 11, 17); *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 786 F. Supp. 3d 237, 257 (D. Mass. 2025); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 121 (D. Mass. 2025).

Defendants wrongly claim that Plaintiffs ask this Court to "substitute its judgment for that of the agency." Opp. 27. Plaintiffs only seek enforcement of the procedural obligations Congress placed on Defendants for the periodic review of conditions in countries designated for TPS. Mem. 7–14. Plaintiffs' references to objective conditions in South Sudan and available evidence ignored by Defendant Noem only serve to illustrate a failure to "undertake a periodic review grounded in fact—*i.e.*, based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith," not to challenge her substantive determination. *Saget*, 375 F. Supp. 3d at 346; *see also* 8 U.S.C. § 1254a(b)(3)(A). To be sure, the Secretary is not required to consider "*all* evidence of the conditions in a country," Opp. 27, but here, she does not refer to *any* evidence as "the basis for [her] determination," 8 U.S.C. § 1254a(b)(3)(A), that there is no ongoing armed conflict in South Sudan. Mem. 10–12.

Defendants reiterate the reasoning provided by Defendant Noem in South Sudan's TPS Termination: full-scale war is no longer present, and the transitional government has "indicat[ed]" a willingness to accept and ensure the safety of returning nationals. Opp. 23. However, they do not offer any explanation for Defendant Noem's departure from the Department's explicit prior findings that armed conflict short of "full-scale civil war" is relevant to periodic review where other related and gross human rights abuses persist. *Cf.* Mem. 10–11. Nor do they address Defendant Noem's departure from the agency's prior consideration of South Sudanese governmental violence against its nationals as relevant to South Sudan's periodic review. *Cf. id.* 11–12; *see also id.* 12–13 (elaborating failure within periodic review to consider available and objective evidence of ongoing extraordinary circumstances in South Sudan that make return for nationals unsafe, encompassing acute food insecurity; environmental and health concerns, including widespread flooding and disease outbreaks; and barriers to humanitarian access).

### 3.    Defendants' Reliance on National Interest Was Unlawful.

Defendants' reliance on national interest as part of the periodic review of South Sudan's TPS designation was contrary to the plain text of the TPS statute. The Secretary may consider "national interest" at designation, not termination, as, during the periodic review, the Secretary shall consider only "conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). Indeed, "reliance on the national interest divorced from an analysis of country conditions . . . is not appropriately considered in the periodic review or termination inquiries." Tr. at 19:2–7, *Doe v. Noem*, No. 1:25-cv-08686-KPF (S.D.N.Y. Nov. 18, 2025); *see also id.* at 19:24–20:3. Defendants argue that national interest can be considered at the periodic review and termination stage, despite the statute's mandating distinct procedural steps for when and how domestic national interest can be considered, but they do not explain why. Opp. 16.

11

Moreover, the statute directs the Secretary to "review the conditions in the foreign state" and "determine whether the conditions" for designation continue to be met. 8 U.S.C. § 1254a(b)(3)(A). Here, the word "conditions" clearly refers to the "conditions in the foreign state," *not* conditions within the United States.

Finally, the TPS statute was not enacted as a matter of foreign policy or national security; Congress established the TPS program "to provide humanitarian relief to foreign nationals within the United States who are unable to return to their country of origin," *NTPSA II SJ Order* at 4 "out of concern that the forced repatriation of those individuals could endanger their lives or safety," H.R. Rep. 100-627, at 6 (1988). "In light of this goal, the Secretary may not take steps that are contrary to the express or implied will of Congress." *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT (N.D. Cal. Dec. 31, 2025), Dkt. 197 at 33 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)). Plaintiffs are therefore likely to succeed on their claim that Defendants' periodic review and termination of South Sudan's TPS designation violated 8 U.S.C. § 1254a.

### 4.    Defendants' Termination Was Contrary to Constitutional Right

Plaintiffs are likely to prevail on their claims under 5 U.S.C § 706(2)(B) because they have shown that racial and national origin discrimination was "a motivating factor" in the termination, satisfying the applicable standard for equal protection violations under *Arlington Heights*. *Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66 (1977).

