## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO POSTPONE AGENCY ACTION**<br><br>Civil Action No. 1:25-cv-13939-PBS |

i

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................**Error! Bookmark not defined.**

I.    THE CERTIFIED ADMINISTRATIVE RECORD CONFIRMS THAT
      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ... **Error! Bookmark not
      defined.**

      A.    The CAR Shows That Defendants Did Not Consult Appropriate Agencies
            as Required by Statute. ..........................................**Error! Bookmark not defined.**

      B.    The CAR Shows that Defendants Impermissibly Considered U.S. National
            Interests. ................................................................**Error! Bookmark not defined.**

      C.    The CAR Shows the Periodic Review Process Was Arbitrary and
            Capricious. ............................................................**Error! Bookmark not defined.**

            1.    Defendants Did Not Solicit a Country Conditions Report from the
                  State Department, Continuing a *Sub Silentio* Change in Agency
                  Policy.........................................................**Error! Bookmark not defined.**

            2.    Defendants' Consideration of National Interests Was Arbitrary and
                  Capricious. ................................................**Error! Bookmark not defined.**

      D.    The CAR Shows That Defendants Either Did Not Review Objective
            Evidence of Conditions in South Sudan or Disregarded Such Evidence to
            Reach a Pre-Determined Conclusion. ...................**Error! Bookmark not defined.**

            1.    The CAR Shows Defendants Did Not Consider Available and
                  Objective Evidence of Ongoing Armed Conflict..... **Error! Bookmark not
                  defined.**

            2.    The CAR Shows That Defendants Did Not Consider Available and
                  Objective Evidence of Other Extraordinary Circumstances..............**Error!
                  Bookmark not defined.**

            3.    Alternatively, the CAR Shows Defendants Review Was Arbitrary
                  and Capricious. ..........................................**Error! Bookmark not defined.**

II.   THE CERTIFIED ADMINISTRATIVE RECORD CONFIRMS THAT
      PLAINTIFFS FACE SEVERE AND IRREPARABLE HARM ABSENT
      POSTPONEMENT. ........................................................**Error! Bookmark not defined.**

CONCLUSION...............................................................**Error! Bookmark not defined.**

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Aung Doe et. al v. Noem et. al*,
    No. 1:25-cv-15483, 2026 WL 184544 (N.D. Ill. Jan. 23, 2026).................................3, 4, 9, 11

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ........................................................................................3

*Campanale & Sons, Inc. v. Evans*,
    311 F.3d 109 (1st Cir. 2002)...........................................................................................3

*Dahlia Doe v. Noem*,
    1:25-cv-08686 (S.D.N.Y. Oct. 20, 2025)........................................................................5

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)........................................................................................................7

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)........................................................................................................7

*FDA v. Wages & White Lion Invs., L.L.C.*,
    604 U.S. 542 (2025)........................................................................................................7

*Make The Road New York v. Noem*,
    No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)..........................................17

*Nat'l TPS All. v. Noem*,
    No. 3:25-cv-05687-TLT, 2025 WL 4058572 (N.D. Cal. Nov. 4, 2025) .........................8

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ..........................................................................6, 10

**Statutes**

5 U.S.C. § 705.......................................................................................................................2, 3, 8, 17

8 U.S.C. § 1254a(1)(A)........................................................................................................17

8 U.S.C. § 1254a(b)(3)(A) .................................................................................................... *passim*

**Other Authorities**

8 C.F.R. § 244.10(e).............................................................................................................17

84 Fed. Reg. 13,688 .............................................................................................................13

85 Fed. Reg. 69,344 ...................................................................................................13

87 Fed. Reg. 12,190 ...................................................................................................13

88 Fed. Reg. 60,971 ...................................................................................................13

90 Fed. Reg. 50,484 ............................................................................................ *passim*

Executive Order 14159 ..............................................................................................10

## INTRODUCTION

The portions of the Certified Administrative Record ("CAR") included in Defendants' expedited production demonstrate that Secretary Noem did not follow the process required by Congress when she terminated South Sudan's Temporary Protected Status ("TPS") designation and that her decision was arbitrary and capricious for several reasons. Specifically, the CAR reflects that:

