**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                        )
AFRICAN COMMUNITIES TOGETHER;       )
MARY DOE; DAVID DOE; PETER DOE;       )
and JACOB DOE, on behalf of                   )
themselves and all others                        )
similarly situated,                                   )
                                                        )
                           Plaintiffs,             )
                                                        )
v.                                                        )          Civil Action
                                                        )          No. 25-cv-13939-PBS
KRISTI NOEM, in her official              )
capacity as Secretary of the              )
Department of Homeland Security;      )
U.S. DEPARTMENT OF HOMELAND        )
SECURITY; U.S. CITIZENSHIP AND       )
IMMIGRATION SERVICES; and UNITED  )
STATES OF AMERICA,                          )
                                                        )
                           Defendants.            )
_____)

**MEMORANDUM AND ORDER**

February 12, 2026

Saris, J.

**INTRODUCTION**

South Sudan was designated for Temporary Protected Status ("TPS") in 2011, shortly after becoming the world's newest nation. After multiple extensions and redesignations, on November 6, 2025, Secretary of Homeland Security Kristi Noem announced that South Sudan's TPS designation would terminate in sixty days. Secretary Noem has decided to terminate the TPS designations of twelve countries in the past twelve months: Venezuela, Afghanistan,

Cameroon, Nepal, Nicaragua, Honduras, Syria, South Sudan, Myanmar, Haiti, Ethiopia, and Somalia. See App. A (summarizing litigation regarding each of these twelve terminations).

On December 22, 2025, a nonprofit called African Communities Together ("ACT") and four South Sudanese TPS holders filed a putative class action complaint against Secretary Noem, the U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), and the United States (collectively, "Defendants"). Plaintiffs allege that the termination of South Sudan's TPS designation violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., and the equal protection component of the Fifth Amendment, see U.S. Const. amend. V. Now before the Court is Plaintiffs' motion to postpone the termination under 5 U.S.C. § 705.

After a hearing and review of the administrative record, the Court concludes that Plaintiffs are likely to succeed on their arguments that Secretary Noem violated the APA by arbitrarily adopting a pattern and practice of terminating each and every TPS designation, by giving pretextual reasons for the termination of South Sudan's TPS designation, and by failing to meaningfully consult with appropriate agencies. The Court further determines that Plaintiffs would suffer irreparable harm absent postponement of the termination and that the balance of equities weighs in

Plaintiffs' favor. Accordingly, the Court **ALLOWS** Plaintiffs' motion to postpone pursuant to 5 U.S.C. § 705 (Dkt. 7).

**BACKGROUND**

I.    **The TPS Statute**

In 1990, Congress amended the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., to create the TPS program. See Immigration Act of 1990, Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030-36 (codified at 8 U.S.C. § 1254a). Under that program, noncitizens from designated countries may apply for work authorization and temporary protection against removal. See 8 U.S.C. § 1254a(a)(1).

The TPS statute authorizes the Secretary of Homeland Security to "designate any foreign state" for TPS only if she finds that at least one of three conditions applies. Id. § 1254a(b)(1). First, a foreign state may be designated if "an ongoing armed conflict . . . would pose a serious threat to the[] personal safety" of returning nationals. Id. § 1254a(b)(1)(A). Second, designation is permitted where a foreign state has requested designation after suffering an "environmental disaster" such as "an earthquake, flood, drought, [or] epidemic." Id. § 1254a(b)(1)(B). Third, the Secretary may designate a foreign state in which "there exist extraordinary and temporary conditions . . . that prevent" that state's nationals "from returning to the state in safety, unless the [Secretary] finds

that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." Id. § 1254a(b)(1)(C).

A TPS designation lasts for six to eighteen months. See id. § 1254a(b)(2). "At least 60 days before [the] end of" a foreign state's designation period, the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation . . . continue to be met." Id. § 1254a(b)(3)(A). "If the [Secretary] does not determine" that the designated foreign state "no longer meets the conditions for designation," the designation period is automatically extended. Id. § 1254a(b)(3)(C). If, on the other hand, "the [Secretary] determines" that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation by publishing notice in the Federal Register of the determination," "including the basis for the determination." Id. § 1254a(b)(3)(B). The resulting TPS termination "shall not be effective earlier than 60 days after the date the notice is published." Id.

Judicial review of the Secretary's TPS determinations is statutorily proscribed. The TPS statute provides that "[t]here is no judicial review of any determination of the [Secretary] with

4

respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." <u>Id.</u> § 1254a(b)(5)(A).

## II.    <u>The Current Administration's TPS Terminations</u>

On the first day of his second term in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025). The executive order directs the Secretary of Homeland Security and other officials to "take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States." <u>Id.</u> at 8446. As relevant here, the executive order tasks government officials with "ensuring that designations of Temporary Protected Status are consistent with the provisions of [§ 1254a], and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." <u>Id.</u>

Since the issuance of that executive order, the government has taken steps to terminate the TPS designations of twelve countries: Venezuela, Afghanistan, Cameroon, Nepal, Nicaragua, Honduras, Syria, South Sudan, Myanmar, Haiti, Ethiopia, and Somalia. <u>See</u> App. A. Only five countries with TPS designations have not yet been slated for termination: El Salvador, Lebanon,

Sudan, Ukraine, and Yemen. <u>See</u> U.S. Citizenship & Immigr. Servs., Temporary                    Protected                    Status, https://www.uscis.gov/humanitarian/temporary-protected-status (last visited Feb. 12, 2026). At least four of these five designations are not yet eligible to be terminated.[1]

## III. **The Termination of TPS for South Sudan**

South Sudan was first designated for TPS in 2011. <u>See</u> Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63629, 63630 (Oct. 13, 2011). The then-Secretary of Homeland Security found that TPS protection was warranted due to both "ongoing armed conflict" and other "extraordinary and temporary conditions" such as food insecurity, human rights abuses, and impediments to humanitarian aid. <u>Id.</u> at 63631. South Sudan then retained TPS until the present through a series of extensions and redesignations. Most recently, in May 2025, DHS announced an automatic six-month extension of South Sudan's TPS designation, noting that Secretary Noem "was unable to make an informed determination" by the "statutory deadline due to the lack of an updated analysis of current country conditions in

---

[1] Yemen's TPS designation is listed as being in place until March 3, 2026. <u>See</u> U.S. Citizenship & Immigr. Servs., <u>Temporary Protected Status Designated Country: Yemen</u>, https://www.uscis.gov/humanitarian/temporary-protected-status/yemen/temporary-protected-status-designated-country-yemen (last visited Feb. 12, 2026). Because Secretary Noem has not announced a termination of that designation, it likely will be automatically extended.

South Sudan." Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19217, 19217 (May 6, 2025).

On November 6, 2025, DHS published a notice announcing that South Sudan's TPS designation would be terminated effective January 5, 2026. Termination of the Designation of South Sudan for Temporary Protected Status ("Termination"), 90 Fed. Reg. 50484, 50484 (Nov. 6, 2025). By DHS's estimate, the termination of South Sudan's TPS designation will affect 232 TPS holders and 73 applicants. See id. at 50486. The termination notice states that the May 2025 extension "occurred because Secretary Noem was provided with a non-current record from the Department of State that was signed November 6, 2024, which, together with other factors, prevented [her] from making an informed decision by the . . . statutory deadline." Id. at 50485. "[A]fter consulting with appropriate U.S. Government agencies" and "review[ing] current country conditions in South Sudan," however, the Secretary determined that South Sudan no longer met the conditions for TPS designation as of November 6, 2025. Id.

