UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AFRICAN COMMUNITIES TOGETHER, et al.,

                    Plaintiffs,

     v.

KRISTI L. NOEM, *in her official capacity as Secretary of Homeland Security*, et al.,

                    Defendants.

Case No. 25-cv-13939-PBS

**Leave to File Excess Pages Granted on March 16, 2026**

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

Defendants respectfully move to dismiss Plaintiffs' complaint, which asserts five claims asking the Court to review and set aside the Secretary of Homeland Security's termination of South Sudan's Temporary Protected Status ("TPS") designation.  *See* Doc. No. 1.  8 U.S.C. § 1254a(b)(5)(A) unambiguously prohibits judicial review of any determination to terminate a TPS designation.  8 U.S.C. § 1252(f)(1) independently precludes courts from enjoining or restraining the operation of the TPS statute.  And, in any event, Plaintiffs' allegations fail to state a plausible claim under either the Administrative Procedure Act (APA) or the Constitution.  The Court should therefore dismiss the complaint for lack of jurisdiction or, alternatively, for failure to state a claim.

## II.    BACKGROUND

### A.    South Sudan's TPS Designation.

As relevant here, the Secretary of Homeland Security is authorized to designate a foreign country for TPS if the Secretary finds that "there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state . . . would pose a serious threat to their personal safety," 8 U.S.C. § 1254a(b)(1)(A), or if the Secretary

finds that there are "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States," 8 U.S.C. § 1254a(b)(1)(C).

Initial TPS designations are discretionary and must be periodically reviewed to determine whether the conditions underlying a country's TPS designation continue to be met. 8 U.S.C. § 1254a(b)(2), (b)(3)(A). The Secretary must "consult[] with appropriate agencies," and, if she determines that a country's TPS designation is no longer justified, must "terminate the designation by publishing notice in the Federal Register of th[at] determination." 8 U.S.C. § 1254a(b)(3)(A), (B). The notice must explain the "basis for the determination." *Id.*

South Sudan was initially designated for TPS on October 13, 2011, for a period of 18 months, on the dual bases of ongoing armed conflict and extraordinary and temporary conditions in South Sudan that prevented nationals of South Sudan from safely returning. *Designation of Republic of South Sudan for [TPS]*, 76 Fed. Reg. 63,629, 63,632 (Oct. 13, 2011). Following the initial designation, South Sudan's TPS designation was extended and newly designated in 2013, 2014, and 2016. *Termination of the Designation of South Sudan for [TPS]*, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025). In 2022 and 2023, former Secretary Mayorkas extended and newly designated TPS for South Sudan. *Id.* "In May 2025, [TPS] for South Sudan was automatically extended for six months, from May 4, 2025, to November 3, 2025." *Id.* "The automatic extension occurred because Secretary Noem was provided with a non-current record from the Department of State that was signed November 6, 2024, which, together with other factors, prevented Secretary Noem from making an informed decision by the March 4, 2025, statutory deadline." *Id.*

On November 6, 2025, Secretary Noem announced that South Sudan's TPS designation would be terminated on January 6, 2026. *Id.* at 50,487. Based on her review, the Secretary determined that "the situation in South Sudan no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning South Sudanese nationals." *Id.* She explained that, "[w]hile there is inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization, return to full-scale civil war, to-date, has been avoided." *Id.* And she found that "[r]ecent diplomatic developments between the U.S. Department of State and South Sudan's transitional government indicate South Sudan's willingness to ensure the safety and reintegration of its returning nationals." *Id.*

The Secretary further found that, "while certain extraordinary and temporary conditions remain, the termination of the South Sudan designation is required because it is contrary to the national interest to permit South Sudanese nationals . . . to remain temporarily in the United States." *Id.* at 50,486. The Secretary found that "[t]here are compelling foreign policy reasons for ending the [TPS] designation for South Sudan," including the importance of "ensuring that South Sudan accepts the return of its citizens in a timely manner when the United States seeks to remove them." *Id.* And she concluded that "there are public safety and national security risks associated with the continued designation of South Sudan," as evidenced by the fact that "[a] portion of the South Sudan [TPS] population has been subjects of administrative investigation for fraud, public safety and national security concerns." *Id.* The Secretary thus concluded that "permitting South Sudanese beneficiaries to remain in the United States is contrary to the national interest." *Id.*

**B.    This Litigation.**

On December 22, 2025, a nonprofit interest organization called African Communities Together and four South Sudanese TPS holders filed this putative class action against the Secretary

3

of Homeland Security, DHS, USCIS, and the United States. Doc. No. 1. Plaintiffs seek judicial review and relief under the APA, claiming that the Secretary's termination of South Sudan's TPS designation was arbitrary and capricious and not in accordance with law. *Id.* at 63-67.

Plaintiffs assert that the Secretary's termination was procedurally improper because she failed to consult with appropriate agencies, gave pretextual reasons for the termination (when she had already "predetermined" to end TPS protections), and impermissibly considered the U.S. national interest in making her determination. *Id.* at 64. They also claim that the Secretary unreasonably departed from past practice by giving TPS holders only 60 days' notice of the termination and, again, by considering the domestic "national interest" in making her decision. *Id.* at 65-66. And they claim that the Secretary purportedly disregarded certain "available [and] objective evidence" that prior administrations found "relevant." *Id.* at 66-67. Plaintiffs also claim that the Secretary's termination determination was motivated by racial animus and therefore violated the equal-protection component of the Due Process Clause of the Fifth Amendment. *Id.* at 68-69.