#### a.    *Arlington Heights Furnishes the Relevant Legal Standard.*

Despite Defendants' assertion of "longstanding [judicial] deference" to the Executive Branch's "foreign policy judgments," Opp. 22, courts have repeatedly held that the appropriate standard for evaluating an Equal Protection challenge to a TPS termination is set forth in *Arlington Heights.* 429 U.S. at 265-66; s*ee e.g.*, *CASA, Inc. v. Noem*, No. 25-1484-TDC, 2025 WL 3514378, *3 (D. Md. Dec. 8, 2025); *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1108, 1157 (N.D. Cal.

2025); *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1008, 1032 (N.D. Cal. 2025); *National TPS Alliance v. Noem*, 773 F. Supp. 3d 807, 857 (N.D. Cal. 2025) (refusing to apply the *Hawaii* standard even though the termination invoked "national security and foreign relations" implications, because "[t]he government does not get a free pass to deferential review under *Trump v. Hawaii* simply because it makes an *ipse dixit* assertion that there is a national security interest. There must be some basis for such a claim" supported by "concrete evidence"); *Centro Presente*, 332 F. Supp. 3d at 409–13*; CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 322-23 (D. Md. 2018); *NAACP v. United States Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 576 (D. Md. 2019).[4] Defendants' argument that the Court should apply the rational basis standard under *Trump v. Hawaii*, 585 U.S. 667 (2018), is therefore contrary to overwhelming precedent, and must be rejected.[4]

As the many other courts to consider this issue have consistently recognized, *Hawaii* concerned a very different factual context: regulation of foreign nationals seeking to enter the country based on national security concerns. *See NTPSA II SJ Order* at 28. By contrast, TPS beneficiaries have long established ties to the United States and are entitled to a "higher level of due process than foreign nationals seeking admission to the country." *Centro Presente*, 332 F. Supp. 3d at 411 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)); *see also DHS v. Regents*

---

[4] Defendants state that "nationality-based classifications" are subject to rational basis review, Opp. n. 5, but Plaintiffs are not simply challenging a categorization based on nationality; they are challenging the racial and ethnic animus which underlies and motivates the overarching policy of terminating TPS for non-white, non-European countries. That form of discrimination often overlaps with and appears in the form of national origin discrimination. *See, e.g., Espinoza v. Farah Mfg. Co., Inc*., 414 U.S. 86, 92 n.5, 95 (1973) (refusing to hire people of "Spanish-speaking background," or insisting on an "Anglo-Saxon background" as a condition of employment constitutes discrimination based on a protected class); 29 C.F.R. § 1606.1 ("EEOC's guidelines on discrimination define "discrimination based on national origin" broadly, to include acts of discrimination undertaken "because an individual has the physical (such as race), cultural or linguistic characteristics of a national origin group").

*of Univ. Of Calif.*, 591 U.S. 1, 34 (2020) (plurality) (applying *Arlington Heights* standard to a challenge to the recission of Deferred Action for Childhood Arrivals (DACA)); *Wong v. United States*, 373 F.3d 952, 970–73 (9th Cir. 2004); *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government") (citing *Mathews v. Diaz*, 426 U.S. 67, 77 (1976)); *see also* Decl. of Mary Doe, Dkt. 8-1 ¶¶ 1–3; Decl. of David Doe, Dkt. 8-2 ¶¶ 1, 3, 4, 19; Decl. of Peter Doe, Dkt. 8-3 ¶¶ 1–2; Decl. of Jacob Doe, Dkt. 8-4 ¶¶ 1–4; Decl. of Amaha Kassa, Dkt. 8-5 ¶¶ 11, 12. Moreover, the Executive Order in *Hawaii* was issued pursuant to a statute that "exudes deference to the President in every clause," *Hawaii*, 585 U.S. at 684, whereas the TPS statute sets forth a clear process and criteria follow. The *Arlington Heights* standard applies here. *National TPS Alliance*, 773 F. Supp. 3d at 856.