- The Department of Homeland Security ("DHS") did not "consult[] with appropriate agencies" as required by the TPS statute. 8 U.S.C. § 1254a(b)(3)(A). The CAR contains just *one* communication between DHS and the State Department: a cursory email thread from July 2025 where DHS notified the State Department of the impending periodic review for South Sudan (along with Syria, Burma, and Ethiopia) and the State Department responded by saying the agency had "no foreign policy concerns with ending these TPS designations." Declaration of Michael E. Cunniff in Support of Plaintiffs' Supplemental Memorandum In Support Of Plaintiffs' Motion To Postpone Agency Action ("Cunniff Decl."), Ex. 1 at South Sudan TPS AR 000775. DHS did not ask for or receive *any* information from the State Department about country conditions in South Sudan, and the CAR does not reflect any other consultation between the agencies. This brief exchange supports three separate process violations: (1) termination of South Sudan's TPS designation was pre-ordained *before* the statutorily-required "periodic review"; (2) DHS did not "consult" with the State Department in a manner that is consistent with letter or spirit of the TPS statute; and

1

(3) DHS improperly considered extra-statutory U.S. national interest factors (here, framed in terms of "foreign policy").

- DHS had access to an overwhelming amount of objective evidence regarding the dire conditions in South Sudan, including clear and uncontroverted evidence of ongoing armed conflict and other extraordinary circumstances that Defendant Noem either failed entirely to consider or cherry-picked to reach an improperly pre-ordained result that was not based on "the conditions" in South Sudan, as required, but instead was consistent with Defendants' politically-motivated initiative to systematically restrict access to TPS for non-white and non-European countries.

In sum, the CAR shows that Plaintiffs are likely to succeed on the merits in demonstrating that the periodic review underlying Defendants' termination decision (the "Termination") violated the Administrative Procedure Act ("APA"), including in reference to the equal protection guarantees of the Fifth Amendment. And given the voluminous objective evidence of ongoing armed conflict and other extraordinary circumstances in South Sudan, the CAR also supports Plaintiffs' arguments regarding the severe and irreparable harm that they would face if termination is allowed to take immediate effect. Plaintiffs respectfully submit that postponement of the Termination is appropriate under Section 705 of the APA so that Plaintiffs can obtain additional discovery relevant to their claims and the Court can fully review the agency's action.

## I.    THE CERTIFIED ADMINISTRATIVE RECORD CONFIRMS THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The CAR shows conclusively that Defendant Noem did not uphold her statutory obligation to "consult[] with appropriate agencies." 8 U.S.C. § 1254a(b)(3)(A); *see also* Memorandum In Support of Emergency Motion, Dkt. 7-1 at 15–16. That failure, standing alone, shows that Plaintiffs are likely to succeed on the merits of their claim that the periodic review underlying the

Termination was unlawful. But that is not all. The CAR also clearly demonstrates that Defendants (1) improperly considered extra-statutory "national interest" factors, (2) failed to consider objective evidence of country conditions or cherry-picked evidence to support a pre-ordained result, and (3) departed from past agency practice in a way that is arbitrary and capricious. For these reasons, postponement is warranted under Section 705 so the Court can conduct a full review of the agency action before it takes effect.

> **A.      The CAR Shows That Defendants Did Not Consult Appropriate Agencies as Required by the TPS Statute.**

At the periodic review stage, Congress provided that the Secretary "shall" review conditions in the TPS-designated country "*after* consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added).  In this Circuit, "consultation means what consultation ordinarily means . . . the act of asking the advice or opinion of someone." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 117 (1st Cir. 2002) (cleaned up).  "Consultation is a process that requires reciprocal communication of some substance; it is not satisfied by a rubber stamp or a sign-off on a decision that has already been made." Mem. Op and Order at 28, *Aung Doe et. al v. Noem et. al*, No. 1:25-cv-15483, 2026 WL 184544 (N.D. Ill. Jan. 23, 2026), Dkt. No. 51 at 28); *see also Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1088 (9th Cir. 2011) (discussing cases defining agency consultation requirements and noting the consultation is an "affirmative duty" that must be "meaningful" and occur before making a decision).