The Federal Register notice provides several explanations for this determination. First, the notice states that Secretary Noem determined that "South Sudan no longer meets the criteria for an ongoing armed conflict" under the TPS statute because although "inter/intra-communal violence" persists, "return to full-scale civil war . . . has been avoided" and "[r]ecent diplomatic

7

developments . . . indicate South Sudan's willingness to ensure the safety and reintegration of its returning nationals." Id.

Next, the notice lists several "improvements in South Sudan's civil safety outlook," infrastructure, and other developments. Id. While acknowledging that "certain extraordinary and temporary conditions remain" in South Sudan, the notice states that Secretary Noem determined that termination "is required because it is contrary to the national interest to permit South Sudanese nationals . . . to remain temporarily in the United States." Id. at 50486. In assessing the national interest, the notice points to "foreign policy concerns" -- such as "the transitional South Sudanese government's current compliance" with accepting returning nationals -- and "public safety and national security risks" posed domestically by South Sudanese nationals who are purportedly "subjects of administrative investigation for fraud, public safety and national security concerns." Id.

Finally, the notice cites Executive Order 14,159, stating that President Trump directed Secretary Noem to "take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States," including by limiting TPS designations. Id. The notice states that this directive from President Trump "bear[s] upon the national interest." Id.

8

IV.  **The Instant Lawsuit**

On December 22, 2025, Plaintiffs filed a putative class action complaint challenging the termination of TPS for South Sudan. Plaintiff ACT is a nonprofit membership organization that has "South Sudanese TPS recipients and/or applicants" among its members and that "fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States." Dkt. 1 ¶¶ 16, 18. Pseudonymous Plaintiffs Mary Doe, David Doe, Peter Doe, and Jacob Doe are South Sudanese nationals whose sole immigration status is TPS. Plaintiffs intend to seek certification of a class consisting of all recipients of TPS for South Sudan, all persons with pending applications for TPS for South Sudan, and the U.S. citizen dependents or immediate relatives of those two groups.

The complaint advances four APA claims and one constitutional claim.[2] Count One alleges that the termination of TPS for South Sudan was procedurally improper in violation of 5 U.S.C. § 706(2)(D) because Secretary Noem "failed to consult with appropriate agencies," failed to review country conditions, based the termination "on a predetermined domestic policy . . . to restrict access to TPS for non-white, non-European, African

---

[2] Defendants do not currently contest standing, and the Court is satisfied that Plaintiffs have adequately demonstrated standing at this stage of the litigation.

immigrants," and improperly considered the "national interest." Id. ¶¶ 202-04; see id. ¶¶ 196-208. Count Two alleges that the Secretary unlawfully departed from past agency practice without explanation by providing only sixty days' notice before the termination, considering the national interest, and failing to consider intervening country conditions since the most recent TPS extension. See id. ¶¶ 209-15. Count Three alleges that the termination was arbitrary and capricious and contrary to law under 5 U.S.C. § 706(2)(A) and (C) because the Secretary, inter alia, failed to consider country conditions, neglected to consult appropriate agencies, and acted based on "undue political influence" and "impermissible racial preferences." Id. ¶ 218(E)-(F); see id. ¶¶ 216-20. Count Four alleges that the termination was "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B) due to "racial and/or national origin animus against African and other non-white or non-European immigrants." Id. ¶¶ 222-23; see id. ¶¶ 221-26. Count Five alleges an equal protection violation under the Fifth Amendment based on that purported animus. See id. ¶¶ 227-32.

On December 23, 2025, Plaintiffs filed an emergency motion to postpone the effective date of the termination pursuant to 5 U.S.C. § 705. Plaintiffs argue that postponement is appropriate because they are likely to succeed on their claims that (1) the termination is contrary to law under § 706(2)(A) because the Secretary made a

predetermined decision to terminate South Sudan's TPS without consulting appropriate agencies or considering current country conditions, and because the Secretary impermissibly considered the national interest, see Dkt. 7-1 at 13-19; (2) the termination is arbitrary and capricious under § 706(2)(A) because it departed from past agency practice in providing only sixty days' notice and considering the national interest, see id. at 19-20; and (3) the termination violated § 706(2)(B) and the Fifth Amendment by discriminating based on race and national origin, see id. at 20-23.

A hearing was held by the emergency judge on December 26, 2025, on Plaintiffs' request for an administrative stay of the termination until the Court could resolve Plaintiffs' § 705 motion. The emergency judge issued the requested relief, thereby staying the effective date of the termination "subject to further [o]rder of this Court or higher courts." Dkt. 37 at 4. As noted in the emergency judge's order, the administrative stay was "not a reflection of the merits" but rather was issued solely to "allow the [C]ourt time to consider the merits" of Plaintiffs' § 705 motion. Id. at 3.

After hearing, upon the Court's request, Defendants filed the certified administrative record on January 26, 2026. The parties then filed supplemental briefing on February 2, 2026. Plaintiffs' § 705 motion is now before the Court.

## LEGAL STANDARD

The APA provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of" the court's review of the agency action. 5 U.S.C. § 705. In determining whether to postpone agency action under § 705, courts assess the factors that govern the issuance of a preliminary injunction. See, e.g., Nat'l TPS All. v. Noem, 150 F.4th 1000, 1015 (9th Cir. 2025); Colorado v. U.S. EPA, 989 F.3d 874, 883 (10th Cir. 2021); Cook County v. Wolf, 962 F.3d 208, 221 (7th Cir. 2020).

Accordingly, a party moving under § 705 must establish that (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of" postponement of the challenged agency action; (3) "the balance of equities tips in [its] favor"; and (4) postponement of the agency action "is in the public interest." Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 25 (1st Cir. 2023) (quoting Dist. 4 Lodge of the Int'l Ass'n of Machinists Loc. Lodge 207 v. Raimondo, 40 F.4th 36, 39 (1st Cir. 2022)). The first factor "is the sine qua non" of the analysis. US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 347 (1st Cir. 2024). The third and fourth factors "merge when the

[g]overnment is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

## DISCUSSION

## I.    Likelihood of Success on the Merits

In determining Plaintiffs' likelihood of success on the merits, the Court must first assess Defendants' jurisdictional arguments. The Court concludes, as explained below, that it has jurisdiction to review several of Plaintiffs' claims. The Court then finds that Plaintiffs are likely to succeed on their claims that Secretary Noem violated the TPS statute by failing to disclose the true basis for her termination determination and failing to consult with appropriate agencies.

### A.    Jurisdiction

The threshold question is whether Plaintiffs' claims are reviewable. The Supreme Court has held that "the presumption favoring judicial review of administrative action" means that a statute "reasonably susceptible to divergent interpretation" does not bar review. Guerrero-Lasprilla v. Barr, 589 U.S. 221, 229 (2020) (quoting Kucana v. Holder, 558 U.S. 233, 251 (2010)). This presumption of reviewability is "'consistently applied' . . . to immigration statutes" and "can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." Id. (first quoting Kucana, 558 U.S. at 251; and then quoting Reno v. Cath. Soc. Servs., Inc., 509 U.S. 43, 64 (1993)).