On February 12, 2026, the Court issued an order postponing the effective date of the Secretary's termination. Doc. No. 65. Defendants have appealed this order and moved to stay it pending appeal. Defendants now separately move to dismiss the complaint.

## III.    STANDARD

A court should dismiss claims under Rule 12(b)(1) when it lacks jurisdiction to decide them. That includes where, as here, § 1254a(b)(5)(A) applies. *See Ramos v. Wolf*, 975 F.3d 872, 888 (9th Cir. 2020) (treating § 1254a(b)(5)(A) as a "jurisdictional statute"), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023). "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable

inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). "A plaintiff, however, may not rest merely on unsupported conclusions or interpretations of law." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (citation omitted). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993).

In addition, a court should dismiss claims under Rule 12(b)(6) when the underlying allegations fail "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court should thus dismiss a claim "if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)). In making this determination, the court should disregard legal conclusions but must treat "[n]on-conclusory factual allegations" as true. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

Ordinarily, the dispositive question in an APA case concerns "not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). "This does not mean, however, that Rule 12(b)(6) can never be in play in an APA [case]." *Id.* at 76 n.4. As the First Circuit has explained, "[s]uch a motion may be appropriate in certain circumstances," including where, as here, "the agency claims that the underlying premise of the complaint is legally flawed (rather than factually unsupported)." *Id.*

5

## IV.    ARGUMENT

### A.    Section 1254a(b)(5)(A) prohibits judicial review of Plaintiffs' claims.

8 U.S.C. § 1254a(b)(5)(A) bars "judicial review of any determination of the [Secretary] with respect to the . . . termination . . . of a [TPS] designation."  Plaintiffs unquestionably seek judicial review of Secretary Noem's termination of South Sudan's TPS designation.  Indeed, they acknowledge that APA review extends only to "final agency action."  Doc. No. 1 at 63 (citing 5 U.S.C. § 704).  And they admit that the relevant "final agency action" of which they seek "[j]udicial review" consists of "Secretary Noem's Termination"—not any collateral procedures or distinct policies.  *Id.*  That is precisely why—as the remedy for *every* claim that they assert—Plaintiffs ask the Court to hold unlawful and set aside "Defendants' Termination of South Sudan's TPS designation."  *Id.* at 64-69.  The Court therefore lacks jurisdiction over their claims under § 1254a(b)(5)(A).

Critically, the Supreme Court has twice granted the government's requests for stays raising the same reviewability bar applied to similar claims, when considering the Secretary's determinations to vacate her predecessor's extension of Venezuela's 2023 TPS designation or terminate Venezuela's 2023 TPS designation.  *Noem v. NTPSA*, 146 S. Ct. 23 (2025) (*NTPSA II*); *Noem v. NTPSA*, 145 S. Ct. 2728 (2025) (*NTPSA I*).  *NTPSA I* involved the argument that the Secretary's vacatur of the extension of Venezuela's 2023 TPS designation "had not provided a 'reasoned explanation.'"  24A1059 Gov't Appl. 19 (citation omitted).  *NTPSA II* involved whether evidence supported the Secretary's vacatur determination; whether she had considered alternatives; and whether her termination of Venezuela's 2023 TPS designation was arbitrary and capricious for failure to meaningfully consult.  *See* 25A326 Gov't Appl. 17- 18.  The government's only argument that it would succeed on those claims was that § 1254a(b)(5)(A) barred review.

The Supreme Court thus determined that the government had made a "strong showing that [it] is likely to succeed on the merits" of its argument involving § 1254a(b)(5)(A) when it granted the government's stay request—twice. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).

The text of § 1254a(b)(5)(A) is broad. Congress prefaced "determination" with the term "any." 8 U.S.C. 1254a(b)(5)(A). "As [the Supreme] Court has repeatedly explained, the word 'any' has an expansive meaning." *Patel v. Garland*, 596 U.S. 328, 338 (2022) (citation and internal quotation marks omitted). The provision thus captures determinations "of whatever kind." *Id.* (quoting *Webster's Third New International Dictionary* 97 (1993)). Likewise, the use of the phrase "with respect to," has "a broadening effect," as it "ensur[es] that the scope of [the] provision covers not only its subject but also matters relating to that subject." *Id.* at 339 (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). When Congress has stripped a court of jurisdiction "'in respect to'" particular claims, the Supreme Court has construed it as a "broad prohibition." *United States v. Tohono O'odham Nation*, 563 U.S. 307, 312 (2011) (citation omitted); *see Patel*, 596 U.S. at 338-339. As the Ninth Circuit recently recognized when granting the government's motion to stay, where a case "involves a *termination* of TPS, an action expressly authorized by statute," the "Secretary's action is unreviewable" under the judicial-review bar's clear terms. *NTPSA v. Noem*, 26-199 C.A. Doc. 11, at 3-4 (9th Cir. Feb. 9, 2026).