> **b.    Plaintiffs Prevail Under Arlington Heights Because Racial Animus Was a Motivating Factor in the Termination.**

Plaintiffs have clearly shown that discriminatory animus was a "motivating factor" behind the challenged action, and are not required to prove that the termination "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265-66. "Plaintiffs can establish a discriminatory purpose in one of two ways: (1) that a 'clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action[,]'or (2), 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021) (citing *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)) (internal quotations omitted). Plaintiffs have shown both. "Factors bearing on discriminatory intent may include 'the degree of disproportionate racial effect, if any, of the policy; the justification, or lack thereof, for any disproportionate racial effect that may exist; and the legislative or administrative historical

background of the decision." *Id.* at 45. *Bos. Parent Coal for Acad. Excellence Corp.*, 996 F.3d at 45 (citing *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 83 (1st Cir. 2004)).

In this case, the degree of disproportionate racial effect is overwhelming and self-evident; every country whose TPS has been terminated by Defendant Noem has been a majority-non-white country. The impact of this action clearly "bears more heavily" on those specific races and national origins. While Defendants assert that the overwhelmingly disparate impact of their unlawful practice of terminating TPS for non-white, non-European countries does not show animus because almost all TPS designees are non-white and non-European (Opp. 26), they ignore the fact that Defendants have simultaneously encouraged admissions of white immigrants, such as Afrikaners. Mem. 17; Dkt. 8-16 at 4–6.

The policy justifications provided for the disparate impact are also nearly non-existent— the only policy justifications provided for the termination of South Sudan's TPS are the assertion that some TPS holders are under administrative investigation, that President Trump wants to eliminate TPS altogether, and that there is a foreign policy benefit of pressuring the government of South Sudan. As argued elsewhere herein, none of these can justify the racially targeted and disproportionate effect of this termination. The justifications provided for the overall policy of terminating TPS designations for non-white countries across the board are even less legitimate, and consist of conspiracy theories, apparent endorsements of eugenics, and racist tropes.[5]

For example, Defendants have repeatedly endorsed the "Replacement Theory"—a white nationalist conspiracy theory that asserts that non-white immigrants will "replace" the white race, destroying the white heritage of the United States. *See* Dkt. 8-15 at 11–16. Defendant Noem has called irregular immigration across the US-Mexico border "an invasion happening on purpose… to remake the foundation of this country." Dkt. 8-14 at 8. President Trump has accused non-white,

non-European immigrants "from Africa" of "poisoning the blood of our country,"[6] and has described immigrants as having "a lot of bad genes" that predispose them to murder. Dkt. 08-20 at 7–9. As recently as October 14, 2025, Defendant Noem's DHS posted a one-word tweet saying "Remigrate"—a code word for "the mass deportation of non-white immigrants" and a "euphemism for ethnic cleansing." Dkt. 8-25 at 4, 6–15.

These statements laced with "charged code words" are clear evidence of racial animus. *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016) (cited in *Valentin v. Town of Natick*, 707 F. Supp. 3d 88, 99 (D. Mass. 2023). Indeed, the Northern District of California recently found that many of these same statements reasonably show unconstitutional animus because they "reflect a stereotyping of the immigrants protected under the TPS program as criminal invaders and perpetuate the discriminatory belief that certain immigrant populations will replace the white population." *See NTPSA II SJ Order* at 31, 49.

These statements of animus by both Defendant Trump and Defendant Noem are far from isolated or incidental—they were reiterated for months leading up to Defendant Noem's decision to terminate TPS for South Sudan and have continued thereafter. On December 9, 2025, President Trump repeated and doubled-down on his racist use of the phrase "sh—hole countries" to describe majority-black TPS-designated countries such as Haiti and Somalia. Dkt. 8-26 at 6–11. In contrast to the out-of-circuit and vacated *Ramos* decision on which Defendants rely heavily, in this case there is no need to make any speculative leaps about whether this longstanding animus infected Defendant Noem's decision-making—the statements were made by the primary "administration officia[l] involved" in the decision-making process herself, and were repeated both before and after the Termination. *Ramos v. Wolf*, 975 F.3d 872, 897 (9th Cir. 2020). Indeed, the day after Defendant Noem's termination of South Sudan's TPS designation, her agency doubled-down on

the racist "invasion" rhetoric and published a graphic calling for more immigration agents to "Defend the Homeland" and "Deport All Foreign Invaders." Dkt. 8-25 at 28.