The CAR contains no indication that anyone at DHS "consulted" another agency in a manner that complies with the TPS statute. Indeed, the *only* communication with another agency contained in the CAR is a single July 2025 email from DHS to the State Department, and the State Department's response.  Cunniff Decl., Ex. 1 at South Sudan TPS AR 775–76.  In DHS's email, a Counselor in the Secretary's office notified a Senior Bureau Official at the State Department that

four "TPS designations are coming up for review"—Syria, South Sudan, Burma, and Ethiopia. *Id.* at South Sudan TPS AR 775. DHS's email was a notification rather than a consultation because it did not include any request to "advise" or for "opinion" from the State Department. *Campanale*, 311 F.3d at 117. The State Department responded the following day to say that "State has no foreign policy concerns with ending the TPS designations on or before those dates." *Id.*. That brief confirmation regarding *foreign policy* concerns was not consultation and did not speak to the relevant considerations under statute, namely "conditions in the foreign state" or whether the "conditions for [TPS] designation . . . continue to be met." *See* 8 U.S.C. 1254a(b)(3)(A). It also indicates that the decision to "end[] the TPS designation" for South Sudan was already made *prior* to the e-mail being sent, in direct violation with the text of the TPS statute which requires an objective review of country conditions and ultimate determination "after" the requisite consultation has taken place. *Id.* There is *no* evidence in the CAR that anyone in DHS consulted the State Department—or any other government agency—regarding country conditions in South Sudan as required by the TPS statute.

Notably, Defendants have used *the same email* as evidence of consultation for termination of TPS status for multiple countries, including Burma, where a district court in Illinois recently granted a motion to postpone that termination. *See Aung Doe*, No. 1:25-cv-15483, Dkt. 51 at 29–30. The court in *Aung Doe* found this single email exchange to be insufficient for several reasons. *First*, the initial DHS email covered four countries, but the State Department's response did not individually consider the circumstances of those countries. *Id.* at 30. *Second*, there was no back-and-forth at all, and the State Department's response suggested that it was a "foregone conclusion that the Secretary would terminate the listed TPS designations, a logical assumption based on the Secretary's recent practice of terminating each TPS designation up for review." *Id. Third*, the

4

conclusory statement by the State Department official addressed only "foreign policy concerns with ending these TPS designations, a distinct issue from the statute's reference to whether the conditions for [TPS] designation under this subsection continue to be met." *Id.* (cleaned up). The same conclusion applies here. *See* Dkt. 52 ("Pls.' Reply Br.") at 9–10; Dkt. 7-1 ("Pls.' Opening Br.") at 9–10; Dkt. 8-8 (Exhibits 16–24 ISO Pls. Mot. to Postpone) (discovery material from parallel litigation concerning TPS for Nepal, Nicaragua, and Honduras, and comprising email exchanges within DHS that belie the occurrence of statutorily required consultation); Dkt. 1 (Compl.) ¶¶ 71–72, 126–31.

### B.    The CAR Shows that Defendants Impermissibly Considered U.S. National Interests.

The only grounds for terminating a TPS designation under the TPS statute is that the *designated country's* conditions no longer meet the requirements for continued designation. *See* 8 U.S.C. § 1254a(b)(3)(A) (during periodic reviews of TPS designations the Secretary "shall review the conditions *in the foreign state*" for which "a designation is in effect under this subsection") (emphases added); *id*. § 1254(b)(3)(B) (allowing for a termination to result from a periodic review if the Secretary determines that the foreign state no longer continues to meet the *conditions* for designation); *id*. § 1254a(b)(1)(A) (initial designations based on armed conflict in the foreign country with no reference *at all* to domestic "national interest"); *id*. § 1254a(b)(1)(C) (initial designations based on extraordinary and temporary conditions and referencing domestic "national interest" not as a "condition" for designating the foreign country but *as an exception to* designating the foreign country); *see also* Oral Order at 19–20, *Dahlia Doe v. Noem,* 1:25-cv-08686, (S.D.N.Y. Oct. 20, 2025), Dkt. 57 (reviewing the TPS statute and finding that "periodic review, including review for termination, is limited to consideration of country conditions, and not to proclamations

of the national interest divorced from those country conditions"); Pls.' Reply Br. at 11–12; Pls.' Opening Br. at 13.