Further, a "heightened showing" is required to bar judicial review of constitutional claims: Where a statute "purports to 'deny any judicial forum for a colorable constitutional claim,'" Congress's "inten[t] to preclude judicial review of constitutional claims . . . must be clear." Elgin v. Dep't of Treasury, 567 U.S. 1, 9 (2012) (quoting Webster v. Doe, 486 U.S. 592, 603 (1988)).

Defendants argue that Plaintiffs' claims are jurisdictionally barred by three statutory provisions. The Court addresses each of those provisions in turn.

1.    8 U.S.C. § 1254a(b)(5)(A)

Defendants first point to the TPS statute itself, which provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). Defendants argue that this provision bars review of all of Plaintiffs' claims because Plaintiffs challenge "the Secretary's determination to terminate South Sudan's TPS" designation. Dkt. 43 at 16. Defendants further contend that the Supreme Court "necessarily determined" the likelihood of success of this argument by staying orders postponing the effective date of the termination of TPS for Venezuela. Id. at 18.

To resolve this issue, the Court must first determine the types of claims that § 1254a(b)(5)(A) renders unreviewable and

14

then determine whether Plaintiffs' claims fall within the scope of this statutory bar. The Court then addresses the Supreme Court's orders in the Venezuela TPS litigation.

        a.    Scope of § 1254a(b)(5)(A)

To assess whether Congress intended to preclude judicial review of certain types of claims, the Court examines the "text, structure, and purpose" of the TPS statute. Elgin, 567 U.S. at 10. A "determination" under the TPS statute, with respect to the periodic review of existing TPS designations, is the Secretary's decision regarding "whether the conditions for [the TPS] designation" of a foreign state "continue to be met." 8 U.S.C. § 1254a(b)(3)(A); see also id. § 1254a(b)(3)(B) (requiring notice when the Secretary of Homeland Security "determines . . . that a foreign state . . . no longer continues to meet the conditions for designation" (emphasis added)). Those designation conditions are the ones set forth in § 1254(b)(1): armed conflict, environmental disaster, or extraordinary and temporary conditions. See id. § 1254(b)(1).

Therefore, in prohibiting "judicial review of any determination . . . with respect to . . . [a] termination . . . of a designation," id. § 1254a(b)(5)(A), the TPS statute forecloses all claims challenging the Secretary's determination that no qualifying armed conflict, environmental disaster, or extraordinary and temporary condition continues to exist (or that

the national interest precludes a designation based on extraordinary and temporary conditions). In other words, the substantive decision to designate a country for TPS, or to terminate such designation, is the Secretary's alone, and the Court cannot, for example, second-guess the weight she ascribes to conditions in the foreign state at issue.

The TPS statute does not, however, prohibit review of whether the Secretary (1) "consult[ed] with appropriate agencies" before terminating a designation; (2) "review[ed] the conditions in the foreign state" after consulting with those agencies; (3) "publish[ed] notice in the Federal Register" of the termination determination and "the basis" for it; and (4) engaged in interagency consultation and country-condition review "[a]t least 60 days before [the] end of the" current designation period and published notice "on a timely basis" after making the termination determination. Id. § 1254a(b)(3)(A)-(B). These procedural requirements are distinct from the substantive "determination" of whether conditions for TPS designation continue to be met. Id.

Defendants argue that the phrase "with respect to" in § 1254a(b)(5)(A) means that the judicial review provision covers all "matters relating to" a determination, not just the determination itself. Dkt. 43 at 16 (quoting Lamar, Archer & Cofrin, LLP v. Appling, 584 U.S. 709, 717 (2018)). But the provision prohibits review "of" a determination "with respect to

the designation, . . . termination[,] or extension" of a foreign state for TPS. 8 U.S.C. § 1254a(b)(5)(A). The phrase "with respect to" thus refers to the <u>types</u> of determinations implicated -- <u>i.e.,</u> determinations relating to designations, terminations, and extensions of TPS, as described in other portions of § 1254a(b).

Further, while the TPS statute bars direct review of the Secretary's country-specific TPS determinations, it does not preclude review of "general collateral challenges to . . . practices and policies used by the agency" in reaching those determinations. <u>McNary v. Haitian Refugee Ctr., Inc.</u>, 498 U.S. 479, 492 (1991). In <u>McNary</u>, the Supreme Court was confronted with a provision that precluded "judicial review of a determination respecting an application for adjustment of status" under an amnesty program for certain agricultural workers. 498 U.S. at 491 (quoting 8 U.S.C. § 1160(e)(1)). Similarly, in <u>Reno</u>, the Court interpreted a provision limiting "judicial review of a determination respecting an application for adjustment of [temporary resident] status." 509 U.S. at 54 (quoting 8 U.S.C. § 1255a(f)(1)). In each case, the Supreme Court held that the jurisdictional bar at issue "applie[d] only to review of denials of individual . . . applications." <u>Id.</u> at 56 (second alteration in original) (quoting <u>McNary</u>, 498 U.S. at 494). Critical to these holdings was the Court's reasoning that each statute's "reference to 'a determination' describes a single act rather than a group of

17

decisions or a practice or procedure employed in making decisions." Id. (quoting McNary, 498 U.S. at 492). So too here: Because the TPS statute precludes judicial review of a "determination," a court may not inquire into the substantive considerations of the Secretary in making country-specific TPS determinations but may entertain collateral challenges to agency "procedures and practices" in administering the TPS program. McNary, 498 U.S. at 494.

Finally, the TPS statute also does not preclude constitutional claims. "[W]here Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." Webster, 486 U.S. at 603. Congress knows how to demonstrate that intent. For example, another section of the INA "specifically precludes review of 'all questions of law and fact, including interpretation and application of constitutional and statutory provisions' except as provided in that section." CASA, Inc. v. Noem, 792 F. Supp. 3d 576, 594 (D. Md. 2025) (quoting 8 U.S.C. § 1252(b)(9)). Section 1254a(b)(5)(A), in contrast, contains no reference to constitutional challenges. Defendants therefore have not made the "heightened showing" required to persuade the Court that § 1254a(b)(5)(A) should be "construed to deny any judicial forum for a colorable constitutional claim." Webster, 486 U.S. at 603.

b.    Application to Plaintiffs' Claims

Having demarcated the scope of the TPS statute's jurisdictional bar, the Court now turns to deciding which of Plaintiffs' claims survive that bar. Defendants argue persuasively that several of Plaintiffs' claims do not. For one, Plaintiffs' argument that Secretary Noem wrongly viewed "armed conflict short of 'full-scale civil war'" as insufficient to satisfy the "armed-conflict-based designation" condition is unreviewable. Dkt. 7-1 at 16-17. Similarly, the Court cannot review Plaintiffs' challenge to Secretary Noem's alleged failure to consider factors such as "acute food insecurity," "widespread flooding," and "barriers to humanitarian access" in determining whether extraordinary and temporary circumstances permit an extension of South Sudan's TPS designation. Id. at 18. And the Court cannot review Plaintiffs' claims that Secretary Noem impermissibly considered the domestic "national interest." Id. at 19. Each of these claims asks the Court to second-guess how Secretary Noem should weigh country conditions in determining whether armed conflict, environmental disaster, or extraordinary and temporary conditions continue to justify a TPS designation. Section 1254a(b)(5)(A) does not allow the Court to pick apart the substantive reasoning of the Secretary's country-specific TPS determinations in this fashion.