Reinforcing that interpretation, the Supreme Court has long recognized that immigration policy is "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" that are "exclusively entrusted to the political branches of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952). The Executive Branch had long exercised inherent authority to afford temporary immigration status based on its assessment of conditions in foreign states, even before there was any specific statutory authority

7

for such relief.  *See Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499, 1501, 1510 (D.C. Cir. 1988) (opinion of Mikva, J.).  That authority included the discretion "not to extend [protected] status" to a particular class of aliens, and the exercise of such discretion was "unreviewable" by courts.  *Id.*  Congress legislated against that backdrop when it enacted the TPS statute and codified in § 1254a(b)(5)(A) the understanding that "[t]here is no judicial review" of such determinations. 8 U.S.C. § 1254a(b)(5)(A).

This Court previously and correctly found that, in light of § 1254a(b)(5)(A), it lacked jurisdiction to review Plaintiffs' allegations that the Secretary (i) "wrongly viewed 'armed conflict short of 'full-scale civil war'' as insufficient to satisfy the 'armed-conflict-based designation,'" (ii) improperly "fail[ed] to consider factors such as 'acute food insecurity,' 'widespread flooding,' and 'barriers to humanitarian access' in determining whether extraordinary and temporary circumstances permit an extension of South Sudan's TPS designation," and (iii) "impermissibly considered the domestic 'national interest'" in making her termination determination.  Doc. No. 65 at 19 (citations omitted).  But it nonetheless found that it could review four aspects of Plaintiffs' claims based on the view that § 1254a(b)(5)(A) only bars review of claims challenging the Secretary's "substantive decision" to terminate a country's TPS designation—not those challenging her compliance with the "procedural requirements" of the TPS statute in arriving at that decision.  Doc. No. 65 at 16.

Respectfully, that latter conclusion was erroneous, as § 1254a(b)(5)(A) does not draw such a substance/procedure distinction.  Section 1254a(b)(5)(A) turns on the object of a plaintiff's challenge (does the plaintiff challenge a termination determination?)—not the grounds for that challenge (does the plaintiff claim that the determination was substantively or procedurally

flawed?). So long as the plaintiff seeks to challenge a termination determination, § 1254a(b)(5)(A) applies and bars judicial review.

*McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), does not support a different view. *McNary* considered a statute that barred judicial review "of a determination respecting an application for adjustment of status" under 8 U.S.C. § 1160(e). *Id.* at 491-492. Each plaintiff had unsuccessfully sought amnesty under § 1160, but none "contest[ed] the denial of their . . . applications" for relief. *Id.* at 488. Instead, the plaintiffs brought a "general collateral challenge[] to unconstitutional practices and policies used by the agency in processing applications." *Id.* at 492. The Supreme Court held that such a challenge was reviewable, notwithstanding the statute's judicial-review bar. Section 1160(e)'s "reference to 'a determination,'" the Supreme Court explained, "describes a single act"—there, the denial of a particular "application" for relief—and not broader "practice[s] or procedure[s] employed in making decisions." *Id.*

Here, the "single act" contemplated by § 1254a(b)(5)(A) is the Secretary's determination with respect to whether to designate a country for TPS or to extend or terminate a particular country's TPS designation. Plaintiffs do not bring a "collateral" attack on the procedures followed in arriving at such a determination—they attack the Secretary's termination determination itself. *See McNary*, 498 U.S. at 492. The "nature of [Plaintiffs'] requested relief" confirms the point. *Id.* at 484. Unlike the plaintiffs in *McNary*, Plaintiffs here do not seek a declaration or injunction invalidating a collateral agency policy or practice. Rather, they seek an order "[s]et[ting] aside or otherwise vacat[ing] the termination of TPS for South Sudan." Doc. No. 1 at 70. Under § 1254a(b)(5)(A), that type of direct attack on the Secretary's termination is unreviewable. Accordingly, the Court should dismiss all of Plaintiffs' claims for lack of jurisdiction.

9

B.      **Section 1252(f)(1) precludes Plaintiffs' requested relief.**

In addition, granting Plaintiffs' requested relief would impermissibly restrain the Secretary's operation of the TPS statute in violation of 8 U.S.C. § 1252(f)(1), which strips "court[s] (other than the Supreme Court)" of "jurisdiction" to "enjoin or restrain the operations of part IV of this subchapter," in any "action or claim" by any "party" (with one exception not relevant here). This provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Section 1254a is one of the statutory provisions that § 1252(f)(1) covers. In the U.S. Code, § 1254a appears in part V of the relevant subchapter. The public law enacted by Congress, however, strips lower courts of the authority to enjoin or restrain "the provisions of chapter 4 of title II," which contains the TPS statute (section 244 of the INA as amended). Illegal Immigration Reform and Immigrant Responsibility Act of 1996, div. C, Pub. L. No. 104-208, §§ 306 (enacting § 1252(f)), 308 (specifying section 244 as part of chapter 4), 110 Stat. 3009. When the enacted text and the U.S. Code conflict, the enacted text prevails. *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. § 204(a), [but] it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112. . . .").