Taken collectively, these are "contemporary statements" indicative of Defendants' discriminatory motive. *Arlington Heights*, 429 U.S. at 268. Moreover, neither Defendant has disavowed or distanced themselves from these racist remarks. *See Saget*, 375 F. Supp. 3d at 368 (quoting *New York v. United States Dep't of Com.*, 351 F. Supp. 3d 502, 668 (S.D.N.Y. 2019) (the court may look beyond the administrative record as the intentional discrimination inquiry "contemplates a wide-ranging and penetrating inquiry capable of uncovering hidden forms of discrimination"). Defendants' statements evincing animus have continued unabated since the Termination of South Sudan's designation. *See generally*, Dkt. 8-20 at 5; Dkt. 8-24 at 2; Dkt. 8-25 at 2; Dkt. 8-26 at 6-11; Dkt. 8-27; Dkt. 8-28; Dkt. 8-29; Dkt. 8-30; Dkt. 8-31; Dkt. 8-32; Dkt. 8-33; Dkt. 8-34; Dkt. 8-35; Dkt. 8-36.

"The specific sequence of events leading up [to] the challenged decision" and "[d]epartures from the normal procedural sequence" are equally problematic for Defendants. *Arlington Heights*, 429 U.S. at 266–68 (citations and internal quotation marks omitted). The termination of South Sudan's TPS designation was the ninth of eleven terminations in as many months—all of which involved a repeated pattern of departures from normal procedures, as described above. *NTPSA I*, 773 F. Supp. 3d at 855–66; *National TPS Alliance v. Noem*, No. 25-cv-05687-TLT, 2025 WL 2233985, at *14–17 (N.D. C.A. July 31, 2025); *see also NTPSA I*, 798 F. Supp. 3d at 1164-65 (denying government's motion for summary judgment on equal protection claims). The termination in this case is no different, and Defendants' abrupt, unacknowledged, and unreasoned departures from normal procedures clearly suggest a discriminatory ulterior motive. *Centro Presente*, 332 F. Supp. 3d at 415.

Defendants argue that this overwhelming pattern of ending all TPS designations for non-white, non-European countries is insufficient to show animus because the TPS statute requires periodic review, and because the pattern of nearly-uniform terminations "follow[s] from the misuse of TPS by the previous administration, which... necessitate[s] termination of improperly designated TPS." Opp. 25. The fact that these designations have come up for periodic review plainly did not require the Secretary to terminate them. Defendants' assertion that the Terminations were required by what they label "misuse of TPS" by the prior administration, Opp. 25, is all but an admission that Defendants were motivated not by a review of individual country conditions, but by an overarching, animus-driven policy of terminating TPS designations for as many previously designated non-white, non-European countries as possible.

Taken together, this legislative and historical background, coupled with additional circumstantial evidence, clearly evince a result that was, at least in part, driven by discriminatory intent based on race or national origin.

### c.    Plaintiffs Also Prevail Under Rational Basis Review Because the Termination Is Not Rationally Related to a Legitimate Purpose.

Plaintiffs would prevail even under rational basis review because the challenged conduct is "not rationally related to a legitimate government purpose." *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 107 (1st Cir. 2015). The Court may consider extrinsic evidence in this assessment. *See Hawaii*, 585 U.S. at 705. Even in this deferential context, the Constitution forbids policies motivated by "a bare [] desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973). That is precisely the case here, as Defendants lack a "facially legitimate and bona fide" reason for their actions independent of unconstitutional motives. *Hawaii*, 585 U.S. at 704. "[D]ecisions about the rights afforded to TPS holders based on negative racial stereotypes [are] completely divorced from any 'facially legitimate and bona fide' reason.'" *See*

*NTPSA II SJ Order* at 33 (because Congress enacted the TPS statute "to formalize humanitarian protections and offer relief to nonimmigrants from foreign states which are not adequately able to house" foreign nationals, "the Secretary may not take steps that are contrary to the express or implied will of Congress or the mandates of the federal constitution") (citing *Hawaii*, 585 U.S. at 703).