Nevertheless, Defendant Noem's Termination reflects that her periodic review of South Sudan's TPS designation found that the continued temporary presence of South Sudanese TPS beneficiaries in the United States is contrary to the "national interest," divorced from country conditions in South Sudan. 90 Fed. Reg. 50,484 (Nov. 6, 2025). The CAR confirms that these impermissible "national interest" factors played a role in the periodic review that led to Termination. Indeed, the cursory State Department email thread detailed above *only* discussed whether there were any U.S. "foreign policy concerns" with terminating South Sudan's TPS designation. *See* Cunniff Decl., Ex. 1 at South Sudan TPS AR000775.

In addition, the Federal Register notice announcing the Termination cited various purported examples of why the continued presence of South Sudanese TPS holders in the United States was contrary to the national interest. One such example asserts that "a portion of the South Sudan Temporary Protected Status population has been subjects [*sic*] of administrative investigation for fraud, public safety and national security concerns." 90 Fed. Reg. 50,484 (Nov. 6, 2025). As a threshold matter, this is not a valid consideration at the periodic review stage as laid out in the TPS statute, which instructs the executive branch to "review the conditions *in the foreign state*," 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). Beyond that, however, the CAR reveals that this assertion is contrary to the record based on Defendants' own data: a report from DHS's Fraud Detection and National Security Data System ("FDNS-DS") showed *no* findings of fraud or public safety concerns for South Sudanese TPS holders. Cunniff Decl., Ex. 2 at South Sudan TPS AR000122.

6

This demonstrates that the Federal Register notice announcing the Termination does not provide a "true and factual" basis for the Termination. *Saget v. Trump,* 375 F. Supp. 3d 280, 346–347 (E.D.N.Y. 2019); *see also* Compl. at ¶ 134 (noting that Defendant Noem used verbatim language for Afghanistan, Haiti, and Syria, claiming that "DHS records indicate that there are . . . nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security."). And it further supports Plaintiff's contention that the decisions was a predetermined action to restrict TPS designations across the board, and not based on the specifics of South Sudan's country conditions, as required; Pls.' Reply Br. at 7–9; Pls.' Opening Br. at 7–9; Dkt. 8-6 (Ex. 9 ISO Pls.' Mot. to Postpone) at 101 (remarks of Defendant Noem that TPS had "been abused and manipulated by the Biden [A]dministration," and indicating that TPS "extensions going forward" "will no longer be allowed," because "the program was intended to be temporary."); *id.*, Ex. 10 at 167 (article noting remarks of the President that he does not consider TPS "legal"); *id.*, Ex. 11 at 2 (remarks of Defendant Noem impugning availability of TPS to people "**even if they entered the country illegally**" and claiming that for "decades the TPS system has been exploited and abused") (emphases in original); Compl. at ¶¶ 114–20 (detailing statements and actions of Administration officials expressing or reflecting their intent to systematically take away TPS and insinuating it to be, or describing it as, "illegal").

### C.    The CAR Shows the Periodic Review Process Was Arbitrary and Capricious.

The CAR further reveals that the periodic review process departed from past agency practice without explanation, making it arbitrary and capricious. While "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change," *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (quotation omitted), generally, "[a]n agency may not . . . depart from a prior policy *sub silentio*," *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).  When an agency does depart from established policy, it "must show

that there are good reasons for the new policy." *Id.* Courts consider "whether an agency changed existing policy" and whether the agency "display[ed] awareness that it *is* changing position and offer[ed] 'good reasons for the new policy[.]'" *White Lion*, 604 U.S. at 568.

Here, the CAR demonstrates that periodic review underlying the Termination arbitrarily departed from prior policy in three ways. *First*, the CAR demonstrates that Defendants did not solicit or consider a country conditions report from the State Department. *See* Pls.' Opening Br. at 2. *Second*, as previously described, Defendants considered U.S. "national interests" in the periodic review process, something that had never been a consideration prior to 2025. *Id.* at 14. *Third*, Defendants disregarded evidence of conditions in South Sudan relevant to factors the agency had considered in prior periodic reviews of South Sudan's designation. *Id.* at 10-13.

Together, these unexplained departures from prior agency practice reflected in the CAR show that the periodic review was not undertaken in good faith but rather to arrive at a preordained conclusion. At every opportunity, Defendants ignored their obligations under statute and did not objectively evaluate the evidence at their disposal, departing from decades of past agency practice to fast-forward to a foregone conclusion. The CAR thus demonstrates that Plaintiffs are likely to succeed on the merits of the claim that the Termination here was arbitrary and capricious under the APA, warranting postponement of the Termination pending the Court's full review of the agency's action. 5 U.S.C. § 705.