Several of Plaintiffs' claims are, however, reviewable. First, the Court may review Plaintiffs' claim that "the decision

to terminate TPS for South Sudan was a predetermined action" in violation of the APA. Id. at 13; see Dkt. 1 ¶¶ 203, 218(E), (G). Plaintiffs contend that Secretary Noem's true reason for terminating South Sudan's TPS designation was to achieve "the politically motivated objective of gutting access to TPS" and "the goal of systematically shrinking" the TPS program. Dkt. 7-1 at 13-14; see also Dkt. 50 at 8 (contending that "the termination of TPS for South Sudan was part of a larger initiative to terminate the TPS program altogether"). In support of the contention that Secretary Noem's asserted reasons for the termination were pretextual, Plaintiffs highlight the fact that Secretary Noem has announced the termination of TPS designations for twelve countries since taking office, as well as the dearth of interagency consultation in the administrative record. Plaintiffs also point to statements by Secretary Noem opposing TPS. See, e.g., Dkt. 7-1 at 14 (claiming that Secretary Noem asserted during her confirmation hearing that the TPS program had "been abused and manipulated" and that extensions would "no longer be allowed").

This argument amounts to a claim of pretext under Department of Commerce v. New York, 588 U.S. 752 (2019). That case stands for the proposition that where there is a "disconnect between" an agency action "and the explanation given," and where "the sole stated reason[s]" for the agency action were "contrived," a court may remand the action to the agency. Id. at 784-85; see id. at 783

(affirming remand due to "significant mismatch between the decision the [agency] made and the rationale [it] provided"). As the Supreme Court noted, this doctrine arises from the "settled proposition[]" that "in order to permit meaningful judicial review" under the APA, "an agency must 'disclose the basis' of its action." Id. at 780 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

Plaintiffs' claim of pretext is reviewable to the extent it represents an allegation that Secretary Noem failed to publish the true basis for her termination determination in the Federal Register. As already noted, the TPS statute requires the Secretary to "publish[] notice in the Federal Register of the [termination] determination," "including the basis for the determination." 8 U.S.C. § 1254a(b)(3)(B). That basis must be a "genuine" basis for the determination; "[a]ccepting contrived reasons would defeat the purpose of" judicial review. Department of Commerce, 588 U.S. at 785. The Court also may review Plaintiffs' claim to the extent it challenges a general "practice or procedure" by DHS of terminating all TPS designations regardless of whether conditions for designation continue to be met. McNary, 498 U.S. at 492.

In addition to Plaintiffs' claim of pretext, the Court may review three other claims made by Plaintiffs. First, the Court may review Plaintiffs' argument that Secretary Noem did not consult with appropriate agencies. See Dkt. 7-1 at 15-16. Second, the Court

deems reviewable Plaintiffs' contention that Secretary Noem departed from past agency practice, without proper explanation, by providing a notice only "60 days prior to [the] effective date" of the termination of South Sudan's TPS. Id. at 19-20. These two assertions relate to procedural requirements that are collateral to the Secretary's substantive "determination" of whether to terminate a TPS designation -- i.e., the TPS statute's provisions requiring that the Secretary "consult[] with appropriate agencies" and that a termination's effective date be no later than "60 days after the date the [termination] notice is published" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A)-(B); see CASA, 792 F. Supp. 3d at 592 (holding that challenges based on "the timing requirements of the TPS statute" are reviewable). Third, because § 1254a(b)(5)(A) does not bar constitutional claims, the Court may review Plaintiffs' claim that the termination of South Sudan's TPS violated the "equal protection component" of the Fifth Amendment's Due Process Clause. Dkt. 7-1 at 20 (quoting Washington v. Davis, 426 U.S. 229, 239 (1976)).

> c.   Effect of Recent Supreme Court Orders

As Defendants point out, the Supreme Court issued two emergency orders in May and October 2025 regarding the termination of TPS for Venezuela. See Noem v. Nat'l TPS All., 145 S. Ct. 2728 (2025) (mem.); Noem v. Nat'l TPS All., 146 S. Ct. 23 (2025) (mem.). Defendants contend that these Supreme Court orders "necessarily

determined that the government was likely to succeed on the merits of its . . . argument," comparable to the one Defendants advance here, that § 1254a(b)(5)(A) bars review of all matters related to a TPS determination. Dkt. 43 at 18.

"Although [the Supreme Court's] interim orders are not conclusive as to the merits, they inform how a court should exercise its . . . discretion in like cases." Trump v. Boyle, 145 S. Ct. 2653, 2654 (2025). Where, as here, the Supreme Court orders provide little to no reasoning, this Court will look to the litigation history culminating in those orders to determine if the instant case differs from them "in any pertinent respect." Id.; see New York v. Trump, __ F. Supp. 3d __, __ (D. Mass. 2025) [2025 WL 3514301, at *10-11] (employing this analytical approach).

Every court to have addressed the issue, including the Ninth Circuit, has concluded that even the Supreme Court's second order -- which stayed the grant of partial summary judgment to plaintiffs challenging the termination of Venezuela's TPS designation, see Noem, 146 S. Ct. at 24 -- contains insufficient reasoning to guide lower courts' legal analyses. See Nat'l TPS All. v. Noem, __ F.4th __, __ (9th Cir. 2026) [2026 WL 226573, at *5]; Doe v. Noem, No. 25-cv-8686 (S.D.N.Y. Nov. 19, 2025), Dkt. 59 at 4:20-6:8, appeal filed, No. 25-2995 (2d Cir. Nov. 25, 2025); Doe v. Noem, No. 25-cv-15483, 2026 WL 184544, at *9 n.3 (N.D. Ill. Jan. 23, 2026); Miot v. Trump, __ F. Supp. 3d __, __ (D.D.C. 2026)

[2026 WL 266413, at *19-20], <u>appeal filed</u>, No. 26-5050 (D.C. Cir. Feb. 6, 2026); <u>see also</u> Nat'l TPS All. v. Noem, No. 26-199 (9th Cir. Jan. 9, 2026), Dkt. 11 at 5 (finding Supreme Court's stay orders informative as to equitable factors but not as to likelihood of success on the merits). Because it is difficult to read the tea leaves of the Supreme Court's orders and the associated litigation history, which are not necessarily at odds with this Court's construction of the TPS statute's judicial review bar, this Court joins the chorus.

   2. 8 U.S.C. § 1252(f)(1)

  Defendants next contend that 8 U.S.C. § 1252(f)(1) bars judicial review of Plaintiffs' motion. With exceptions not relevant here, that section strips district courts of "jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." 8 U.S.C. § 1252(f)(1).

  The parties dispute whether the TPS statute is among "the provisions of part IV of this subchapter" referenced by § 1252(f)(1). <u>Id.</u> Defendants concede that "§ 1254a appears in part V of the relevant subchapter" in the U.S. Code but argue that the public-law version of § 1252(f)(1) does encompass § 1254a and trumps the U.S. Code's language. Dkt. 43 at 21. Plaintiffs respond that Congress did not intend § 1254a to be covered by § 1252(f)(1).