This Court previously declined to decide whether the TPS statute is a covered provision but found that § 1252(f)(1) does not apply in this case because Plaintiffs seek "vacatur under the APA," as opposed to an "injunction 'that operate[s] *in personam*.'" Doc. No. 65 at 25 (citations omitted). Critically, though, § 1252(f)(1) is not limited to injunctions; it applies to any orders that "enjoin *or restrain*" a covered statute's operation, "[r]egardless of the nature of the action or

claim[.]" § 1252(f)(1) (emphasis added). Thus, whether Plaintiffs' requested relief—"[s]et[ting] aside or otherwise vacat[ing] the termination of TPS for South Sudan" under the APA, Doc. No. 1 at 70—constitutes an *injunction* misses the point. Indeed, the word "restrain" must have independent meaning from "enjoin." Congress provided in the neighboring provision that no court shall "enjoin the removal of any alien" in certain circumstances. *Id.* § 1252(f)(2). The variation in the side-by-side provisions indicates that "restrain" was an intentional addition that carries separate meaning and broadens the sweep of § 1252(f)(1) beyond injunctions. *See City & County of San Francisco v. Environmental Prot. Agency*, 604 U.S. 334, 344 (2025).

The dispositive inquiry is thus not whether Plaintiffs seek an injunction but instead whether they seek an order that "enjoins or restrains the operation of" the TPS statute. The answer is clearly yes. Granting Plaintiffs' requested relief would assuredly "restrain" the Secretary from exercising her authority under the TPS statute, compel the expenditure of finite governmental resources implementing a TPS designation that is contrary to the national interest, and preclude Executive officials from enforcing immigration laws in the way the Executive Branch deems appropriate. *See Aleman Gonzalez*, 596 U.S. at 549 ("restrain" means to "check, hold back, or prevent (a person or thing) from some course of action"); *see also Black's Law Dictionary* 1314 (defining "[r]estrain" as meaning to "limit" or "put compulsion upon") (emphasis omitted). Section 1252(f)(1) therefore applies and precludes the Court from granting Plaintiffs' requested relief.

### C. Plaintiffs' allegations fail to state a claim on the merits.

#### 1. The Court should dismiss Count One.

Plaintiffs first assert that the Court should set aside "Defendants' Termination of South Sudan's TPS designation" because it was made "without observance of procedure required by law." Doc. No. 1 at 63-64 (citing 5 U.S.C. § 706(2)(D)). They specifically assert that the

termination "was procedurally improper" because the Secretary allegedly "failed to consult with appropriate agencies"; based her determination "on a predetermined domestic policy of the Trump administration to restrict access to TPS for non-white, non-European, African immigrants"; and "relied on 'national interest' considerations divorced from the conditions inside South Sudan." *Id.* at 64. Those allegations fail to state a plausible claim.

**Consultation.** Plaintiffs allege that the Secretary "failed to consult with other agencies as required by the TPS statute" because she did not "receiv[e] any recommendation or contemporaneous conditions report from the State Department." *Id.* at 37-39. But as the Court previously recognized, DHS *did* notify a Department of State official about certain TPS designations coming up for review—including the designation for South Sudan. Doc. No. 65 at 34. And, in response to that email, the Department of State official replied: "I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues." *Id.* at 32 (citing Doc. No. 59-3 at 133). Accordingly, DHS sought information and advice from State—its views on South Sudan's TPS designation—and State responded by providing its views by confirming that it had "no foreign policy concerns with ending" the TPS designation for South Sudan and the United States has "partnered with South Sudan on immigration-related issues." *Id.* The TPS statute requires nothing more.

Plaintiffs' allegation that the Secretary did not receive a formal recommendation or a contemporaneous country conditions report from State—even accepted as true—does not state a violation of the TPS statute, which requires only "consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A). It does not require a specific type or degree of consultation—let alone demand a formal letter or a country conditions report. For example,

nothing in the statute requires the Secretary to engage in face-to-face meetings, send two emails instead of one, convey or receive a specific amount of information, or discuss set topics. Plaintiffs' claim that the Secretary should have engaged in different modes of consultation would contravene the principles that courts undertaking APA review may not substitute their own discretionary judgments for that of the agency, *see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and that courts are "'generally not free to impose' additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel," *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (quotation marks omitted).

In support of its order granting Plaintiffs' motion to postpone, the Court cited the sixth edition of Black's Law Dictionary (1990), which defined "[c]onsultation" as the "[a]ct of consulting or conferring; e.g. patient with doctor; client with lawyer. Deliberation of persons on some subject. A conference between the counsel engaged in a case, to discuss its questions or arrange the method of conducting it." *See* Doc. No. 65 at 33; Black's Law Dictionary 316 (6th ed. 1990). And from there, the Court observed that the sixth edition of Black's Law Dictionary defined "[d]eliberation," in turn" as "[t]he act of weighing and examining the reasons for and against a contemplated act or course of conduct." *Id.* (citing Black's Law Dictionary 427 (6th ed. 1990)). But even assuming it was appropriate to treat "consultation" and "deliberation" as definitionally equivalent, DHS's email exchange with the Department of State still plainly meets this definition. The Court also observed that the seventh edition of Black's Law Dictionary (1999) defined "[c]onsultation" as "[t]he act of asking the advice or opinion of someone." *Id.* at 43. But that is precisely what DHS's email exchange with the Department of State shows. At bottom, no definition of consultation requires a specific level of thoroughness or extensiveness.