Defendants assert that the Termination survives rational basis review because it was plausibly related to "foreign relations interests, border security priorities, and the objectives of the TPS program." Opp. 23-4. As argued above, there is no rational relationship between "border security priorities" and the stripping of lawful status from the South Sudanese TPS community currently residing lawfully in the United States. Defendants' assertion to the contrary is based on the same misrepresentation of the administration of TPS as "illegal" and TPS-holders as unlawfully present which multiple federal courts have already rejected. Tr. at 33:14-18 *Doe v. Noem,* No. 1:25-cv-08686-KPF (S.D.N.Y. Nov. 18, 2025). Nor can the Termination be rationally based in the "objectives of the TPS program," Opp. 24, because Congress established the TPS program "to provide humanitarian relief to foreign nationals within the United States who are unable to return to their country of origin," *NTPSA II SJ Order* at 4 "out of concern that the forced repatriation of those individuals could endanger their lives or safety," H.R. Rep. 100-627, at 6 (1988). "In light of this goal, the Secretary may not take steps that are contrary to the express or implied will of Congress." *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT (N.D. Cal. Dec. 31, 2025), Dkt. 197 at 33 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)). This termination, announced with only a sixty-day wind-down, cannot serve the humanitarian objective behind Congress' enactment of the statute. For this same reason, the termination also cannot survive rational basis review based on the "foreign relations interests" of any particular

administration—the statute was enacted specifically to insulate country-based humanitarian relief from "the vagaries" of domestic political shifts. 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute).

Furthermore, there is no record evidence offering any factual support whatsoever to these bald assertions of national interest. The only basis provided in Defendant Noem's termination is that an unspecified "portion" of South Sudan TPS holders have been under "administrative investigation"; it does not articulate the basis for the claimed investigation, nor any particular harm or injury resulting from purported conduct, nor how that implicates the U.S. national interest. This single sentence in the Termination cannot show a "facially legitimate and bona fide", rational basis for the Termination. *Hawaii*, 585 U.S. at 704.

### 5.    Defendants' Periodic Review Was Arbitrary and Capricious Because It Departed from Past Agency Practices.

Defendants do not meaningfully dispute that the provision of only a 60-day transition period is arbitrary and capricious as a break from past practice. Opp. 19–20. They never contest that the 60-day period breaks with two decades of uninterrupted practice; that an agency must "display awareness" of, and "offer good reasons" for, a departure from a "decades-old practice," *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 570 (2025); or that Defendant Noem did neither of these things. Moreover, whether an agency has made a "hard-and-fast commitment," Opp. 28, has no place in the "change-in-position" framework, *see Wages & White Lion Invs.*, 604 U.S. at 568. The four terminations with no wind-down period that Defendants reference all occurred prior to 2004, for countries that had been designated for TPS for less than three years. *See* Dkt. 8-6 at 66–69. These four terminations do not constitute past practice when considered collectively with the subsequent two decades of past practice.  *See NTPSA II SJ Order* at 48–49 (denying defendants' motion for summary judgment because of the "fail[ure] to [] acknowledge

or explain the departure from the decades-long practice of providing at least a 6-month transition period under the APA").

Defendants do not dispute that Defendant Noem's "national interest" justification was arbitrary and capricious because it departed from decades of past practice without explanation. *Cf* Mem. 20; Dkt. 8-7 at ¶¶ 5, 8–11. Moreover, Plaintiffs do not ask this Court to review the substance of Defendant Noem's "national interest" justification; thus, the cases cited by Defendants are inapposite for consideration of Plaintiffs' arbitrary and capricious claim. Opp. 29. This undisputed violation of the APA provides sufficient grounds alone to grant postponement.

## II.    PLAINTIFFS HAVE SHOWN IRREPARABLE HARM AND THE BALANCE OF EQUITIES AND PUBLIC INTEREST ARE IN THEIR FAVOR.

First, Plaintiffs have clearly shown irreparable harm. If forced to return to South Sudan, Plaintiffs will suffer severe risk to their health and safety, including threats to their lives. Dkt. 8-1 at 4–5; Dkt. 8-2 at 4; Dkt. 8-3 at 3–4; Dkt. 8-4 at 4–5; Dkt. 8-5 at 4–6. Plaintiffs also face imminent separation from their families, loved ones, and communities. *See Leiva–Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (identifying "separation from family" as an irreparable harm); Dkt. 8-1 at 2; Dkt. 8-2 at 2–4; Dkt. 8-3 at 2; Dkt. 8-4 at 2, 4; Dkt. 8-5 at 4–6. Defendants rely on *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), and claim that Plaintiffs have not adequately alleged that harm is "likely" to occur. *Id*. Defendants also argue that the harm Plaintiffs face should receive less weight due to the temporary nature of TPS under the statute. *Id.*