1. <u>Defendants Did Not Solicit a Country Conditions Report from the State Department, Continuing a *Sub Silentio* Change in Agency Policy.</u>

As revealed in discovery during litigation related to the periodic review processes leading to termination of the TPS designation for Nepal, Honduras, and Nicaragua, DHS stopped receiving country conditions information from the State Department as part of the TPS periodic review process in or around March 2025. *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT, 2025 WL

4058572 (N.D. Cal. Nov. 4, 2025), Exs. in Supp. of Pls' Mot. for SJ, Dkt. 176-22 at 1504_0002–1504_0003 (April 8, 2025, email exchanges involving DHS personnel and noting that: "Mirna just confirmed the DoS [Department of State] process" . . . "DOS [Department of State] is no longer providing country conditions"); *id*., Dkt. 176-27 at 1525 (March 11, 2025, email exchange involving DHS personnel and remarking that for TPS periodic reviews Department of State personnel "are going to provide a letter instead of country conditions"); *id*., Dkt. 176-28 at 2342 (March 21, 2025, email exchange involving DHS personnel and remarking that "State will no longer submit detailed COI [] reports for TPS decision-making"). This reflects a sharp break in agency practice of soliciting and reviewing State Department country conditions reports as part of the periodic review process. *See* Dkt. 8-6 (Ex. 6 ISO Pls.' Mot. for Postponement) at 15–28 (U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020)) (laying out the steps normally taken by DHS and the Department of State during the periodic review process). The CAR here shows the same; while there is a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") Directorate *within DHS*, there is no such report from the State Department. Defendants provide no rationale for this abrupt shift in procedure, making it arbitrary and capricious. *See* Pls.' Reply Br. at 9–10; Pls.' Opening Br. at 8–10; Compl. at ¶¶ 71–74, 126–31.

2.    Defendants' Consideration of National Interests Was Arbitrary and Capricious.

As described above, Defendants improperly considered domestic "national interests" during the periodic review process. In addition to being a consideration not provided for in the statute, *see* 8 U.S.C. § 1254a(b)(3)(A), it is a consideration upon which no prior TPS termination decision had ever rested prior to 2025. In postponing the termination of Burma's TPS status, the

district court found that Plaintiffs were likely to succeed on their claim that Defendant Noem's reliance on national interest in her termination notices was arbitrary and capricious because it deviated from past policy with no explanation of why. *Aung Doe*, No. 1:25-cv-15483, Dkt. 51 at 49–51; *Dahlia Doe v. Noem,* No. 1:25-cv-08686 (S.D.N.Y.), Dkt. 59 at 15-18.

Here, Defendant Noem relies on a similar national interest claim, supported by a claim that "a portion of the South Sudan Temporary Protected Status Population has been subjects of administrative investigation for fraud, public safety, and national security concerns." Compl. at ¶¶ 98–101; *see also* Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, n. 13, 14, 15 (Nov. 6, 2025). This apparent conclusion is contrary to the objective evidence contained in the CAR, which shows that *no* South Sudanese TPS holders were subject to such investigation for fraud and public safety. *See* Cunniff Decl., Ex. 2 at South Sudan TPS AR000122. Thus, the CAR shows that Defendants' unexplained policy change to consider domestic national interests, and the purported rationale for doing so, were both arbitrary and capricious. *See* Pls.' Reply Br. at 11–12; Pls.' Opening Br. at 13; Dkt. 8-7 (Ex. 15 ISO Pls.' Mot. to Postpone); Compl. at ¶¶ 98–101, 132–35.

### D. The CAR Shows That Defendants Either Did Not Review Objective Evidence of Conditions in South Sudan or Disregarded Such Evidence to Reach a Pre-Determined Conclusion.