The Court need not resolve this dispute because even if the TPS statute is encompassed by § 1252(f)(1), Plaintiffs' motion does not seek to "enjoin or restrain the operation of the" TPS statute. 8 U.S.C. § 1252(f)(1). This language in § 1252(f)(1) precludes the issuance of only "a specific category of remedies," and it is "included . . . in a provision whose title -- 'Limit on injunctive relief' -- makes clear the narrowness of its scope." Biden v. Texas, 597 U.S. 785, 798 (2022). Although the Supreme Court has not specifically addressed whether § 1252(f)(1) extends to declaratory relief and vacatur under the APA, see id. at 801 n.4, binding precedent from the First Circuit dictates that "declaratory relief remains available under [§] 1252(f)(1)," Brito v. Garland, 22 F.4th 240, 252 (1st Cir. 2021); see Guerrero Orellana v. Moniz, __ F. Supp. 3d __, __ (D. Mass. 2025) [2025 WL 3033769, at *12], and this Court likewise concludes that "§ 1252(f)(1) does not apply to vacatur," Texas v. United States, 50 F.4th 498, 528 (5th Cir. 2022); cf. New York, __ F. Supp. 3d at __ [2025 WL 3514301, at *17] (noting distinction between injunctive relief and vacatur); infra section IV (same). Plaintiffs' requests for declaratory relief and vacatur, see Dkt. 1 at 70, therefore may proceed to the extent they are not barred by § 1254a(b)(5)(A). And because a postponement of agency action under § 705 "functions as a 'temporary form of vacatur,'" not as a preliminary injunction "that operate[s] in personam," Plaintiffs' requested relief in the

instant motion is not barred by § 1252(f)(1). Make the Rd. N.Y. v. Noem, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (per curiam) (quoting All. for Hippocratic Med. v. U.S. FDA, 78 F.4th 210, 254 (5th Cir. 2023)).

### 3.    5 U.S.C. § 701(a)(2)

Defendants level one final challenge to this Court's ability to entertain Plaintiffs' APA claims. In a footnote, Defendants posit that the APA's waiver of sovereign immunity does not apply to Plaintiffs' suit because TPS termination determinations are "committed to agency discretion by law." Dkt. 43 at 16 n.2 (quoting 5 U.S.C. § 701(a)(2)).[3]

This argument fails. The Supreme Court has "read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018) (quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)). The TPS statute does not present such rare circumstances; on the contrary, it "imposes . . . 'categorical

---

[3] In the same footnote, Defendants also suggest that the TPS statute is one which "grants consent to suit [but] expressly or impliedly forbids the relief which is sought." Dkt. 43 at 16 n.2 (quoting 5 U.S.C. § 702). But the TPS statute does not preclude all of Plaintiffs' APA claims, as already explained, see supra Section I.A.1, and the relief sought by Plaintiffs is permissible, see infra Section IV.

requirement[s]' that the Secretary" of Homeland Security consult with appropriate agencies, review country conditions, and publish the basis for her determination in the Federal Register. Id. at 24 (quoting Bennett v. Spear, 520 U.S. 154, 172 (1997)); see 8 U.S.C. § 1254a(b)(3). Even if the substantive weight ascribed by the Secretary to certain country conditions is discretionary, these procedural requirements are not. Section § 701(a)(2) thus does not change the scope of this Court's review. See Miot, __ F. Supp. 3d at __ [2026 WL 266413, at *18-19].

### B.    Merits of Non-Barred Claims

The Court addresses each of Plaintiffs' reviewable arguments in turn.

#### 1.    Pretext

Plaintiffs argue that Secretary Noem's decision to terminate TPS for South Sudan is part of a preordained pattern and practice of terminating all TPS designations, regardless of country conditions, based on "the politically motivated objective of gutting access to TPS" and "the goal of systematically shrinking" the TPS program. Dkt. 7-1 at 13-14. As previously noted, this claim also implicates the TPS statute's requirement that the Secretary publish "the basis for [her] determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(B).

At the outset, the Court notes that it "may not set aside an agency's policymaking decision solely because it might have been

influenced by political considerations or prompted by an Administration's priorities." Dep't of Com., 588 U.S. at 781. "Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'" Id. (quoting Sierra Club v. Costle, 657 F.2d 298, 408 (D.C. Cir. 1981)). Nevertheless, "in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." Id. at 780 (quoting Burlington Truck Lines, 371 U.S. at 168). Where there is "a significant mismatch between the decision the [agency] made and the rationale [it] provided," the "contrived" rationale is inadequate under the APA. Id. at 783, 785.

Relatedly, if the Secretary of Homeland Security fails to provide "the basis" -- not just any basis, but "the" true basis -- for her termination determination in the Federal Register, she acts contrary to the TPS statute. 8 U.S.C. § 1254a(b)(3)(B); see Nat'l TPS All., ___ F.4th at ___ (Mendoza, J., concurring) [2026 WL 226573, at *27] (noting that an agency must disclose its "actual basis" for acting). That procedural requirement is reviewable by this Court, see supra Section I.A.1.a, as is Plaintiffs' claim that Defendants engaged in a preordained practice of terminating all TPS designations as "part of a larger initiative to terminate the TPS program altogether," Dkt. 50 at 8; see McNary, 498 U.S. at 492.

Several lines of evidence show a likelihood of success on the claim that Secretary Noem "was determined to" terminate all TPS designations "from the time [s]he entered office" and failed to disclose that basis for her termination determination in the Federal Register. Dep't of Com., 588 U.S. at 782-83. First, the Court cannot ignore the fact that Secretary Noem has decided to terminate twelve TPS designations in as many months. See App. A. The sole extension granted by Secretary Noem during that span, by DHS's own admission, occurred only because Secretary Noem missed the "statutory deadline" for South Sudan -- not because she determined that conditions for TPS designation continued to exist. Termination, 90 Fed. Reg. at 50485. This pattern of TPS terminations demonstrates a likelihood of success in proving a "practice or procedure" by DHS of terminating all designations irrespective of country conditions. McNary, 498 U.S. at 492. It also distinguishes this case from the litigation regarding Venezuela's TPS designation, in which the Supreme Court ruled against the plaintiffs on its emergency docket. While Venezuela's designation was the first that Secretary Noem sought to terminate, South Sudan's was the eighth. And while Secretary Noem had sought to terminate six countries' TPS designations as of the date the

district court granted partial summary judgment in the Venezuela litigation, she has, by now, announced the termination of twelve.[4]

Furthermore, one salient statement in the Federal Register notice is belied by the record, bolstering Plaintiffs' claim that the explanation provided by Secretary Noem was "contrived." Dep't of Com., 588 U.S. at 785. The Federal Register notice states that South Sudanese TPS holders have "been subjects of administrative investigation for fraud, public safety[,] and national security concerns." Termination, 90 Fed. Reg. at 50486. The administrative record reveals, however, that when USCIS searched for records of fraud or public safety concerns among 228 South Sudanese TPS holders, it found none. See Dkt. 59-1 at 129.[5] Notably, Secretary Noem used the exact same language alleging fraud, public safety, and national security concerns when announcing the termination of TPS for at least four other countries. See Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20309, 20311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45398, 45401

[4] The Court recognizes that several courts have allowed TPS terminations to proceed. See generally App. A. Nevertheless, with each additional TPS designation that Secretary Noem decides to terminate, claims that such termination determinations are preordained become increasingly supported.

[5] The portion of the administrative record concerning USCIS's search for national security concerns among these TPS holders is redacted, see Dkt. 59-1 at 129, but Defendants do not contend that any such concerns were identified.