13

**Predetermined.**  Plaintiffs next allege that the Secretary's reasons for terminating South Sudan's TPS designation were "pretext" for a "predetermined domestic policy of the Trump administration to restrict access to TPS."  Doc. No. 1 at 40, 64.  But, to start, there is no such thing as a "predetermination" claim.  As the Supreme Court explained when reversing the Fifth Circuit's holding that the prior administration cancelled certain protocols because it lacked a sufficiently "open mind," an "agency's *ex ante* preference for terminating [a prior administration's action]— like any other feature of an administration's policy agenda—should not be held against the" ultimate agency decision.  *Biden v. Texas*, 597 U.S. 785, 812 (2022).  Nor is there any requirement that an agency have an "openminded attitude" in considering an action.  *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 685 (2020).  Instead, as long as an agency complies with "the APA's objective criteria," courts may not "rebuke[]" agencies for "purported attitudinal deficiencies" such as having a preferred policy outcome.  *Id.* at 674, 685.

Consequently, *even if* Plaintiffs had plausibly alleged that the termination in this case was predetermined, which they have not, that would not establish a violation of the APA.[1]  That is distinct from a claim of pretext, which the Supreme Court has permitted only upon evidence that the agency's "sole stated reason" for taking an action was "contrived."  *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019).  And even when it comes to a claim of pretext, it is "typical"— not a basis to set an agency action aside—for an agency to "have both stated and unstated reasons

---

[1] Notably, in the complaint itself, Plaintiffs acknowledge the Secretary allowed South Sudan's TPS designation to be extended in May 2025 to gather updated information to inform her determination with respect to country conditions and the national interest, Doc. No. 1 at 18, directly undermining their claim that the Secretary had "predetermined" to terminate South Sudan's TPS designation.  Moreover, the administrative record reflects that the Secretary engaged in an extensive and thorough review process—including consideration of an array of evidence and analyses from the U.S. Department of State and U.S. Citizenship and Immigration Services (USCIS)—further belying any notion that the Secretary had "predetermined" to terminate South Sudan's TPS designation no matter what her review revealed.

for a decision." *Id.* Pleading a pretext claim thus requires asserting plausible factual allegations that, accepted as true, would establish that all of the agency's stated reasons were less than genuine, which Plaintiffs have not done.

The Court previously found that Plaintiffs' are likely to succeed on their pretext-for-predetermination claim, citing "[s]everal lines of evidence" as support. Doc. No. 65 at 29. But, respectfully, none of them is persuasive. *First*, the Court relied heavily on the fact that the Secretary "has decided to terminate twelve TPS designations in as many months." *Id.* The TPS statute, however, *required* the Secretary to decide whether to extend or terminate these designations at specified intervals, 8 U.S.C. § 1254a(b)(3)(A), and so the *timing* of these decisions (i.e., 12 terminations "in as many months") does not suggest that the Secretary's stated reasons were pretext. Moreover, the fact that 12 out of 12 of these decisions were terminations, not extensions, does not logically speak to whether the Secretary's stated reasons were pretext. Such a percentage does not make it harder to believe that the Secretary genuinely determined that each country no longer continued to meet the conditions for designation. In fact, a series of termination decisions by the Secretary is consistent with the view that the prior administration did not act with the requisite rigor and circumspection in exercising the authority granted by the TPS statute. The Court's finding of likely pretext is further belied by the fact that the Secretary deliberately allowed for the extension of the South Sudan TPS designation in order to gather more recent information to inform her determination with respect to country conditions and the national interest. 90 Fed. Reg. 19,217, 19,218 (May 6, 2025).

*Second*, the Court found that the Secretary's stated reasons were inconsistent with the administrative record. Doc. No. 65 at 30-31. For instance, the Court stated that "one salient statement in the Federal Register notice is belied by the record." *Id.* at 30. The Secretary stated

that "[a] portion of the South Sudan [TPS] population has been subjects of administrative investigation for fraud, public safety and national security concerns." 90 Fed. Reg. 50,484, 50,486. But, according to the Court, "[t]he administrative record reveals . . . that when USCIS searched for records of fraud or public safety concerns among 228 South Sudanese TPS holders, it found none." Doc. No. 65 at 30. The Court's assertion, however, rests on an incomplete review of the administrative record. Although USCIS's search of its Fraud Detection and National Security Directorate does not appear to have yielded hits for fraud or public safety findings involving South Sudanese TPS holders, *see* Doc. No. 59-1 at 129, DHS's search of the TECS platform *did* yield such results. The administrative record shows that "a small portion of the South Sudan TPS population has been subject to administrative investigations for potential risks to national security or public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation." *Id.* at 138. Namely, "DHS data reveals that approximately 28% of South Sudan TPS beneficiaries or applicants have at least one TECS hit in their immigration benefit request history." *Id.*