First, Defendants argue that Plaintiffs' claimed harms are too speculative. *Id.* Defendants misstate Plaintiffs' injuries, which are not limited to the harm that will be imposed if they are removed to South Sudan (the "clear likelihood" of which is amply shown by the voluminous country conditions evidence in the record) but also include the immediate harm of losing lawful status here in the United States and becoming ineligible for at least some forms of future relief.

Mem. 18. The Secretary's failure to follow statutory and Constitutional requirements also constitutes independent irreparable harm. Mem. 18. As Plaintiffs have shown a likelihood of success on the merits of their claims, the irreparable harm is likely under *Winters*.

Second, because the statute vests the Secretary with the decision to continue or terminate TPS, Defendants cannot shift harms arising from unlawful termination onto Congress. Many TPS holders are seeking to adjust their immigration status. Cutting short their TPS protection will cut many of those avenues off, and asylum is not a backstop due to the administration's blanket pause on asylum proceedings. Dkts. 8-49 at 2, 4–6, 10–13.

In addition, the balance of hardships and public interest merge when the government is a party, and both weigh heavily in favor of Plaintiffs. *Nken v. Holder*, 556 U.S. 418, 435 (2009). First "[t]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *New York v. McMahon*, 784 F. Supp. 3d 311, 372 (D. Mass. 2025) (quotation omitted); *see also Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005) ("[T]he public has an important interest in making sure government agencies follow the law").Second, there is a strong public interest in avoiding "substantial societal costs" that flow from unnecessary and arbitrary immigration enforcement, which include "separate[ing] families and remov[ing] from the community breadwinners, caregivers, parents, sibling and employees." *Sampiao v. Hyde*, 799 F. Supp. 3d 14, 34 (D. Mass. 2025). Plaintiffs' religious congregations, clients, and academic and athletic communities all face harms both economic and non-economic from Plaintiffs' loss of status. Dkt. 08-01 at 2; Dkt. 08-02 at 2-4; Dkt. 08-03 at 2; Dkt. 08-04 at 2, 4; Dkt. 08-05 at 4–6.

Defendants ask this Court to ignore specific and compelling equities that weigh heavily in Plaintiffs' favor, Mem. 27–28, based largely on non-binding and unreasoned emergency stays.

Opp. 28. As addressed *supra*, at 6, those stays are non-binding on this case. As courts analyzing the effects of unlawful TPS terminations have found, "[P]laintiffs' injuries far outweigh any harm to the government from a postponement." *Haitian Evangelical Clergy Ass'n v. Trump,* 789 F.Supp.3d 255, 276 (E.D.N.Y. 2025) ("HECA"); *accord Saget*, 375 F. Supp. 3d at 377–78.

Defendants allege that they will face irreparable harm if they are "enjoined by a court from effectuating statutes enacted by representatives of [the] people." Opp. 29 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).[5] But Defendants fail to reckon with the illegality of the Secretary's actions; "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Defendants' only other argument regarding the balance of equities and public interest is that the relief sought by Plaintiffs would "disrupt" the President's "messaging", "complicating... foreign policy issues." Opp. 29. As argued above, Congress's purpose in enacting the TPS statute— and as a result, the public's interest in implementing the statute—was to provide humanitarian relief insulated from the "vagaries" of domestic political shifts, such as the foreign policy goals of any particular President. 101 Cong. Rec. H25811, 25838. Defendants' apparent admission that the termination of South Sudan's TPS designation was intended as a "messaging" tool (Opp. 29) in order to put pressure on the South Sudanese government to continue its "compliance" with U.S.