The TPS statute calls for "review of conditions in the foreign state" at the periodic review stage. Defendant Noem was required to base this review on "objective conditions in the [] country," "regardless of any government official's political motives." *Saget*, 375 F. Supp. 3d at 346; *see also* 8 U.S.C. § 1254a(b)(3)(A). Based on the clear evidence in the CAR, Defendants either (a) did not review objective evidence of current conditions in South Sudan at all, in violation of the TPS statute; or (b) cherry-picked from the record only evidence that supported the decision

to terminate the TPS designation, making the Termination arbitrary and capricious.  Either way, the CAR demonstrates that Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs have shown from statements made by Defendant Noem, President Trump, and others in his administration that there is considerable pressure to terminate TPS designations, regardless of the objective country conditions in the foreign states in question.  *See, e.g.* Executive Order 14159, "Protecting the American People Against Invasion" (stating that policies of past administrations had led to an "unprecedented flood of illegal immigration" that had caused "vile and heinous acts against innocent Americans" and calling on the DHS Secretary to ensure that TPS designations "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute[.]"); Dkt. 8 (Exs. 9–12, 25–26, 52–75 ISO Pls.' Mot. to Postpone) (compiling statements of Defendant Noem, President Trump, and others committing to "end" TPS).  This is not just empty rhetoric; Defendant Noem has followed through by terminating TPS status for all 12 countries for whom she has overseen a periodic review.

Considered in the context of Defendants' wider conduct in terminating TPS designations at every turn, the failure to consider the objective evidence in the record as laid out herein "suggests that the Secretary did not review the evidence regarding any of these countries . . . as required by the TPS statute." *Aung Doe,* No. 1:25-cv-15483, Dkt. 51 at 36.

       1.    <u>The CAR Shows Defendants Did Not Consider Available and Objective Evidence of Ongoing Armed Conflict</u>

Plaintiffs previously noted that the Termination notice itself reflected that Defendant Noem failed to consider available and objective evidence of ongoing armed conflict.  *See* Pls.' Opening Br. at 10–12.  The Termination notice states that "there is inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization," but concludes that the country no longer meets the "ongoing armed conflict" element of the TPS

statute simply because "return to full-scale civil war, to date, has been avoided."  90 Fed. Reg. 50,484 (Nov. 6, 2025).

The CAR reflects that this assessment is contrary to objective evidence contained in the record and which Defendants had an obligation to consider as part of the periodic review process. *DHS itself* specifically warned that armed conflict had increased since the prior TPS extension in March 2025.  A country conditions report from DHS's Refugee, Asylum, and International Operations Directorate ("RAIO") covering the reporting period from May 16, 2023 to June 13, 2025 demonstrates this, noting that "armed violence has *escalated* in various parts of the country," that more than 100,000 people in South Sudan were newly displaced to neighboring countries, and that 65,000 more were internally displaced, from late February through early June 2025.  Cunniff Decl. Ex. 3, South Sudan TPS AR000147, AR000164.  The RAIO report goes on to note that there was a *resumption* of armed violence in March 2025, and that hostilities had escalated "drastically" in March 2025.  *Id.* at AR000149.

Ignoring this objective evidence in the periodic review process is a violation of Congress's mandate that the Government "shall" review conditions in the foreign state and renders the periodic review process not in accordance with the law.  8 U.S.C. § 1254a(b)(3)(A). *See also* Pls.' Reply Br. at 7-20; Pls.' Opening Br. at 7-17.

   2. <u>The CAR Shows That Defendants Did Not Consider Available and Objective Evidence of Other Extraordinary Circumstances.</u>

Similarly, Plaintiffs previously noted that Defendant Noem's consideration of extraordinary circumstances in South Sudan appeared to include only cherry-picked indicia of minor positive developments:  Two infrastructure grants from the World Bank; a $9 million grant for an internet project still in the development phase; a refugee-flow statistic from nearly four years

ago; and the presence of a United Nations Mission that has existed since 2011.  90 Fed. Reg. 50,484, n. 13, 14, 15 (Nov. 6, 2025).

The CAR is replete with available and objective evidence that such factors are still present. For example, the RAIO report states that "South Sudanese are currently experiencing some of the highest levels of food insecurity since South Sudan became an independent nation in July 2011." Cunniff Decl., Ex. 3 at South Sudan TPS AR000159.  The report also notes that the country is facing "multiple health emergencies," including several different disease outbreaks, *id.* at AR 000160, and continued displacement from flooding, *id.* at AR 000161.  In short, Defendant Noem's own agency provided her with available and objective evidence of ongoing extraordinary circumstances—evidence that Congress requires her to consider.  8 U.S.C. § 1254a(b)(3)(A).  She did not do so, rendering the process contrary to law. *See* Pls.' Reply Br. at 9-11; Pls' Opening Br. at 7-14.