(Sept. 22, 2025); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733, 54737 (Nov. 28, 2025); Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1547, 1551 (Jan. 14, 2026). This pattern indicates a likely "practice or procedure" of using stock language in the Federal Register notices regardless of USCIS's actual findings. McNary, 498 U.S. at 492.

Similarly, the Federal Register notice includes several instances of cherry-picked positive data that are sharply at odds with the country conditions described in the administrative record. For example, the notice states that a United Nations mission is helping "build[] the capacity of South Sudan's local police and justice system." Termination, 90 Fed. Reg. at 50485. But the notice does not discuss that the same United Nations mission, which was established in 2011, reported in 2025 that it was "gravely concerned by escalating violence," "civilian displacement," "rising abductions," and other "threat[s] to international peace and security in the region." Dkt. 59-9 at 93-94, 96. While the Court lacks jurisdiction to assess whether Secretary Noem adequately weighed country conditions in South Sudan, the disconnect between the Federal Register notice and her own administrative record is further evidence of pretext.

Secretary Noem's failure to consult with other agencies -- which is discussed in more detail below, see infra Section

I.B.2 -- also weighs toward a finding of pretext. Defendants cite only one communication as evidence of interagency consultation. On July 21, 2025, a DHS employee emailed a State Department employee the following:

> The following TPS designations are coming up for review:
> - Syria: Aug. 1 decision deadline
> - South Sudan: September 3 decision deadline
> - Burma: September 26 decision deadline
> - Ethiopia: October 13 decision deadline

Dkt. 59-3 at 133. The State Department employee replied as follows:

> I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues.

Id. This minimal evidence of consultation bolsters Plaintiffs' claim that the default Defendants were predetermined to terminate South Sudan's TPS designation.

Finally, Secretary Noem has vocally opposed the TPS program writ large. For example, as Plaintiffs point out, Secretary Noem stated during her confirmation hearing that TPS "has been abused and manipulated by the Biden Administration" and that the TPS "program was intended to be temporary." Dkt. 1 ¶ 114. The Court is "not required to exhibit a naiveté from which ordinary citizens are free." Dep't of Com., 588 U.S. at 785 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977)). It is self-evident that Secretary Noem was predisposed to terminate TPS designations from the outset of her tenure. Secretary Noem cannot

be faulted for having a policy preference; after all, a "change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 59 (Rehnquist, J., concurring). Still, her public statements reinforce the argument that the decision to terminate South Sudan's TPS designation was preordained and that the Federal Register notice's assertion that the termination resulted from South Sudan no longer meeting the statutory conditions for designation was not the real reason. It is highly likely that no country will pass muster, no matter how dire its conditions.

Plaintiffs thus are likely to succeed on their argument that Secretary Noem failed to disclose the true "basis for [her] determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(B).

### 2. Consultation

The Court next addresses Plaintiffs' separate claim of insufficient interagency consultation. The TPS statute requires the Secretary to "consult[] with appropriate agencies" before reviewing country conditions and determining whether to terminate a TPS designation. 8 U.S.C. § 1254a(b)(3)(A). "Consultation," at the time of the enactment of the TPS statute, meant the "[d]eliberation of persons on some subject," Consultation, Black's Law Dictionary (6th ed. 1990), that is to say, "[t]he act of

weighing and examining the reasons for and against a contemplated act or course of conduct," Deliberation, Black's Law Dictionary (6th ed. 1990). See also Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 117 (1st Cir. 2002) (defining consultation as "[t]he act of asking the advice or opinion of someone" (alteration in original) (quoting Consultation, Black's Law Dictionary (7th ed. 1999)).

In support of their argument that Secretary Noem satisfied this consultation requirement, Defendants point only to the July 2025 email exchange with the State Department discussed above. No communications between DHS and State Department officials about country conditions are included in the administrative record. Under any reasonable interpretation of the word "consultation," the single email chain cited by Defendants plainly is inadequate.[6]

It is true that the administrative record contains a country-conditions report from USCIS and a redacted memorandum from the USCIS Director to Secretary Noem. See Dkt. 59-1 at 141-90; see also Dkt. 59-1 at 123-126 (internal DHS correspondence). But Defendants do not contend that conversations within DHS's "own subcomponents could fulfill" the TPS statute's consultation requirement. Doe, 2026 WL 184544, at *14 n.4. It is significant that the Secretary of State traditionally provided DHS with a

---

[6] Notably, another district court found this same email chain to be insufficient evidence of interagency consultation with respect to Secretary Noem's termination of TPS for Myanmar. See Doe, 2026 WL 184544, at *13-14.

formal "letter with a recommendation" regarding TPS determinations. Dkt. 8-6 at 24. There is no such correspondence in the administrative record.

The lack of any evidence of consultation with the State Department about conditions for designation also differentiates this case from the Venezuela TPS litigation. There, DHS received a "one-and-a-half page letter" from the Secretary of State before terminating Venezuela's TPS designation. Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1108, 1151 (N.D. Cal. 2025), aff'd, __ F.4th __ (9th Cir. 2026) [2026 WL 226573]. In staying the district court's grant of partial summary judgment to the plaintiffs in that case, the Supreme Court may well have viewed this evidence of consultation as adequate under the TPS statute. The Supreme Court's order thus does not preclude finding that insufficient interagency consultation occurred here, where no such letter from the Secretary of State was received.[7]

---

[7] Similarly, although the Ninth Circuit recently stayed a grant of partial summary judgment to plaintiffs challenging the termination of TPS for Nepal, Nicaragua, and Honduras, see Nat'l TPS All., No. 26-199, Dkt. 11 at 5, the district court in that case found inadequate consultation even though DHS staff solicited country conditions reports from the State Department, see Nat'l TPS All. v. Noem, No. 25-cv-05687, 2025 WL 4058572, at *5 (N.D. Cal. Dec. 31, 2025). No such consultation between DHS and the State Department occurred here.

In sum, Plaintiffs are likely to succeed on their claim that Secretary Noem acted contrary to law by failing to consult with appropriate agencies. See 5 U.S.C. § 706(2)(A).

### 3. Notice

Next, Plaintiffs contend that Secretary Noem deviated from prior agency practice without proper explanation by providing only sixty days' notice before terminating South Sudan's TPS designation. They point out that before President Trump's current term, the twelve most recent TPS terminations -- spanning two decades -- came with at least six months' notice. Defendants respond that providing sixty days' notice is per se permissible because the TPS statute expressly provides that DHS may make its termination determination "60 days before [the] end" of the current designation period. 8 U.S.C. § 1254a(b)(3)(A).

The Court need not determine Plaintiffs' likelihood of success on this argument because the Court has already concluded that Plaintiffs are likely to succeed on their claims that Secretary Noem failed to disclose the true basis for her termination determination and to consult with appropriate agencies.

### 4. Equal Protection

Finally, Plaintiffs assert that Secretary Noem's termination determination was rooted in race-based and national origin-based animus in violation of the "equal protection component" of the

Fifth Amendment's Due Process Clause. Dkt. 7-1 at 20 (quoting
Washington, 426 U.S. at 239). Plaintiffs point to "charged code
words" used by Secretary Noem, President Trump, and others in the
current administration, claiming that these statements "lay bare
[Defendants'] animus" against "non-white, non-European
noncitizens." Dkt. 7-1 at 22; see, e.g., Dkt. 1 ¶ 144 (alleging
that Secretary Noem referred to unlawful immigration "as an
'invasion happening on purpose . . . to remake the foundation of
this country'" (alteration in original)); id. ¶ 147 (alleging that
President Trump stated that immigrants from Africa and Asia "are
poisoning the blood of our country"); id. ¶ 150 (alleging that
"Secretary Noem has referred to non-white immigrants as 'dirt
bags'"); id. ¶ 155 (alleging that DHS tweeted a word,
"[r]emigrate," which "has ties to white nationalism"); id. ¶ 159
(alleging that President Trump "referred to countries designated
for TPS as 'shithole' countries").