The Court also stated that "the Federal Register notice includes several instances of cherry-picked positive data that are sharply at odds with the country conditions described in the administrative record." Doc. No. 65 at 31. As its sole example, the Court observed that the termination notice stated that "a United Nations mission is helping 'build[] the capacity of South Sudan's local police and justice system.'" *Id.* But the Court faulted the Secretary for not "discuss[ing] that the same United Nations mission . . . reported in 2025 that it was 'gravely concerned by escalating violence,' 'civilian displacement,' 'rising abductions,' and other 'threat[s] to international peace and security in the region.'" *Id.* (citations omitted). Although the Court acknowledged that it cannot "assess whether Secretary Noem adequately weighed country

16

conditions in South Sudan," it nonetheless found that "the disconnect between the Federal Register notice and her own administrative record is further evidence of pretext." *Id.* The Court's finding that there is a "disconnect" between the termination notice and the United Nations reports, however, necessarily reflects a determination that the Secretary gave certain portions of those reports too much weight and other portions insufficient weight.

*Third*, the Court found that the Secretary "fail[ed] to consult with other agencies" before deciding to terminate South Sudan's TPS designation, and that this purported failure "also weighs toward a finding of pretext." *Id.* at 31-32. But, as discussed above, the administrative record plainly shows that DHS consulted with the Department of State—even if that consultation was not as robust as the Court would have liked. *See* pp. 12-13, *infra*. Moreover, Plaintiffs themselves alleged that consultation with appropriate agencies "usually" involves consulting with USCIS— thus acknowledging that USCIS constitutes an agency for purposes of the TPS statute's consultation provision. Doc. No. 1 at 11-12, 19. And the administrative record shows that the Secretary consulted with USCIS before deciding to terminate South Sudan's TPS designation. *See, e.g.*, Doc. No. 59-1 at 141-90.

*Fourth*, the Court found that the Secretary's public statements—which the Court characterized as "oppos[ing] the TPS program writ large"—"reinforce the argument that the decision to terminate South Sudan's TPS designation was preordained" and that the Secretary's stated reason for termination (namely, that South Sudan no longer met the conditions for its TPS designation) "was not the real reason." Doc. No. 65 at 32-33. Yet, the Court's assertion that the Secretary "opposed the TPS program writ large" badly misconstrues the Secretary's actual statement. *Id.* at 32. The sole statement relied upon by the Court came from Secretary Noem's confirmation hearing, in which she stated that the TPS statute "has been abused and manipulated

17

by the Biden Administration" and that TPS "was intended to be temporary." *Id.*  As to the first comment: expressing the view that a prior administration *abused and manipulated* a statute does not constitute opposition to *the statute itself*.  As to the second comment: the Secretary was obviously talking about TPS designations, not the TPS statute, which does not contain a sunset provision.  And, so understood, the Secretary's comment was indisputably correct.  TPS designations *are*—indeed, by statute *must*—be temporary.

**National Interest.**  Plaintiffs also claim that the Secretary impermissibly considered the "national interest." Doc. No. 1 at 64.  But the statute *requires* the Secretary to consider whether "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States."  8 U.S.C. § 1254a(b)(1)(C).  The Secretary "shall terminate" a designation if she determines the country "no longer continues to meet the conditions for designation under [§ 1254a(b)(1)]." *Id.* § 1254a(b)(3)(B).  And South Sudan was designated for TPS because it met the "condition" set forth in § 1254a(b)(1)(C), which requires that the designation be in the "national interest."  Once the Secretary determined that the designation was "contrary to the national interest," the "condition[ ] for designation under [§ 1254a(b)(1)]" "no longer continue[d] to [be] me[t]," and the statute required the Secretary to terminate the designation. *Id.* § 1254a(b)(1)(C), (3)(B).  The Secretary did not violate the statute by complying with its explicit mandate.

### 2.    The Court should dismiss Count Two.

Plaintiffs next claim that the Court should set aside "Defendants' Termination of South Sudan's TPS designation" because it allegedly departed from DHS's past practice in two ways. Doc. No. 1 at 65-66. *First*, Plaintiffs allege that the Secretary's decision to provide South Sudanese TPS holders "with only 60-days' notice" of the termination was "an unacknowledged and unreasoned departure from decades of decision-making practices and procedures." *Id.* at 65.  The

INA, however, provides that, "[n]otwithstanding any other provision of law . . . no court shall have jurisdiction to review . . . any . . decision or action of . . . the Secretary of Homeland Security the authority for which is specified under this subchapter to be in [her] discretion."  8 U.S.C. § 1252(a)(2)(B)(ii).  One provision of that subchapter—i.e., the TPS statute—allows the Secretary to publish a termination notice 60 days in advance, 8 U.S.C. § 1254a(b)(3)(B), and specifies that the decision to provide for a longer transition period remains in the Secretary' discretion.  *See* 8 U.S.C. § 1254a(d)(2) (stating that the Secretary "may" provide for a longer transition period). Section 1252(a)(2)(B)(ii) thus independently precludes the Court from reviewing the Secretary's discretionary decision regarding whether to provide more than 60 days' notice of the effective date of a TPS termination.