---

[5] Defendants also plainly misstate the law when they claim that Plaintiffs sought relief would "require" the Secretary "to permit individuals from South Sudan to remain in the country, with work authorization and protection from removal or even initiation of removal proceedings." Opp. 29. The TPS statute places numerous additional restrictions on TPS eligibility, and there is no restriction on DHS's ability to initiate removal proceedings against a TPS-holder on a case-by-case basis, on any number of criminal or security-based grounds. *See* 8 U.S.C. § 1254a(c)(1)(A); 8 U.S.C. § 1254a(c)(2)(B); 8 U.S.C. § 1254a(c)(3); 8 U.S.C. § 1182; 8 U.S.C. § 1158(b)(2)(A)).

deportations (90 Fed. Reg. 50,484, 50,486) is antithetical to the purpose of the statute, and therefore clearly in opposition to the public interest.[6]

## III.    THIS COURT CAN GRANT THE REQUESTED RELIEF UNDER 5 U.S.C § 705.

Defendants contend that 8 U.S.C. § 1252(f)(1) bars the postponement of agency action because (1) the TPS statute falls within the ambit of enumerated provisions subject to the provision's limits on non-individual injunctive relief and (2) postponement of agency action is relief that "enjoins or restrains" the operation of the TPS statute within the supposed meaning of the provision. Opp. 12–14. Defendants are wrong. Section 1254a does not fall within the scope of 1252(f)(1), nor does it "enjoin or restrain" the TPS statute. Defendants additionally argue that any postponement relief should be limited to the individual plaintiffs, a contention that a multitude of Courts have rejected.

### A.    Section 1254a Is Not Within the Ambit of Enumerated Provisions for Which 1252(f)(1) Restricts Non-Individual Injunctive Relief.

Section 1252(f)(1) limits a court's ability "to enjoin or restrain the operation of part *IV* of this subchapter"—namely, 8 U.S.C. §§ 1221–32 (provisions concerning assorted forms of immigration enforcement under the heading, "Inspection, Apprehension, Examination, Exclusion, and Removal"). *Id*. (emphasis added). The TPS statute, § 1254a, is in part V of the same subchapter. This is not merely a formal distinction: part IV focuses on a sweep of enforcement-related actions, while part V focuses on adjustment and changes in status, including TPS. Section 1252(f)(1)'s limitation on review therefore cannot apply. *See, e.g., CASA, Inc. v. Noem*, 792 F.

---

[6] This also overstates the "foreign policy" fig leaf included in the termination notice, which is limited to ensuring that South Sudan accepts third country deportees, and accepts South Sudanese nationals who are lawfully removed from the U.S. Neither of these goals is implicated by or even related to the question of permitting South Sudanese nationals *lawfully present* in the United States under the TPS program to continue to remain in the U.S. temporarily.

Supp. 3d 576, 591 (D. Md. 2025) (collecting cases). "[B]ased on the plain language of the statue, [1254a] is not subject to the bar of § 1252(f)." *Id.* at 595.

Defendants recognize that § 1254a is incorporated into part V of the U.S. Code but nonetheless contend § 1252(f)(1) applies based on the Congressionally enacted text. Opp. 13. Although Defendants cite a case supporting the general proposition that enacted text prevails over the U.S. Code when interpreting text, *id.*, that proposition does not trump or even engage with the particulars of this statutory scheme. "[T]he Supreme Court has repeatedly and consistently identified the portion of the INA subject to the bar on injunctive relief in § 1252(f)(1) as either 'part IV of subchapter II' or as '8 U.S.C. §§ 1221-1232," the specific sections that presently contained within Part IV of Subchapter II." *CASA, Inc.* 792 F. Supp. 3d at 591 (collecting cases). In asking this Court to read § 1254a into subchapter IV, rather than subchapter V, the Defendants propose this Court "deviate from the Supreme Court's longstanding reading of § 1252(f)(1)." *Id.* at 595.

Additionally, section headings of the U.S. Code serve as evidence of the meaning of a statute. *See Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008). Here, it would be illogical for the TPS statute, which deals with the countries' designations for TPS and the eligibility of individuals from those countries to receive TPS, to be situated in a subchapter discussing detention and removal, and subject to 1252(f)(1), which deals specifically with "[j]udicial review of orders of removal."

**B.    Postponement of Agency Action is Not Injunctive Relief Subject to the Limitations of 1252(f)(1).**

Defendants argue that § 1252(f)(1) extends beyond injunctive relief to any forms of relief that "enjoin or restrain" the "operation" of the enumerated provisions, and, in any event, postponement of agency action is basically the same as an injunction. Opp. 12–14. Courts have

largely rejected these arguments. *See, e.g.*, *NTPSA*, 150 F.4th at 1018 ("[A] stay or postponement of agency action under the APA" is not injunctive relief).