### 3. Alternatively, the CAR Shows Defendants Review Was Arbitrary and Capricious.

Even if the Court concludes that Defendants did review conditions in South Sudan in a manner consistent with the statute, they did so in a manner that was arbitrary and capricious.  As noted above, Defendants failed to consider a mountain of evidence from internal DHS reports in determining that since "full-scale civil war" had not broken out, there was no longer an "ongoing armed conflict" warranting extension of the TPS designation.  90 Fed. Reg. 50,484 (Nov. 6, 2025). In addition to not being in accordance with the law, it reflects a change in standard for what constitutes "ongoing armed conflict" that is arbitrary and capricious.

The civil war in South Sudan officially ended in 2018. *See* Cunniff Decl., Ex. 3 at South Sudan TPS AR000147 (describing history of armed conflict in South Sudan).  However, its TPS designation had been extended because of ongoing armed conflict four times *after* the war had

officially ended. 84 FR 13,688, 85 FR 69,344, 87 FR 12,190, 88 FR 60,971. The extension of South Sudan's TPS designation in 2023, for example, states: "*In spite of* the 2018 peace agreement that established the current transitional government—and to which President Kiir and Vice President Machar were signatories—South Sudan faces often violent political contestations, and the lack of stable government has facilitated ongoing violence that is nearly always characterized by gross human rights violations that have targeted civilians and caused mass displacements in parts of the country." 88 FR 60971 (emphasis added) (cleaned up). The most recent RAIO report reflects that these same issues related to ongoing armed violence are still present. *See* South Sudan TPS AR000146–65 (noting a "deteriorating security situation with intensifying clashes, airstrikes, and intercommunal violence in the Upper Nile Region, "continued insurgency . . .with abuses against civilians" in the greater Equatoria Region, and the internal displacement of 65,000 people and external displacement of 100,000 more between late February and early June 2025). The Termination notice evaluates none of this, instead stating that despite "inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization, return to full-scale civil war, to-date, has been avoided." 90 Fed. Reg. 50,484 (Nov. 6, 2025).[1]

The Termination notice does claim that the armed conflict has resolved; it simply changes the standard against which it is measured. Similarly, the Termination extraordinary circumstances the Termination did not explain why Defendant Noem did not consider factors that prior periodic reviews considered when determining whether other extraordinary circumstances still exist in South Sudan, including acute food insecurity; environmental and health concerns, including

---

[1] The Termination notice also points to a 2024 UN report as evidence of "[i]mprovements in displacement trends," *Id.* at n. 13, without acknowledging the RAIO report describing hundreds of thousands of newly displaced residents.

14

widespread flooding and disease outbreaks; and barriers to humanitarian access. *Compare* 90 Fed.

Reg. 50,484, 50,485, *with* 88 Fed. Reg. 60,971, 60,975; *see* also Pls.' Reply Br. at 11; Pls' Opening

Br. at 12.

## II. THE CERTIFIED ADMINISTRATIVE RECORD CONFIRMS THAT PLAINTIFFS FACE SEVERE AND IRREPARABLE HARM ABSENT POSTPONEMENT.

The CAR is also replete with evidence of the irreparable harm the Plaintiffs will suffer

should the Court not postpone the effective date of South Sudan's TPS termination. For example,

the objective evidence contained in the CAR demonstrates that TPS holders forced to return to

South Sudan would be walking into a "dire humanitarian situation" in a country facing "multiple

disease outbreaks," and women and children especially would be at the risk of "conflict-related

sexual violence." Cunniff Decl., Ex. 3 at South Sudan TPS AR000147, 156, 160 (USCIS RAIO

unit country conditions report, covering May 16, 2023 to June 12, 2025, with some information

through July 16, 2025). The CAR also reflects that there are overlapping humanitarian crises on

the ground: more than three-quarters of the population is in need of humanitarian assistance, and

more than sixty percent suffer from food insecurity. *See id.* at AR000157–58. The humanitarian

crisis continues to deepen with an "alarming escalation of attacks on civilians and civilian

infrastructure." *Id.* at AR000150 (quoting South Sudan Protection Analysis Update, Global