Courts have reached differing conclusions in resolving
similar constitutional challenges to TPS terminations. Compare,
e.g., Doe, No. 25-cv-8686, Dkt. 59 at 28:20-29:6 (finding no
likelihood of success on constitutional claim), with, e.g., Miot,
__ F. Supp. 3d at __ [2026 WL 266413, at *34] (finding likelihood
of success on constitutional claim). Because Plaintiffs have shown
a likelihood of success on other claims, the Court does not address
Plaintiffs' equal protection claim now and will assess the merits

of that claim on a more ample record. See Doe, 2026 WL 184544, at *24.

## II. **Irreparable Harm**

In addition to showing a likelihood of success on the merits, Plaintiffs must also demonstrate that they are "likely to suffer irreparable harm in the absence of" postponement of Secretary Noem's termination determination. Sosa, 80 F.4th at 25 (quoting Dist. 4 Lodge, 40 F.4th at 39). On this score, Plaintiffs easily meet their burden.

The administrative record reflects that South Sudan remains dangerous and unstable in various ways. As noted by a country-conditions report prepared by USCIS in June 2025, South Sudan "was embroiled in a civil war" between December 2013 and September 2018, when a tenuous peace agreement was reached. Dkt. 59-1 at 154. The report states that the peace agreement "has effectively collapsed" in the past year, "plung[ing] the country into a political crisis" and leading to an "escalat[ion]" in "armed violence." Id. at 155; see also id. ("South Sudan is on the brink of a renewed civil war . . . ."). This "violence has worsened an already dire humanitarian situation in South Sudan," including "chronic food insecurity," "economic crisis," and mass displacement due to "the ongoing civil war in neighboring Sudan." Id. at 155-56. Meanwhile, South Sudan "has been grappling with a cholera outbreak" and other diseases. Id. at 168. The State Department maintains a "Level 4:

Do Not Travel" advisory for South Sudan, stating, among other things, that "carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout" the country. Dkt. 59-3 at 115. The many articles and reports included in the administrative record echo the same refrain: South Sudan is in a state of crisis. See generally Dkts. 59-3 to -9.

Defendants largely do not contest the dangerousness of conditions in South Sudan. They do point out, however, that the State Department's travel advisory assesses threats only to U.S. citizens, not to South Sudan's own returning nationals. Even if this is true, most of the country conditions evident in the administrative record -- including armed violence, food scarcity, widespread disease, and political and economic crisis -- undisputedly affect South Sudan's own nationals. See, e.g., Dkt. 59-1 at 165 (reporting that over three-quarters of South Sudan's population are "in need of humanitarian assistance").

Defendants further contend that harm to current TPS holders is mitigated because their removal is a "mere possibility." Dkt. 43 at 36. But many TPS holders -- including the four named Plaintiffs -- have TPS as their sole form of status. And the "loss of liberty" during removal proceedings would itself "constitute irreparable harm." Guerrero Orellana v. Moniz, 802 F. Supp. 3d 297, 312 (D. Mass. 2025), appeal filed, No. 25-2152 (1st Cir. Dec. 2, 2025). Moreover, even in instances where removal does not occur,

Plaintiffs note (and Defendants do not dispute) that a temporary gap in immigration status would engender other repercussions, such as loss of work authorization and ineligibility for certain types of immigration relief.

## III. **Balance of Equities and Public Interest**

The final two § 705 factors -- balance of the equities and the public interest -- "merge when the [g]overnment is the opposing party." Nken, 556 U.S. at 435. In analyzing these factors, courts "explore the relative harms" to the parties and gauge "the interests of the public at large." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (quoting Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers)). The Court finds that these factors, too, favor Plaintiffs.

Defendants claim a general public interest in allowing the government to enforce statutes. But there is "no public interest in the perpetuation of unlawful agency action." Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 76 (1st Cir. 2025) (quoting League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)). If Secretary Noem obeys the mandatory procedural requirements of the TPS statute, including by consulting with appropriate agencies and disclosing the true basis for her termination determination, she can eliminate South Sudan's TPS designation.

Defendants also invoke a governmental interest in initiating removal proceedings against individuals who Defendants claim could impede the "national interest" of the United States. Dkt. 43 at 37. But, as previously noted, the administrative record reflects that the government found no evidence of fraud or public safety concerns caused by South Sudanese TPS holders. Further, the TPS statute permits DHS to "withdraw" TPS protections from any individual TPS holder if DHS finds that the individual was ineligible for TPS, including due to certain convictions or national security risks. 8 U.S.C. § 1254a(c)(3); see id. §§ 1254a(c)(2)(B), 1158(b)(2)(A)(iv).

The Court concludes that the many irreparable harms that South Sudanese TPS holders imminently face upon termination of South Sudan's TPS designation outweigh the largely unsubstantiated concerns raised by Defendants. Because all factors relevant to the § 705 analysis favor Plaintiffs, the Court will grant Plaintiffs' motion to postpone.

**IV.  Scope of Relief**

Defendants request that postponement of agency action under § 705 "should be limited to . . . Plaintiffs" if granted. Dkt. 43 at 37. But, as already noted, relief pursuant to § 705 does not "operate in personam," but rather "functions as a 'temporary form of vacatur.'" Make the Rd. N.Y., 2025 WL 3563313, at *16 (per curiam) (quoting All. for Hippocratic Med., 78 F.4th at 254); see

41

also <u>Doe</u>, 2026 WL 184544, at *26 ("[The] language [of § 705] is naturally read to authorize courts to postpone or stay the agency action itself, rather than enjoining its enforcement as to particular plaintiffs."). Unlike injunctive relief, vacatur need not be (and typically is not) party-specific. <u>See</u> <u>New York</u>, __ F. Supp. 3d at __ [2025 WL 3514301, at *17]. Because Secretary Noem acted contrary to the TPS statute, postponement of her entire action -- <u>i.e.</u>, the termination of TPS for South Sudan -- is warranted.