Moreover, Plaintiffs' claim would fail in any event.  As just discussed, the TPS statute explicitly allows the Secretary to publish a termination notice 60 days in advance.  8 U.S.C. § 1254a(b)(3)(B) (termination "shall not be effective earlier than 60 days after the date the notice is published").  And the relevant regulations make clear that TPS protections can end "upon the sixtieth (60th) day after the date notice of termination is published in the Federal Register." 8 C.F.R. § 244.19; *see also* 8 C.F.R. § 244.13(b).  In her discretion, the Secretary "may" provide for a longer transition period. 8 U.S.C. § 1254a(d)(2).  But the government has never made a "hard-and-fast commitment" to offer longer periods of notice—nor has it taken an "earlier [agency] position" that could have conferred a legitimate reliance interest on a TPS recipient.  *FDA v. Wages and White Lion Invs., LLC*, 604 U.S. 542, 573-85 (2025).  Even if the agency's past choices of wind-down periods for other countries could create a "hard-and-fast commitment," those past choices reflect variation, not consistency, on the length of wind-down periods.  And even if this argument had merit, which the Government maintains it does not based on the clear statutory bar

19

in Section 1252(a)(2)(B)(ii), this argument could at most justify relief regarding *the winddown period*, not the *termination itself*.

*Second*, Plaintiffs claim that the Secretary impermissibly considered the "domestic U.S. 'national interest'" in a break with past practice. Doc. No. 1 at 65. But, again, § 1252(a)(2)(B)(ii) strips courts of "jurisdiction to review . . . any . . decision or action of . . . the [Secretary] the authority for which is specified under this subchapter to be in [her] discretion." And the TPS statute plainly vests the Secretary with discretion to decide whether "permitting the [affected] aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C).

Moreover, as described above, the Secretary *must* consider the "national interest" in deciding whether a country continues to meet the conditions for designation in § 1254a(b)(1)(C). And nowhere does the TPS statute constrain what the Secretary can consider when deciding what is in the national interest—let alone require her to focus solely on foreign country conditions. The question of what serves the national interest offers "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); *see Trump v. Hawaii*, 585 U.S. 667, 684-86 (2018) (where President has discretion to determine if alien's entry "would be detrimental to the interests of the United States," courts should not inquire "into the persuasiveness of the President's justifications"); *Webster v. Doe*, 486 U.S. 592, 600 (1988) ("'in the interest of the United States' . . . exudes deference" and lacks "meaningful judicial standard of review"). The Secretary's consideration of domestic interests in evaluating the United States' "national interest" thus could not have been arbitrary and capricious as a matter of law.

### 3.    The Court should dismiss Count Three.

In Count Three, Plaintiffs allege that "Defendants' Termination of South Sudan's TPS designation" was arbitrary and capricious, an abuse of discretion, and contrary to law for several reasons. Doc. No. 1 at 66-67. Specifically, they allege that the termination was a predetermined political decision, that the termination was motivated by racial animus, that the Secretary failed to consult appropriate agencies, and that the Secretary failed to consider certain "objective, available evidence" of country conditions that prior administrations or other agencies had found "relevant." *Id.* The first three allegations fail for the reasons described above, pp. 12-18, *infra*, and below, pp. 22-25, *supra*. And the last allegation—a purported failure to consider "objective, available evidence"—similarly does not suffice state a claim.

Notably, at the hearing on Plaintiffs' motion to postpone, Plaintiffs' counsel reiterated the claim that the Secretary was required to consider certain "available and objective evidence." Jan. 15, 2026, Hr'g Tr. at 8:6-8. But, as the Court quickly and correctly observed, "the statute actually doesn't say that." *Id.* at 8:9-10. The statute provides that the Secretary "shall review the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). It does not remotely prohibit the Secretary—in evaluating those conditions—from making judgment calls or assessments over which different people could disagree. In essence, Plaintiffs take issue with the way in which the Secretary weighed the evidence—alleging that she "cherry picked" certain positive improvements in South Sudan while overlooking "evidence of numerous factors"—such as human rights abuses and widespread flooding—that "the Department previously found relevant." Doc. No. 1 at 20-27. But when reviewing agency action under the APA, a court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009).

### 4.    The Court should dismiss Counts Four and Five.

Finally, in Counts Four and Five, Plaintiffs allege that "Defendants' Termination was impermissibly motivated by racial and/or national origin animus against African and other non-white or non-European immigrants," and therefore violated the equal-protection component of the Due Process Clause of the Fifth Amendment.  Doc. No. 1 at 68-69.