"Section 1252(f)(1) applies only to injunctive relief and other 'forms of relief that operate *in personam*.'" *Make the Rd. N.Y., v. Noem,* No. 25-5320, slip op. at 33 (D.C. Cir. Nov. 22, 2025), Dkt. 2146745. That matters because an "injunction [is] a traditional equitable remedy which may expose the enjoined party to the district court's coercive contempt powers." *Williams v. Jones*, 11 F.3d 247, 256 (1st Cir. 1993). Because an APA postponement or stay of agency action operates as to the agency and not against a person, it is materially different in kind from an injunction. *NTPSA v. Noem*, 150 F.4th at 1018 ("[A] stay or postponement of agency action under the APA" is not injunctive relief); *accord HECA*, 789 F.Supp.3d at 271 (E.D.N.Y. 2025).  Similarly, numerous courts have already held that § 1252(f)(1) does not bar the final relief of vacatur, which "does nothing but" "re-establish the status quo." *Texas v. United States*, 40 F.4th 205, 219-20 (5th Cir. 2022); *accord CASA,* 792 F. Supp. 3d at 591. Defendants' argument that the relief sought is "functionally identical" to an injunction therefore lacks merit. Opp. 14.

### C.     The Appropriate Relief is Blanket Postponement Under 5 U.S.C. § 705.

Finally, Defendants' arguments against blanket postponement ignore both the language of the APA and decades of precedent.  The APA provides that a reviewing court "shall…hold unlawful and set aside agency action" that it finds to be not in accordance with the law. 5 U.S.C. § 706(1); (2).  When those conditions are met, "[t]he ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (when agency action is found unlawful, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). Defendants' attempt to restrict postponements to the parties "ill fits Section 705's text." *MRNY v. Noem*, No. 25-5320, slip. op. at 75 (D.C. Cir. Nov. 22, 2025).

"Section 705 stays operate on the legal source of the authority for AN agency to act at all" rather than "simply insulat[ing] certain parties from enforcement measures. *Id.* at 75-76 (quoting 5 U.S.C. § 705). If a court were to order that an agency action only be postponed as to certain individuals, but that the agency can move forward with the action against others, "*the* effective date of the [agency] action" would not have "been postponed." *Id.* at 76 (emphasis in original).

Moreover, as the D.C. Circuit recently explained in rejecting the same argument Defendants raise here, the analysis in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), was specific to injunctions, and "there is good reason to think that Congress did not intend to incorporate" the "background equitable principles" animating *CASA* into the APA." *MRNY*, No. 25-5320, at 77 (quotation omitted).

Blanket postponement under 5 U.S.C. § 705 is not only consistent with longstanding APA practice but is of particular importance in immigration matters, where nationwide consistency is of paramount importance.

## CONCLUSION

For all of foregoing reasons, the Court should exercise its authority under 5 U.S.C. § 705 to stay the effective date of South Sudan's termination pending the final judgment on the merits of Plaintiffs' claims.

Dated: January 14, 2026                    Respectfully submitted,

*/s/ Stephen Petkis*
Mark H. Lynch (*pro hac vice*)
Stephen Petkis (*pro hac vice*)
Paul Killebrew (*pro hac vice*)
Ayana M. Lindsey (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
MLynch@cov.com

SPetkis@cov.com
PKillebrew@cov.com
ALindsey@cov.com

Sarah Leadem (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
SLeadem@cov.com

Michael E. Cunniff (*pro hac vice*)
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
(212) 841-1000
MCunniff@cov.com

*/s/ Nargis Aslami*
Nargis Aslami (Bar No. 714848)
Golnaz Fakhimi (*pro hac vice*)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362,
Washington, D.C. 20005
202.897.2622
Nargis@muslimadvocates.org
Golnaz@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/ Erik Crew*
Erik Crew
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org


*Counsel for Plaintiffs African Communities*
*Together, David Doe, Mary Doe, Peter Doe, and*
*Jacob Doe, and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Stephen Petkis*
Stephen Petkis