Protection Cluster, Apr. 1, 2025, pg. 14). Ongoing armed conflict has resulted in large numbers of

civilian deaths and mass displacement. *See id.* at AR000148-55. During a three-month period last

year, "over 100,000 South Sudanese were newly displaced to neighboring countries by conflict,

and 65,000 displaced internally. Meanwhile, the ongoing civil war in neighboring Sudan has

displaced over one million people from Sudan to South Sudan, straining already overstretched

resources, disrupting aid delivery, and further destabilizing the country of South Sudan." *Id.* at

AR000148. Moreover, government forces conduct arbitrary arrests, *see id.* at AR000154, and

restrict fundamental freedoms affecting "civil society actors, political activities, journalists, humanitarian workers and members of parliament perceived to be critical of the government." *Id.* at AR000150.

The Trump administration has expressed its concerns about these dire conditions in South Sudan. In March 2025, President Trump "determined that it is necessary to continue the national emergency … with respect to South Sudan" and described "activities that threaten the peace, security, or stability of South Sudan and the surrounding region, including widespread violence and atrocities, human rights abuses, recruitment and use of child soldier, attacks on peacekeepers, and obstruction of humanitarian operations." Cunniff Decl., Ex. 4 at South Sudan TPS AR000002 (Message from President Trump to Congress (H. Doc. No. 119-34)). In April 2025, U.S. Ambassador to the United Nations Dorothy Shea warned of the "deteriorating security situation in South Sudan," where "92 percent of the population live in extreme poverty," "millions are experiencing acute food insecurity," and there are "reports of ground attacks, aerial bombardments, and indiscriminate use of barrel bombs that have killed many civilians and displaced tens of thousands. Cunniff Decl., Ex. 5 at South Sudan TPS AR000201.

The U.S. State Department has recently advised against travel to South Sudan "due to crime, kidnapping, and armed conflict." See Cunniff Decl., Ex. 6 at South Sudan TPS AR000741 (January 2025 Travel Advisory); See Ex. 8 at South Sudan TPS AR000757 (March 2025 Travel Advisory). These travel advisories describe safety and security concerns in South Sudan such as the presence of land mines, "[a]rmed conflict between various political and ethnic groups," and the population's "ready access to weapons due to years of civil war, inter- and intra-ethnic conflict, and political unrest." See Cunniff Decl., Ex. 7 at South Sudan TPS AR000745-46 (January 2025 Travel Advisory). Diseases such as cholera, typhoid, malaria, yellow fever, and dengue are

prevalent, and there are "shortages of food, water, medicine, and medical supplies throughout" the country. See *id.* at South Sudan TPS AR000751–752 (January 2025 Travel Advisory).

All of these conditions reflect risks of grave and even deadly harms that Plaintiffs and other South Sudanese TPS holders and applicants face upon forcible or voluntary return to South Sudan. If postponement of the Termination is not granted and the Termination takes immediate effect, it is cold comfort to them that they may be able to raise limited, back-footed legal defenses, if DHS undertakes enforcement actions against them.

Significantly, through such immigration enforcement actions, Defendants would be subjecting TPS holders and prima-facie-eligible TPS applicants to harms that Congress wanted them *to avoid*. See 8 U.S.C. §§ 1254a(1)(A) (protection from deportation), (d)(4) (protection from immigration confinement); 8 C.F.R. § 244.10(e) (protections extend to given applicants). Moreover, Congress established TPS as a form of humanitarian protection that does not turn on individualized persecution and harm, the way that asylum and related forms of protection do and that not all TPS holders and applicants may be able to establish. And all of this harm is compounded by the fact that Defendants are aggressively seeking to restrict access to standard removal proceedings and instead undertake expedited removals with few, if any, procedural rights for the targeted individuals. *See, e.g.*, *Make The Road New York v. Noem*, No. 25-5320, 2025 WL 3563313, *14 (D.C. Cir. Nov. 22, 2025) (litigation challenging DHS policy expanding the scope of expedited removal).

For these and the many other reasons Plaintiffs have provided, allowing the Termination to take immediate effect would cause irreparable harm to them, other South Sudanese TPS holders and applicants, and their loved ones. *See* Pls' Reply Brief at 21–24; Pls' Opening Br. at 17–19.

## CONCLUSION

For all of these reasons, the Court should exercise its authority under 5 U.S.C. § 705 to postpone the effective date of South Sudan's termination pending the conclusion of this case on the merits.