## <u>ORDER</u>

For the foregoing reasons, Plaintiffs' motion to postpone the effective date of Defendants' termination of South Sudan's TPS designation (Dkt. 7) is **<u>ALLOWED</u>**.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

**APPENDIX A**

| Country | Status of Litigation |
|---------|---------------------|
| Venezuela | DHS published notice on February 3, 2025, of a purported vacatur of a prior extension of Venezuela's TPS designation, see 90 Fed. Reg. 8805 (Feb. 3, 2025), and published notice on February 5, 2025, of the termination of TPS for Venezuela, see 90 Fed. Reg. 9040 (Feb. 5, 2025). A district court granted plaintiffs' motion to postpone those actions, see Nat'l TPS All. v. Noem, 773 F. Supp. 3d 807, 868 (N.D. Cal. 2025), but the Supreme Court stayed that relief pending appeal, see Noem v. Nat'l TPS All., 145 S. Ct. 2728, 2729 (2025) (mem.). The district court subsequently granted partial summary judgment to plaintiffs and vacated the termination of TPS for Venezuela, see Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1108, 1164 (N.D. Cal. 2025), which the Supreme Court again stayed, see Noem v. Nat'l TPS All., 146 S. Ct. 23, 24 (2025) (mem.). The Ninth Circuit recently affirmed the district court's grant of partial summary judgment, subject to the ongoing Supreme Court stay. See Nat'l TPS All. v. Noem, __ F.4th __, __ (9th Cir. 2026) [2026 WL 226573, at *18]. Venezuela's TPS designation thus is not currently in effect. |
| Afghanistan | DHS published notice on May 13, 2025, of the termination of TPS for Afghanistan. See 90 Fed. Reg. 20309 (May 13, 2025). A district court denied plaintiffs' motion to postpone that action, see CASA, Inc. v. Noem, 792 F. Supp. 3d 576, 612 (D. Md. 2025), and the Fourth Circuit likewise declined to postpone it on an emergency basis, see CASA, Inc. v. Noem, No. 25-1792, 2025 WL 2028397, at *1 (4th Cir. July 21, 2025). Afghanistan's TPS designation thus is not currently in effect. |
| Cameroon | DHS published notice on June 4, 2025, of the termination of TPS for Cameroon. See 90 Fed. Reg. 23697 (June 4, 2025). A district court denied plaintiffs' motion to postpone that action, see CASA, Inc. v. Noem, 792 F. Supp. 3d 576, 612 (D. Md. |

| | |
|---|---|
| | 2025), and the Fourth Circuit likewise declined to postpone it on an emergency basis, see CASA, Inc. v. Noem, No. 25-1792, 2025 WL 2028397, at *1 (4th Cir. July 21, 2025). Cameroon's TPS designation thus is not currently in effect. |
| Nepal | DHS published notice on June 6, 2025, of the termination of TPS for Nepal. See 90 Fed. Reg. 24151 (June 6, 2025). A district court granted plaintiffs' motion to postpone that action, see Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1008, 1040 (N.D. Cal. 2025), but the Ninth Circuit stayed that relief pending appeal, see Nat'l TPS All. v. Noem, No. 25-4901 (9th Cir. Aug. 20, 2025), Dkt. 19 at 1. The district court subsequently granted partial summary judgment to plaintiffs and vacated the termination of TPS for Nepal, see Nat'l TPS All. v. Noem, No. 25-cv-05687, 2025 WL 4058572, at *29 (N.D. Cal. Dec. 31, 2025), which the Ninth Circuit again stayed, see Nat'l TPS All. v. Noem, No. 26-199 (9th Cir. Jan. 9, 2026), Dkt. 11 at 5. Nepal's TPS designation thus is not currently in effect. |
| Nicaragua | DHS published notice on July 8, 2025, of the termination of TPS for Nicaragua. See 90 Fed. Reg. 30086 (July 8, 2025). A district court granted plaintiffs' motion to postpone that action, see Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1008, 1040 (N.D. Cal. 2025), but the Ninth Circuit stayed that relief pending appeal, see Nat'l TPS All. v. Noem, No. 25-4901 (9th Cir. Aug. 20, 2025), Dkt. 19 at 1. The district court subsequently granted partial summary judgment to plaintiffs and vacated the termination of TPS for Nicaragua, see Nat'l TPS All. v. Noem, No. 25-cv-05687, 2025 WL 4058572, at *29 (N.D. Cal. Dec. 31, 2025), which the Ninth Circuit again stayed, see Nat'l TPS All. v. Noem, No. 26-199 (9th Cir. Jan. 9, 2026), Dkt. 11 at 5. Nicaragua's TPS designation thus is not currently in effect. |
| Honduras | DHS published notice on July 8, 2025, of the termination of TPS for Honduras. See 90 Fed. Reg. 30089 (July 8, 2025). A district court granted plaintiffs' motion to postpone that action, see |

|  | |
|---|---|
|  | _Nat'l TPS All. v. Noem_, 798 F. Supp. 3d 1008, 1040 (N.D. Cal. 2025), but the Ninth Circuit stayed that relief pending appeal, _see Nat'l TPS All. v. Noem_, No. 25-4901 (9th Cir. Aug. 20, 2025), Dkt. 19 at 1. The district court subsequently granted partial summary judgment to plaintiffs and vacated the termination of TPS for Honduras, _see Nat'l TPS All. v. Noem_, No. 25-cv-05687, 2025 WL 4058572, at *29 (N.D. Cal. Dec. 31, 2025), which the Ninth Circuit again stayed, _see Nat'l TPS All. v. Noem_, No. 26-199 (9th Cir. Jan. 9, 2026), Dkt. 11 at 5. Honduras's TPS designation thus is not currently in effect. |
| Syria | DHS published notice on September 22, 2025, of the termination of TPS for Syria. _See_ 90 Fed. Reg. 45398 (Sep. 22, 2025). A district court granted plaintiffs' motion to postpone that action. _See Doe v. Noem_, No. 25-cv-8686 (S.D.N.Y. Nov. 19, 2025), Dkt. 54 at 1, _appeal filed_, No. 25-2995 (2d Cir. Nov. 25, 2025). Syria's TPS designation thus is currently in effect. |
| South Sudan | DHS published notice on November 6, 2025, of the termination of TPS for South Sudan, _see_ 90 Fed. Reg. 50484 (Nov. 6, 2025), after South Sudan's TPS designation had automatically extended for six months earlier in the year, _see_ 90 Fed. Reg. 19217, 19217 (May 6, 2025). This Court grants Plaintiffs' motion to postpone that action. South Sudan's TPS designation thus is currently in effect. |
| Myanmar | DHS published notice on November 25, 2025, of the termination of TPS for Myanmar. _See_ 90 Fed. Reg. 53378 (Nov. 25, 2025). A district court granted plaintiffs' motion to postpone that action. _See Doe v. Noem_, No. 25-cv-15483, 2026 WL 184544, at *26 (N.D. Ill. Jan. 23, 2026). Myanmar's TPS designation thus is currently in effect. |
| Haiti | DHS published notice on November 28, 2025, of the termination of TPS for Haiti. _See_ 90 Fed. Reg. 54733 (Nov. 28, 2025). A district court granted plaintiffs' motion to postpone that action. _See Miot v. Trump_, __ F. Supp. 3d __, __ (D.D.C. 2026) [2026 |

| | |
|---|---|
| | WL 266413, at *39], <u>appeal filed</u>, No. 26-5050 (D.C. Cir. Feb. 6, 2026). Haiti's TPS designation thus is currently in effect. |
| Ethiopia | DHS published notice on December 15, 2025, of the termination of TPS for Ethiopia. <u>See</u> 90 Fed. Reg. 58028 (Dec. 15, 2025). A district court administratively stayed that action pending a resolution of plaintiffs' motion to postpone. <u>See Afr. Cmtys. Together v. Noem</u>, No. 26-cv-10278 (D. Mass. Jan. 30, 2026), Dkt. 36. Ethiopia's TPS designation thus is currently in effect. |
| Somalia | DHS published notice on January 14, 2026, of the termination of TPS for Somalia, effective March 17, 2026. <u>See</u> 91 Fed. Reg. 1547 (Jan. 14, 2026). No lawsuit challenging that action has yet been filed. Somalia's TPS designation thus is currently in effect. |