As an initial matter, Plaintiffs allege that the Court should apply "exacting scrutiny" to their equal-protection claims, citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) as support.  *See id.* at 69.  The Supreme Court's decision in *Trump* v. *Hawaii*, 585 U.S. 667 (2018), however, prescribes that rational-basis review governs constitutional challenges to Executive Branch immigration policies like the challenged termination and that such policies pass muster so long as they are "plausibly related" to the government's policy objective.  *Id*. at 704.  That deferential review reflects that "decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications . . . defined in the light of changing political and economic circumstances,'" which are judgments "'frequently of a character more appropriate to either the Legislature or the Executive.'"  *Id*. at 702 (citation omitted).[2]

Like the policy at issue in *Hawaii*, TPS termination determinations involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *id.*, precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. The TPS statute requires the Secretary to determine whether a foreign state is able "to handle

---

[2] In addition, nationality-based classifications drawn by Congress or the Executive under the immigration laws are reviewed for rational basis. *See Kandamar v. Gonzales*, 464 F.3d 65, 73-74 (1st Cir. 2006); *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979). Moreover, as in *Kandamar*, "[t]here is nothing in this record to demonstrate outrageous discrimination." 464 F.3d at 74 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999)).

adequately the return" of its nationals and whether conditions in the country prevent the country's nationals "from returning to the state in safety." 8 U.S.C. § 1254a(b)(1). Such determinations are fraught with potential implications for our relations with the relevant country, as the Secretary recognized and explained in announcing her determination to terminate South Sudan's TPS.

The Secretary again categorically denies that any racial, ethnic, or other animus motivated her determination, which easily passes rational-basis review. South Sudan's TPS designation was terminated because "South Sudan no longer continues to meet the conditions for [TPS]" under the TPS statute. 90 Fed. Reg. at 50,487. That determination reflected the Secretary's judgment that permitting South Sudanese nationals to remain temporarily in the U.S. is contrary to our "national interest," considering the foreign policy, public safety, and national security considerations that she identified. *Id.* at 50,486. It was thus "plausibly related" to the government's foreign relations interests, border security priorities, and the objectives of the TPS program. *Hawaii,* 585 U.S. at 704-05. Her determination was fully consistent with Congress's goal of providing temporary relief to aliens until the conditions necessitating that relief come to an end.

Even under heightened scrutiny, Plaintiffs' minimal allegations fail to state a claim. Under *Arlington Heights*, to establish an equal protection claim, Plaintiffs would need to prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision." 429 U.S. at 265-66. Plaintiffs summarily assert that the Secretary's termination determination "cannot be explained other than by reference to race and/or national origin." Doc. No. 1 at 69. But the Court need not and should not credit that conclusory assertion. *Iqbal*, 556 U.S. at 678. And none of Plaintiffs' remaining allegations could establish a discriminatory purpose.

Plaintiffs allege that President Trump and the Secretary have made statements evoking "white nationalist" and "anti-immigrant ideology." Doc. No. 1 at 44. But the cited statements

raise no plausible inference of discriminatory intent.  Furthermore, many were "remote in time and made in unrelated contexts," and thus "do not qualify as 'contemporary statements' probative of the decision at issue."  *DHS* v. *Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020) (opinion of Roberts, C.J.) (quoting *Arlington Heights*, 429 U.S. at 268); *see Ramos*, 975 F.3d at 898 (noting that President Trump's statements "occurred primarily in contexts removed from and unrelated to TPS policy or decisions").  Some statements arose during the campaign trail—just like the statements *Hawaii* rejected.  Others date from the first Trump Administration—the same administration that *extended* South Sudan's TPS designation three times.  None reflects any kind of racial or national-origin animus.

Moreover, Plaintiffs' allegations concerning statements made by President Trump— besides mischaracterizing the statements themselves—could not plausibly show animus by *the Secretary*.  *See, e.g.*, *Staub* v. *Proctor Hosp.*, 562 U.S. 411, 418 (2011); *Ramos*, 975 F.3d at 897 ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination cases can be transposed to th[e] particular context" of TPS terminations.).  Otherwise, courts could invalidate any agency official's actions based on mere allegations that a more senior government official harbored some discriminatory motive.  That theory would also invite impermissible intrusion on privileged Executive Branch deliberations, see *United States* v. *Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, *Nixon* v. *Fitzgerald*, 457 U.S. 731, 749-50 (1982).

Plaintiffs' allegation that the Secretary's termination determinations this year have had a "disparate impact on particular racial groups" similarly fails to state a claim.  Doc. No. 1 at 30 (citation omitted).  Of course, the relevance of any disparate impact naturally depends on the specific demographics at issue.  And, here, almost "every country that has been designated for TPS

24

since its inception has been 'non-European' . . . and most have majority 'non-white' populations." *Ramos*, 975 F.3d at 898. Thus, under Plaintiffs' logic, "almost any TPS termination in the history of the program would bear 'more heavily' on 'non-white, non-European' populations and thereby give rise to a potential equal protection claim," which "cannot be the case." *Id.* Indeed, the Supreme Court has squarely rejected this type of "disparate impact" evidence as sufficient to state a plausible equal protection claim. *Regents*, 591 U.S. at 34 ("[B]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. . . . Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.").

In sum, Plaintiffs' allegations fail to support a claim that the Secretary's TPS determination was motivated by racial animus, even if the *Arlington Heights* test were applied. And there is no serious question that the termination determination can "reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705. Plaintiffs have therefore failed to state an equal-protection claim.

## V.    CONCLUSION

The Court should dismiss the complaint.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: March 16, 2026                   By:    */s/ Michael L. Fitzgerald*
                                        MICHAEL L. FITZGERALD
                                        Assistant United States Attorney
                                        U.S. Attorney's Office

1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3266
michael.fitzgerald2@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Assistant U.S. Attorney