# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA, <br><br> *Defendants*. | **AMENDED COMPLAINT** <br><br> Civil Action No. 1:25-cv-13939-PBS <br><br> Pursuant to L.R. 5.1(c), Plaintiffs request **emergency relief** against agency action that was scheduled to take effect at **12:00 a.m. on January 6, 2026**. |

## INTRODUCTION

1.      South Sudan is currently facing a humanitarian crisis, and ongoing armed conflict continues to threaten the safety of its nationals, as the country teeters on the brink of another civil war.

2.      Congress enacted Temporary Protected Status ("TPS") to protect eligible individuals from removal to countries designated unsafe on account of dire conditions like armed conflict, natural disaster, or other extraordinary circumstances. *See* 8 U.S.C. § 1254a. TPS provides eligible beneficiaries with the right to live and work legally in the United States during a period when it is unsafe for them to return to their country of origin.

3.      The United States government designated South Sudan for TPS in 2011, following South Sudan's independence from Sudan after over two decades of civil war. The initial designation turned both on the existence of armed conflict and on other extraordinary

circumstances. Since then, the United States has repeatedly and consistently redesignated or extended South Sudan on each of those grounds. The redesignations have recognized the ongoing, devastating, and widespread armed conflict in the country—which has included gender-based and sexual violence, arbitrary arrests and confinement, torture and physical violence, and the killing of civilians. Every redesignation has also recognized other extraordinary circumstances, such as food insecurity, destructive droughts and flooding, population displacement, barriers to accessing humanitarian relief, and disease outbreaks.

4.      Approximately 232 South Sudanese nationals are currently TPS beneficiaries and, as a result, find refuge in the United States. Approximately 73 South Sudanese nationals have pending applications for that same protection.

5.      Through a November 6, 2025, notice in the Federal Register, U.S. Department of Homeland Security ("DHS") Secretary Kristi Noem announced the January 5, 2026, termination of TPS for South Sudan ("the Termination"). As a result of the Termination, South Sudanese TPS holders in the U.S. will lose their protected status as of midnight on January 6, 2026, and face unconscionable harm. People with pending applications and the U.S.-based dependents and immediate relatives of recipients and applicants will also be harmed.

6.      The individual plaintiffs are four South Sudanese nationals with TPS, who have lived in the United States for years and have deep ties to this country and their communities here. They are each members of African Communities Together ("ACT"). ACT is an associational Plaintiff that represents the interests of South Sudanese TPS recipients and applicants in the U.S., as well as their U.S.-based families.

7.      Plaintiffs bring this action to challenge Defendants' Termination as unlawful. Defendants' actions put the individual Plaintiffs and other TPS recipients at imminent risk of

losing critical humanitarian protection, robs people with pending applications of the opportunity for that protection, harms members of Plaintiff ACT, and harms the U.S.-based dependents and immediate relatives of recipients and applicants.

8.        Should TPS for South Sudan terminate imminently and unlawfully, the individual Plaintiffs and other South Sudanese TPS holders will face an impossible choice: to uproot their lives yet again, in search of safety in a third country; to remain in the United States without TPS, at risk of deportation, related immigration confinement, and loss of work authorization and eligibility for a driver's license; or to relocate to South Sudan, a country where their safety and even their lives would assuredly risk be in peril, as the U.S. Department State has affirmed in its Travel Advisory for South Sudan.

9.        The Termination is one of a series of purposeful and pretextual terminations by Secretary Noem of TPS for several non-European countries whose nationals are majority non-white. To date, the Trump Administration has sought to terminate TPS for all other countries whose designations have been up for periodic review, including: Ethiopia, Cameroon, Haiti, Afghanistan, Nepal, Burma, Syria, Nicaragua, Honduras, and Venezuela. The decisions to terminate TPS for these countries and for South Sudan are part of the Trump Administration's ongoing effort to eliminate access to the Congressionally authorized TPS program. The apparent goal of that effort is to significantly reduce the number of non-white and non-European immigrants in the United States.

10.       Defendants' decision to terminate TPS for South Sudan violates the TPS statute and the Administrative Procedure Act ("APA") because it was made without consulting appropriate agencies; without due consideration of available and objective evidence of South Sudan's dire conditions; in disregard of established DHS practices; and in improper reliance on

impermissible factors, as well as being politically influenced. Each of these procedural deficiencies violates the APA.

11.    Defendants' unexplained decision to have the Termination take effect 60 days after its announcement independently violates the APA, because it is a stark departure from the established past practice of providing an orderly transition period of at least six months or more.

12.    The insufficiency of the 60-day wind-down period is compounded by other severe and recent policy changes that impede access to other immigration benefits. One such change is a blanket pause on all asylum processing in the U.S., announced on December 2, 2025. That blanket pause makes accessing asylum ahead of the Termination virtually impossible.

13.    Accessing any other immigration status ahead of the Termination also seems virtually impossible because of: (1) the Administration's blanket pause, announced on December 2, 2025, on the processing of immigration benefits applications from people in the U.S. who are the nationals of any countries subject to entry bans that the Administration instituted effective June 9, 2025; (2) the extension of the entry bans to nationals of South Sudan and 19 other majority Black countries, including 17 other African countries, announced on December 16, 2025, and effective January 1, 2026; and (3) a December 18, 2025, social media announcement by the Director of USCIS, expanding the processing pause on immigration benefits applications to applicants in the U.S. who are South Sudanese nationals.

14.    The Termination of South Sudan's TPS designation also violates the Constitution in multiple respects. First, the Termination violates the Equal Protection Clause because it was motivated, at least in part, by racial, ethnic, and national origin-based animus. The dehumanizing rhetoric that Secretary Noem, President Trump, and officials in his Administration have consistently used to describe and justify their TPS decisions demonstrates their underlying animus

4

against immigrants who are not white or descended from Europeans, including South Sudanese immigrants. That animus and related rhetoric have been particularly stark for the nationals of majority Black countries. Second, the Termination violates the Due Process Clause. TPS holders have substantial liberty and property rights in their TPS status, which confers both protection from removal and work authorization. And the TPS statute itself establishes procedural safeguards that are constitutionally necessary to protect those interests. By issuing the Termination in violation of those procedures, the Secretary violated the due process rights of South Sudanese TPS holders and applicants, who now face the summary loss of their liberty and property interests.

15.    In the alternative, and under Federal Rule of Civil Procedure 8(d)(2)–(3), Plaintiffs allege that the DHS Secretary lacked statutory authority to terminate South Sudan's TPS designation under 8 U.S.C. § 1254a. Congress made clear repeatedly and unambiguously throughout the TPS statute that the "Attorney General"—and only the "Attorney General"—possesses the authority to terminate TPS status. And contrary to the government's assertions, Congress never transferred that authority to the DHS Secretary or any other official. For any or all of these reasons, this Court should set aside the agency's unlawful decision to terminate TPS for South Sudan nationals.

## THE PARTIES

### Plaintiffs

16.    **Plaintiff African Communities Together ("ACT")** is a non-profit, membership-based organization that fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States. It was founded in 2013 and is incorporated in New York.

17.      ACT has thousands of members nationwide. Its membership is diverse and includes people around the U.S. who are the nationals or descendants of myriad African nations, as well as their U.S.-based family members. ACT's membership has diverse citizenship and immigration statuses and includes TPS holders and/or applicants from South Sudan and other African countries, including Sudan and Ethiopia.

18.      ACT's members who are South Sudanese TPS recipients and/or applicants live around the United States, including in Massachusetts.

19.      ACT brings this action on behalf of itself and its members, including the individual Plaintiffs.

20.      **Plaintiff Mary Doe** is a Black woman who is a South Sudanese national and a TPS holder. Mary has lived in the U.S. for years, and TPS is currently her sole form of immigration status. She is a member of ACT and works and lives in the U.S., in the same town as her elder sister and her sister's five children, who range in age from 11 to 21. Her sister and sister's children are all U.S. citizens. Mary is very close with them, and they rely on her to help with her sister's business, which enables her sister to spend more time caring for her children.

21.      In their community and surrounding ones, Mary earns her living as an outreach worker for low-income women who are pregnant or who otherwise have children under three years old. She provides education and support to these women to promote their wellbeing and their children's wellbeing. She currently has many clients, all of whom are U.S. citizens or green card holders. She enjoys her work and finds it rewarding to serve her community.

22.      Mary's values are informed by her Christian faith. She is a member of a local church, whose functions she attends regularly.

23.     Mary's TPS status allows her eligibility for her driver's license, which is essential for her career and daily life.

24.     **Plaintiff David Doe** is a Black man who is a South Sudanese national and a TPS holder. David has lived in the U.S. for years, and TPS is his sole form of immigration status currently.

25.     David is a member of ACT. He lives and works in the U.S., as an addiction case manager. In that capacity, he supports vulnerable community members in their efforts to achieve recovery and sobriety that enables them, their families, and their communities to begin to heal from the ravages of drug and alcohol addiction. He has found his work so gratifying that he is working to become a licensed addiction counselor.

26.     David relies on TPS for eligibility for his driver's license, which is essential for the work he does and for assorted aspects of his daily life.

27.     **Plaintiff Peter Doe** is a Black man who is a South Sudanese national and a TPS holder. David has lived in the U.S. for years, and TPS is his sole form of immigration status currently. Peter is a member of ACT and lives in the U.S. The place he calls home in the U.S. is where his cousin lives, who is more like a brother to him. Peter loves their community, including its diversity.

28.     **Plaintiff Jacob Doe** is a Black man who is a South Sudanese national, a TPS holder, and a member of ACT.

29.     Jacob has lived in the U.S. for years, with a host family. Everyone in the host family is a U.S. citizen and is affiliated with a local church. Jacob and his host family have built a friendship and a bond with each other that are important to Jacob, because they mitigate his separation from his own family since coming to the United States.

30.    Jacob and his host family volunteer together and attend church together. Jacob is deeply involved in the community through church programs. He volunteers by teaching the youth about Christ and helping out when the church feeds the homeless and the hungry. Every Saturday he volunteers by coaching children sports to get them outside and away from their phones and to teach them important lessons about the value of teamwork.

31.    While in the U.S., Jacob has obtained contract work, drilling and repairing water wells. Through this work, he has been essential to providing water to community members, including rural communities. He has responded to urgent calls, including natural disasters that rendered drinking water inaccessible, as well as to routine calls for drilling and repairing water wells. Throughout these experiences, he has enjoyed being a dependable member of the teams that do this work and that rely on their grit to keep doing it.

32.    Jacob longs to save up enough money to attend college in the U.S., if possible, and to gain employment that can help him support his family, who are struggling to survive outside the U.S. Their access to the most basic necessities is very limited and irregular, including for his mother, who is ill; and they have relied on whatever financial support that Jacob is able to provide them.

33.    Through TPS, Mary, David, Peter, and Jacob have immigration status, access to related federal benefits (like work authorization), access to related state benefits (like driver's licenses), protection against deportation charges and related confinement within the U.S., and protection against forced removal to South Sudan—where they and many others face grave and deadly dangers because of ongoing armed conflict and other extraordinary circumstances there.

**Defendants**

34.    **Defendant Markwayne Mullin** is the Secretary of the U.S. Department of Homeland Security. As the highest-ranking officer for DHS, Secretary Mullin has statutory

authority over all TPS extension, termination, and designation decisions.[1] He is sued in his official capacity.

35.  **Defendant U.S. Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program. Its highest-ranking officer is its Secretary, and references herein to "the Secretary" correspond to the DHS Secretary.

36.  **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

37.  **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

## JURISDICTION AND VENUE

38.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, including the Fifth Amendment to the Constitution and the APA, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution.

39.  The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the APA, 5 U.S.C. § 701 *et seq.*, and its common law equitable powers.

---

[1] *See* 8 U.S.C. § 1254a(b); *see also* 6 U.S.C. § 557 (transferring certain functions from the Attorney General).

40.    The APA waives the Government's sovereign immunity from claims alleging unlawful agency action and "seeking relief other than money damages." 5 U.S.C. § 702. In addition, sovereign immunity does not bar claims against federal officials for non-monetary injunctive relief to prevent violations of federal law.[2]

41.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one Plaintiff and putative class representative resides in this judicial district.

## THE STATUTORY SCHEME FOR TPS AND RELATED AGENCY PRACTICES

42.    Congress created TPS as a response to unconstrained executive discretion in immigration humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief, through a process that lacked "any specific … criteria."[3]

43.    Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute). Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before and provide beneficiaries with certainty about "what [their] rights are, how [an agency] determines what countries merit [protected] status," and "how long [beneficiaries] will be able to stay." *Id.* at 25837 (statement of Rep. Bill Richardson).

---

[2] *Larson v. Domestic & Foreign Com.* Corp., 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).
[3] *See* Lynda J. Oswald, Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters, 85 Mich. L. Rev. 152, 157–60, 178 n.153 (1986) (quoting Letter from Att'y Gen. William F. Smith to Rep. Lawrence J. Smith. (July 19, 1983)). The facts in paragraphs 42–193 are alleged as of the date of Plaintiffs' original complaint, and have not been modified to reflect intervening developments in this litigation, including the filing of the administrative record.

10

44.        Since 1990, the TPS statute has given the executive branch authority to provide humanitarian relief to nationals of designated countries who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Secretary of DHS may designate a country for TPS where (A) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (B) [there is a natural disaster] or (C) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

45.        Significantly, Congress included the "national interest of the United States" provision only in subsection (C), for designations based on "extraordinary and temporary conditions"; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

46.        The statute first requires the Secretary to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Secretary "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the [Secretary] may specify." *Id.* §1254a(b)(2).

47.        As long as the Secretary consults appropriate agencies and determines certain country conditions exist, she may designate a country for TPS.

48.        By contrast, Congress limited the Secretary's discretion to periodically review TPS designations. *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020)

11

("GAO Report") at 15–18, 27 (differentiating between the discretion afforded before and after an initial designation).

49.      The statutory requirements for periodic review of a designation are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

50.      The periodic review process typically begins months before the 60-day deadline. *See* GAO Report at 20–21. As part of the process, both USCIS and the U.S. Department of State ("State Department") usually have prepared country conditions memoranda and recommendations for the Secretary. *See id.* 15–16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).[4]

51.      Customarily, USCIS manages and coordinates the TPS periodic review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country conditions report and recommendation from the State Department.[5] After considering the materials provided, USCIS

---

[4] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case en banc, so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

[5] *See* GAO Report at 15–21; *see also, e.g., Saget v. Trump*, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019).

prepares for the Secretary a detailed recommendation, based on country conditions, and called a "Director Memo."[6]

52.     Once the Secretary makes her decision, the statute requires that she "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

53.     Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default."[7]

54.     In contrast, if the Secretary timely "determine[s]" (after consulting appropriate agencies and reviewing objective evidence of country conditions) that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

55.     The Secretary has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency

---

[6] *See, e.g.*, *Saget*, 375 F. Supp. 3d at 299–300.
[7] *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal.), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) ("*NTPSA I* PI Decision").

provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period.[8] The practice of furnishing orderly transitions of at least 6 months has been ongoing for over thirty years, and the Trump Administration applied it during its first term in office. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less.[9]

56.     To be eligible for TPS, individuals from a designated country must meet stringent requirements, including: (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as a noncitizen or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history (including misdemeanors in some cases); and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9.

57.     Further, an individual is ineligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

58.     Congress ensured that people who are granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States;

---

[8] *See Nat'l TPS Alliance v. Noem*, No. 3:25-cv-05687-TLT, Dkt. No. 28 (C.D. Cal. 2025) (chart submitted into evidence, documenting the transition periods for all TPS terminations from 1992 to 2018, almost all of which lasted between 6 to 18 months).
[9] *Id.*

"shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *See id*. § 1254a(b)(1).

59.    Individuals who apply for TPS and are *prima facie* eligible for it may receive work authorization and protection from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

**SOUTH SUDAN'S INITIAL TPS DESIGNATION AND REPEATED EXTENSIONS AND REDESIGNATIONS, SPANNING 2011–2025**

60.    South Sudan is a country in eastern Africa whose nationals are predominantly Black. The country gained independence from Sudan in 2011 after a 22-year war, which was one of the longest and most severe armed conflicts ever recorded.[10]

61.    Despite gaining its official independence, severe and widespread armed conflict persisted in South Sudan. In 2013, ongoing regional and ethnic armed conflicts escalated into the South Sudanese Civil War, which formally lasted seven years.

62.    The conflict was marked by hundreds of thousands of deaths, millions of internally and externally displaced peoples, widespread starvation, and economic devastation. This conflict and its devastation are well-documented, including by the U.S. State Department.[11]

63.    For seven years of its fourteen-year statehood, South Sudan has experienced full-scale war. For the other seven years, humanitarian crises and widespread armed conflict have

---

[10] *See generally* Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629 (Oct. 31, 2011); Center for Preventive Action, *Civil War in Sudan*, COUNCIL FOR FOREIGN RELATIONS (Nov. 6, 2025), https://www.cfr.org/global-conflict-tracker/conflict/power-struggle-sudan.

[11] Lauren Ploch Blanchard, Cong. Rsch. Serv., IF10218.19, *South Sudan*, (May 9, 2025) (collecting State Department commentary), https://www.congress.gov/crs-product/IF10218.

resulted in rampant armed violence, consistent and gross human rights abuses, and other extreme threats to peoples' lives and safety.[12]

64.    The Secretary of Homeland Security first designated South Sudan for TPS in November 2011, based both on armed conflict, 8 U.S.C. § 1254a(b)(1)(A), and on other extraordinary circumstances, 8 U.S.C. § 1254a(b)(1)(C). The designation identified relevant conditions warranting the country's designation for TPS on both grounds, including: escalating intercommunal armed conflict, targeted attacks on civilians, mass displacement related to the armed conflict, mass food insecurity, and lack of access to drinking water.[13] In 2013, the Secretary extended and redesignated South Sudan for another eighteen-month period, based on the continuation of conditions that existed at the initial designation, including ongoing armed conflict and other extraordinary circumstances.[14]

65.    On eight occasions, successive Secretaries of Homeland Security repeatedly extended and/or redesignated South Sudan for TPS, each time citing ongoing armed conflict, human rights abuses, and humanitarian catastrophe.[15] Each extension and redesignation

---

[12] *See generally* Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629 (Oct. 13, 2011); Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866 (Jan. 9, 2013); Extension and Redesignation of South Sudan for Temporary Protected Status, 79 Fed. Reg. 52,019 (Sept. 2, 2014); Extension and Redesignation of South Sudan for Temporary Protected Status, 81 Fed. Reg. 4,051 (Jan. 25, 2016); Extension of South Sudan for Temporary Protected Status, 82 Fed. Reg. 44,205 (Sept. 21, 2017); Extension of the Designation of South Sudan for Temporary Protected Status, 84 Fed. Reg. 13,688 (Apr. 5, 2019); Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344 (Nov. 2, 2020); Extension and Redesignation of South Sudan for Temporary Protected Status, 87 Fed. Reg. 12,190 (Mar. 3, 2022).

[13] Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629, 63,630–31 (Oct. 13, 2011).

[14] Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866, 1,868–69 (Jan. 9, 2013).

[15] *See generally* Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866 (Jan. 9, 2013); Extension and Redesignation of South Sudan for Temporary Protected Status, 79 Fed. Reg. 52,019 (Sept. 2, 2014); Extension and Redesignation of South

underscored that these conditions prevented the safe return of South Sudanese nationals from the diaspora.[16]

66.      In its sixth extension, in November of 2020, after the official end of the civil war, the Secretary noted that "[d]espite a decrease in large-scale fighting and limited progress on the country's political transition, ongoing armed conflict persists in several areas in South Sudan among both signatories and non-signatories to the peace agreement."[17] The Secretary further noted pervasive sexual and gender-based violence; the conscription of children into armed groups; the arbitrary detention, torture, and extrajudicial killing of civilians; the mass displacement of civilians; widespread food insecurity, exacerbated both by droughts and flooding; and deep economic crisis.[18]

67.      In September 2023, DHS reviewed South Sudan's TPS and redesignated the country through May 2025, under both the armed conflict and extraordinary and temporary conditions subsections of the statute.[19]

68.      As to armed conflict, DHS found that "[i]n spite of the 2018 peace agreement that established the current transitional government [] South Sudan faces 'often violent political contestations,' and the lack of stable government has facilitated ongoing violence that is 'nearly

---

Sudan for Temporary Protected Status, 81 Fed. Reg. 4,051 (Jan. 25, 2016); Extension of South Sudan for Temporary Protected Status, 82 Fed. Reg. 44,205 (Sept. 21, 2017); Extension of the Designation of South Sudan for Temporary Protected Status, 84 Fed. Reg. 13,688 (Apr. 5, 2019); Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344 (Nov. 2, 2020); Extension and Redesignation of South Sudan for Temporary Protected Status, 87 Fed. Reg. 12,190 (Mar. 3, 2022). Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971 (Sep. 6, 2023).

[16] *Id.*

[17] Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344, 69,346 (Nov. 2, 2020).

[18] *Id.* at 69,346–47.

[19] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971 (Sept. 6, 2023).

always characterized by gross human rights violations that [have] targeted civilians and caused mass displacements' in parts of the country."[20] The 2023 redesignation recognized that conflict among armed actors had continued and that armed groups were prepared to return to war, even though the country was not currently undergoing a full-blown civil war.[21] It further noted related circumstances, including: arbitrary arrests, detentions, and killing of civilians; sexual and gender-based violence; physical abuse; forced recruitment, including of children, into armed forces; and looting and destruction of civilian property.[22]

69.     As to other extraordinary circumstances, DHS noted the impacts of widespread flooding, disease outbreaks, food insecurity, and barriers to accessing humanitarian relief.[23]

70.     In May 2025, DHS announced that South Sudan's TPS designation had automatically extended for an additional six months, stating there was insufficient information regarding current country conditions and the "national interest" to issue a determination.[24]

### DEFENDANTS' TERMINATION OF SOUTH SUDAN'S TPS DESIGNATION

71.     On November 6, 2025, Defendants issued a notice in the Federal Register terminating South Sudan's TPS designation, beyond January 5, 2026. The Termination reflects a variety of procedural and statutory irregularities driven by DHS's institution of new guidance providing that TPS periodic review should "[f]ocus on conditions described in the original designation," *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-2 at 1693—while disregarding intervening conditions.

---

[20] *Id*. at 60,974.
[21] *Id.*
[22] *Id*.
[23] *Id*. at 60,974–75.
[24] Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,222 (May 6, 2025).

*Failure to Consult Appropriate Agencies*

72.         On information and belief, prior to the Termination, and consistent with DHS's new guidance for periodic reviews, Defendant Noem did not meaningfully consult with appropriate federal agencies, as otherwise required by the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(A). To date, Defendants have not publicly specified, in the Termination notice or elsewhere, any particular consultation they conducted or whether they followed even the general practice of soliciting a country conditions report from USCIS.[25] However, discovery obtained in *NTPSA II* reveals that, in the course of periodic reviews of the TPS designations for South Sudan and Afghanistan, occurring in or around February 2025, the consultation the Defendants did undertake was intended to place a heavy thumb on the scales in favor of termination: "The DMs [Director Memos] **should include additional information that would support different decision outcomes**. For example, are there improvements that have been made in the country? What about information about fraud/abuse of the program? . . . There are some stats pending, but [it is not clear] where that will be added." *See NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-16 at 3 (emphases added). This does not appear to be an isolated example: Defendant Noem has issued previous terminations under similar conditions, without appropriately conducting the required consultation.[26] As revealed in discovery during the *NTPSA II* litigation, in or around March 2025 DHS stopped

---

[25] *But cf*. GAO Report at 20–26.

[26] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*") (Dkt. No. 97) (discovery order indicating that Secretary Noem issued the terminations for Nicaragua, Honduras, and Nepal's TPS designations without reviewing country conditions reports from the relevant agencies); *see also supra* ¶¶ 48–52  ("The Statutory Scheme of TPS and Related Agency Practices") (noting the requirement for interagency consultation.).

receiving country conditions information from the State Department as part of the TPS periodic review process.[27]

### *Failure to Consider Objective and Available Evidence of Country Conditions*

73.      The TPS statute requires Defendant Noem to consider objective and available evidence of country conditions during her periodic review of the TPS designation for South Sudan. *See* 8 U.S.C. § 1254a(b)(3)(A). She did not do so.

74.      Instead, she cherry-picked "improvements." *See* 90 Fed. Reg. at 50,485; *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-16 at 3. The Secretary's failure to *fully* consider current conditions in South Sudan relevant to TPS redesignation was based on the new DHS guidance, which marks an arbitrary and unexplained return to a methodology for periodic reviews found to be unlawful during the prior Trump Administration.[28] The Termination does not acknowledge or explain Defendant Noem's reliance on the new and legally suspect DHS guidance.

### *Failure to Consider Evidence of Ongoing Armed Conflict and Its Ramifications*

75.      In her Termination, Defendant Noem failed to consider the available, objective evidence of ongoing armed conflict in South Sudan, including evidence of numerous considerations the Department previously found relevant to periodic review of the armed-conflict basis for South Sudan's TPS designation.

76.      Secretary Noem's entire explanation for the Termination of South Sudan's designation based on ongoing armed conflict is contained in two sentences: one stating that full-

---

[27] *See* Exs. in Supp. of Pls' Mot. for SJ, Dkt. 176-22 at 1504_003; Dkt. 176-27 at 1524; Dkt. 176-28 at 2342, *Nat'l TPS All. v. Noem*, Case No. 3:25-cv-05687-TLT (N.D. Cal. July 7, 2025) ("*NTPSA II*").

[28] *See Ramos v. Nielsen* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

scale war is no longer present, and one stating that the transitional government has "indicate[d]" a willingness to accept and ensure the safety of returning nationals.[29]

77.    However, a plethora of available and objective evidence establishes that, throughout 2025, armed conflict and related violence escalated and further endangered the already tenuous 2018 peace agreement that had arisen out of the civil war. Armed conflict between warring political and communal factions has escalated to levels not previously experienced since the 2018 peace agreement,[30] and experts are warning of an imminent return to full-scale war.[31] Ugandan forces have deployed to South Sudan's capital city; war in neighboring Sudan is spilling across South Sudan's porous border; and political sectarianism is increasing.[32]

78.    In April 2025, the State Department recognized that "South Sudan is on the brink of openly renewed conflict and political upheaval, with tensions escalating following a Nuer militia's capture of an army base in Nasir in March."[33]

79.    Since April, the situation has only worsened. In October 2025, a U.N. Commissioner on Human Rights in South Sudan stated: "South Sudan's political transition is falling apart[.][] The ceasefire is not holding, political detentions have become a tool of repression,

---

[29] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025).

[30] Office of the U.N. High Comm'r for Human Rights, Press Release, *South Sudan: U.N. Commission Urges General Assembly to Bolster Dialogue and Justice Efforts, to Avert Return to Full Scale War*, (Oct. 29, 2025), https://www.ohchr.org/en/press-releases/2025/10/south-sudan-un-commission-urges-general-assembly-bolster-dialogue-and?sub-site=HRC.

[31] Human Rights Council, Commission on Human Rights in South Sudan, *Plundering a Nation: how rampant corruption unleashed a human rights crisis in South Sudan*, ¶ 1, U.N. Doc. A/HRC/60/CRP.5 (Sept. 16, 2025).

[32] Center for Preventive Action, *Instability in South Sudan*, COUNCIL FOR FOREIGN RELATIONS (Mar. 21, 2025), https://www.cfr.org/global-conflict-tracker/conflict/civil-war-south-sudan.

[33] U.S. Dep't of State, Overseas Security Advisory Council, *South Sudan Country Security Report*, (Apr. 30, 2025), https://www.osac.gov/Content/Report/60d44686-9142-4338-937d-1c78087363c9.

the peace agreement's key provisions are being systematically violated, and the government forces are using aerial bombardments in civilian areas. All indicators point to a slide back toward another deadly war."[34]

80.      The South Sudanese army's "indiscriminate airstrikes in populated areas" have resulted "in civilian casualties, the displacement of the civilian population, and the destruction of medical facilities, schools, and homes."[35] Nearly 400,000 civilians have been newly displaced by the armed conflict, and two million more remain displaced inside South Sudan.[36]

81.      The U.N. has noted that "[k]illed, displaced and starved, civilians are bearing the brunt of the human rights crisis, while violence by SSPDF [South Sudan People's Defence Forces] in populated civilian areas signals a return to full-scale war."[37] Civilians in South Sudan are regularly killed, displaced, or face other risks because of the ongoing armed conflict.[38]

82.      Among those other risks is "one of the highest rates of gender-based violence (GBV) in the region, with 2.7 million people at risk."[39] "The bodies of women and girls continu[e] to be subjected to extreme forms of sexual violations by armed groups and militias. National authorities are complicit in these crimes, and in forced recruitment and other grave violations

---

[34] Office of the U.N. High Comm'r (Oct. 29, 2025), *supra* n. 30.

[35] Office of the U.N. High Comm'r for Human Rights, Press Release, *South Sudan: Türk alarmed by deteriorating human rights situation amid rising violence and political tensions* (Sep. 26, 2025), https://www.ohchr.org/en/press-releases/2025/09/south-sudan-turk-alarmed-deteriorating-human-rights-situation-amid-rising.

[36] *Id.*

[37] Human Rights Council, *supra* n. 31.

[38] *Id.*

[39] U.N. Population Fund, *Knowledge, Attitudes and Practices Survey on Gender-based Violence in Upper Nile, Jonglei and Unity states, South Sudan*, 6 (Jan. 2025), https://reliefweb.int/report/south-sudan/knowledge-attitudes-and-practices-survey-gender-based-violence-south-sudan-final-report-january-2025?_gl=1*aj340a*_ga*MTg5MzA1NzMxNS4xNzY2MDU5NTU1*_ga_E60ZNX2F68*czE3NjYwNTk1NTUkbzEkZzEkdDE3NjYwNTk4NjIkajYwJGwwJGgw.

against children."[40] The "state policy of extrajudicial killings" further "inflames conflicts in areas where intra-communal violence is already rife,"[41] and intra-communal strife alone has been exacting "a deadly toll on civilians with a 33 per cent year-on-year increase."[42]

83.        Indeed, the U.S. State Department continues to maintain a Level 4 "Do Not Travel" advisory for South Sudan due to "crime, kidnapping, and *armed conflict*" and has stated that "*[a]rmed conflict* is ongoing and includes fighting between various political and ethnic groups. Weapons are readily available to the population."[43]

84.        The Termination does not address any of this available, objective evidence of ongoing armed conflict, all of which directly correlates to considerations the prior DHS Secretary deemed relevant to the periodic review of the armed-conflict basis for South Sudan's TPS designation. The Termination does not explain Defendant Noem's departure from applying considerations her agency previously deemed material.

85.        In the Department of Homeland Security's 2023 periodic review of TPS for South Sudan, the Secretary of Homeland Security considered conflict between state and nonstate actors; "collective punishment of civilians" by government forces, "often based on ethnicity"; "simmering ethnic conflict" resulting in displacement and human rights abuses; and resulting "dire consequences" for women and children, including gender-based violence and "grave violations against children."[44]

---

[40] Office of the U.N. High Comm'r (Oct. 29, 2025), *supra* n. 30.
[41] *Id.*
[42] Office of the U.N. High Comm'r (Sep. 16, 2025), *supra* n. 35.
[43] *South Sudan Travel Advisory*, U.S. DEP'T OF STATE (NOV. 13, 2025), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SouthSudan.html (emphases added).
[44] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971, 60,974 (Sept. 6, 2023).

86.        In her Termination, Defendant Noem acknowledged that "there is inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization"[45] but inexplicably glossed over this armed conflict solely because "return to full-scale civil war, to date has been avoided."[46]

87.        The Termination fails to explain Defendant Noem's departure from the Department's explicit prior finding that armed conflict short of "full-scale civil war" is still relevant to redesignation of TPS for South Sudan when it involves widespread, gross human rights abuses, including violence against civilians, gender-based violence, grave violations against children, and mass displacements[47]: factors that objective, available evidence shows still apply[48] and that the Termination did not address.[49]

88.        Instead, the Termination relied improperly on the transitional government's resumed acceptance of deportees from the U.S. to infer "South Sudan's willingness to ensure the safety and reintegration of its returning nationals."[50] That inference is flatly contradicted by objective evidence of how the current South Sudanese government is a substantial source of grave harm to its nationals,[51] which the Termination did not address.[52] The inference also departs from the prior DHS Secretary's consideration in 2023 of South Sudanese governmental violence against its nationals as relevant to the periodic review of the armed-conflict basis for South Sudan's TPS

---

[45] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025).

[46] *Id.*

[47] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971, 60,974 (Sept. 6, 2023).

[48] *See supra* ¶¶ 77–83.

[49] 90 Fed. Reg. at 50,485.

[50] *Id.*

[51] *See supra* ¶¶ 79–83.

[52] *See supra* note 49

designation.[53] The Termination does not explain why Defendant Noem departed from her agency's prior consideration of that factor.

***Failure to Consider Evidence of Extraordinary and Temporary Conditions***

89.     In her Termination, Defendant Noem failed to consider available, objective evidence of ongoing, extraordinary, and temporary conditions in South Sudan, including evidence of numerous factors the Department previously found relevant to periodic review of the extraordinary-circumstances basis for South Sudan's TPS designation.

90.     The prior periodic review, in 2023, considered acute food insecurity; environmental and health concerns, including widespread flooding and disease outbreaks; and barriers to humanitarian access.[54]  Available and objective evidence demonstrates that all of these conditions still exist.

91.     The United Nations Office for the Coordination of Humanitarian Affairs ("UNOCHA") estimates 927,000 people have been harmed by recent flooding across South Sudan, with 335,000 people displaced by floods alone.[55] The overall number of internally displaced people within South Sudan is nearing 2 million.[56]

92.     Floods more than double the frequency of cholera outbreaks in South Sudan, by imperiling access to clean water and impeding humanitarian access to affected areas.[57] Since the

---

[53] *See supra* note 47.
[54] 88 Fed. Reg. 60,971, 60,975.
[55] U.N. Office for the Coordination of Humanitarian Affairs (OCHA), *South Sudan: Floods Snapshot* (Oct. 17, 2025), https://www.unocha.org/publications/report/south-sudan/south-sudan-floods-snapshot-17-october-2025.
[56] European Comm'n, European Civil Protection and Humanitarian Aid Operations, *South Sudan* (Nov. 25, 2025), https://civil-protection-humanitarian-aid.ec.europa.eu/where/africa/south-sudan_en.
[57] U.N. News, *South Sudan's longest cholera outbreak enters critical stage* (July 8, 2025), https://news.un.org/en/story/2025/07/1165348.

25

cholera outbreak was declared in October 2024, over 80,000 cholera cases and 1,400 cholera deaths have been documented.[58] U.N. agencies and others have declared that the cholera outbreak "'is not merely a public health crisis, but a multi-sectoral emergency exacerbated by flooding, displacement, and limited access to basic services.'"[59]

93.      Over 7.5 million people in South Sudan face acute food insecurity. [60] The Reconstituted Joint Monitoring and Evaluation Commission ("RJMEC") for South Sudan reported in September 2025 that "[a]cute food insecurity and malnutrition continued to be driven by the severe impacts of persistent conflict, expanding flood extent, economic deterioration, and a high returnee and refugee burden on household access to local food sources and life-saving humanitarian food assistance."[61]

94.      The crisis of food insecurity in South Sudan is exacerbated by substantial barriers to access to humanitarian relief within the country. The RJMEC, which monitors incidents regarding aid distribution, found that U.N. aid distribution was disrupted at least seventy times in September 2025 alone, and that at least 56 of those times involved "violence against humanitarian staff" or "active hostilities disrupting the delivery of critical humanitarian services."[62] The RJMEC

---

[58] *Id.*

[59] *Id.*

[60] U.N. Peacekeeping, *Stakes rise for South Sudan: What's happening, and why it matters* (Nov. 11, 2025), https://peacekeeping.un.org/en/stakes-rise-south-sudan-whats-happening-and-why-it-matters.

[61] H.E. Amb. Maj. Gen. George Aggrey Owinow, *Quarterly Report on the State of Implementations of the Revitalised Agreement on the Resolution of the Conflict in the Republic of South Sudan for the period of July 1st to September 30th, 2025*, RECONSTITUTED JOINT MONITORING AND EVALUATION COMMISSION (RJMEC) SOUTH SUDAN, Report No. 028/25, (Oct. 23, 2025), https://www.jmecsouthsudan.org/index.php/reports/rjmec-quarterly-reports/270-rjmec-quarterly-report-on-the-status-of-implementation-of-the-r-arcss-from-1st-july-to-30th-september-2025/file

[62] *Id.* at ¶ 58.

noted "[t]here is a need to urgently restore humanitarian access, particularly in conflict-affected areas, to avert a possible full-scale food and nutrition catastrophe."[63]

95.    Humanitarian challenges in South Sudan are deepened by crises in neighboring Sudan.  Since the civil war in Sudan started in 2023, 1.2 million people have fled into South Sudan.[64] "South Sudan is facing its most perilous moment since independence in 2011. The war in Sudan, coupled with political instability, flooding, and food shortages at home, has pushed 9.3 million people into humanitarian need."[65]

96.    Instead of considering any of this objective and available evidence of worsening conditions, the Termination appears to have considered only modest positive developments: two infrastructure grants from the World Bank; a $9 million grant for an internet project still in the development phase; a refugee-flow statistic from nearly four years ago; and the presence of a United Nations Mission that has existed since 2011.[66]

97.    The Termination did not explain why or how any of these developments has obviated the need to consider the factors that the prior periodic review considered, which available and objective evidence demonstrates still exist and therefore warranted consideration within Defendant Noem's periodic review.

***Consideration of U.S. "National Interest," Which Is Contrary to the TPS Statute and Departs from Past Agency Practice Without Explanation***

98.    Defendant Noem relies on the claim that the continued temporary presence of South Sudanese TPS beneficiaries is contrary to the "national interest" of the United States and cites

---

[63] *Id.*

[64] Nathan Carey, *"We escaped hell, but we arrived in another one"*, Norwegian Refugee Council (Nov. 5, 2025), https://www.nrc.no/perspectives/2025/we-escaped-hell-but-we-arrived-in-another-one.

[65] *Id*.

[66] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, n. 13, 14, 15 (Nov. 6, 2025).

various purported examples. One such example asserts that "a portion of the South Sudan Temporary Protected Status population has been subjects of administrative investigation for fraud, public safety and national security concerns."[67]

99.        It is impossible to know what Defendant Noem is referring to here.  There is no citation; no individuals or alleged conduct is identified; nor are the circumstances of the claimed 'administrative investigation' discernible. In fact, this allegation appears to be boilerplate language lifted directly from the termination notices for Syria, Afghanistan, and Haiti.[68]

100.        Under the statute, TPS protections are unavailable *ab initio* to individuals with disqualifying criminal history (including misdemeanors in some cases), or who are found to be inadmissible on grounds relating to national security, foreign policy, or on many other bases.[69] It is improper to conclude, as the Secretary does here, that the conduct of any single South Sudanese who might be ineligible under these grounds disqualifies the entire South Sudanese population in the United States from TPS.

101.        Furthermore, the consideration of the domestic "national interest" is procedurally improper during a periodic review,  because the statute instructs the Secretary to look only at "the conditions in the foreign state (or part of such foreign state) for which a designation is in effect . . . [and] whether the conditions for such designation  . . . continue to be met," 8 U.S.C. § 1254a(b)(3)(A). Consideration of United States national interests is also procedurally improper in

---

[67] *Id.* at 40,486.

[68] *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398, 45,401 (Sept. 22, 20250; Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025).

[69] 8 U.S.C. § 1254a(c)(1)(A); 8 U.S.C. § 1254a(c)(2)(B); 8 U.S.C. § 1182; 8 U.S.C. 1158(b)(2)(A).

the context of a TPS designation based on ongoing armed conflict, *see* 8 U.S.C. § 1254a(b)(1)(A), and had not been invoked as a basis for *any* terminations prior to 2025.

***Unreasoned Departure from the Past Agency Practice of Orderly Transition Periods***

102.    The Termination was published a mere 60 days prior to the effective date, [70] the minimum required under the statute. This is a significant departure from established policy and practice of affording more orderly transition period of 6 month or longer.[71]

## THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE ACCESS TO TPS

103.    The South Sudan Termination is a resumption of the first Trump Administration's attempts to end TPS designations for non-European countries whose nationals are majority non-white. Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 877–78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, comprising approximately 98 percent of all TPS holders at the time.[72] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

104.    Documents obtained in litigation and congressional investigations subsequently revealed that the 2017 and 2018 termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined

---

[70] Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,218 (May 6, 2025).

[71] *See supra* note 8.

[72] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y, TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1094–99 (N.D. Cal. 2018) (vacated and remanded on different grounds; quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[73]

105.    Moreover, every district court to consider animus as a motivating factor in these terminations found that they were part of a policy "to decrease the presence of non-white immigrants in the United States."[74]

106.    DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101.

107.    The courts that reviewed these decisions consistently found that DHS had radically changed the way it approached TPS decisions and justified the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F. Supp. 3d at 1097–98; *Centro Presente*

[73] *See also* Minority Staff of S. Comm. on Foreign Rels., 116th Cong., *Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

[74] *Saget v. Trump*, 375 F. Supp. 3d 280, 368–72 (E.D.N.Y. 2019) (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F. Supp. 3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

*v. DHS*, 332 F. Supp. 3d 393, 412–14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018).

108.    To justify these terminations and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support that claim.

109.    The U.S. District Court for the Eastern District of New York found that the Acting Secretary of Homeland Security, Elaine Duke, decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F. Supp. 3d at 343, 347–48, 359–62. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance. *Id*. at 307–09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest," despite the fact that virtually any criminal record would be enough to disqualify an individual applicant for TPS eligibility. *See id*. at 352; *cf*. 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – i.e., that non-whites commit crimes and are on the public dole." *Ramos*, 336 F. Supp. 3d at 1105.

110.    After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id*. at 1092, 1097–98; *see also Centro Presente*, 332 F. Supp. 3d at

31

416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees").

111.    The U.S. District Court for the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. *Saget*, 375 F. Supp. 3d at 346.

112.    Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." *Ramos*, 336 F. Supp. 3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries. *Id.* at 1099–1100, 1104.

113.    As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan did not go into effect. *See, e.g.*, *Ramos*, 709 F. Supp. 3d at 878–79. DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[75] *See id.* And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and instead extended TPS designations for those countries. *See id.*  In doing so, DHS extensively criticized the flawed

---

[75] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

country-conditions analyses in the termination decisions issued under the first Trump Administration.[76]

**THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END ACCESS TO TPS**

*Secretary Noem, President Trump, and Vice President Vance Commit to Terminating TPS*

114.    Even before she became Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to relevant country conditions. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."[77]

115.    Defendant Noem repeatedly asserted that TPS was a program to benefit people who had entered the country illegally or who commit crimes in the United States. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[78] In her press statement announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available

---

[76] *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

[77] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-securitysecretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54); *see also* NBC News (@NBCNews), *Meet the Press full broadcast* – Feb. 2, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco (at approximately 16:25).

[78] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860

33

to nationals of certain designated countries that allows aliens,[79] *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[80] Defendant Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[81]

116.     President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS and characterized designations as illegal, or, in the Vice President Vance's words, "a magic amnesty wand."[82]

117.     Before taking office, both the President and the Vice-President made clear their intent to target TPS designations for termination.[83] President Trump, while campaigning, said that

---

[79] The term "alien" is used throughout the Immigration and Nationality Act to describe non-citizens, but it and the related term "illegal alien" are considered by some to be a derogatory term used particularly to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.*, Kai Wei, et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) SOC. SCIS. J. 1, 10–11 (2019), https://www.mdpi.com/20760760/8/3/93#B63-socsci-08-00093. Notably the current Trump Administration concertedly specified that it would use these terms, as a matter of policy, and departing from the contrary policy of the Biden Administration. *See, e.g.*, Todd Lyons, Acting Director, U.S. Immigr. & Customs Enforcement, *Updated Terminology for Communications Materials and Internal and External Communications* (Mar. 31, 2025), https://www.ice.gov/doclib/foia/policy/memo_CommsTerminology_03.31.2025.pdf.

[80] Press Release, *U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS* (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphases in original).

[81] *Id*. (Here, Secretary Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).

[82] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, NEWSWEEK (Sept. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[83] *See* Chris Cameron*, Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. TIMES (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

he would "[a]bsolutely … revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[84]

118.     He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town" of Springfield, Ohio.[85]

119.      For his part, Vice President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[86] Because TPS is a statute enacted by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS itself. Vice President Vance expressed this view repeatedly while campaigning.[87]

---

[84] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed*, NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[85] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concernced'*, ROLLINGSTONE (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621.

[86] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, WASH. EXAM'R (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporaryprotected-status-venezuelans/.

[87] *See, e.g.*, CNN-News 18 (@cnnnews18), CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants, YouTube (Sept. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand."); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sept. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jdvance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally . . . . if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").

120.     According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS designations as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[88]

## DEFENDANTS' RENEWED EFFORTS TO END TPS

121.     Neither the adverse decisions of federal courts nor DHS's 2023 analysis of conditions in South Sudan have deterred the second Trump Administration from pursuing its plan to effectively end access to TPS consistent with campaign promises. To date, the Administration has attempted to terminate every TPS designation that has come up for review, announcing terminations for South Sudan, Ethiopia, Cameroon, Haiti, Syria, Afghanistan, Nepal, Burma, Nicaragua, Honduras, and Venezuela. The termination decisions—including the termination of TPS for South Sudan—reflect preordained outcomes driven by the very sort of partisan politics the statute is intended to exclude from consideration.

122.     On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO"). The supposed "invasion" involved purportedly "unprecedented" levels of irregular entry into the United States. *Id*. § 1. The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *Id*.

---

[88] *See* Charlie Savage *et al.*, *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

123.    The Executive Order directs the Secretary of Homeland Security to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." Invasion EO § 16(b). Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens in the United States." *Id.*

124.    Immediately after Defendant Noem was confirmed as Secretary of Homeland Security, Defendants began to implement the Executive Order's mandate, and several of Secretary Noem's termination decisions rely explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below, Defendant Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."[89]

125.    Within days of taking office, Defendant Noem began improperly terminating TPS designations, following the same procedurally improper playbook that was eventually used to terminate South Sudan.

***Failure to Consult Appropriate Agencies and to Consider Country Conditions Within Periodic Reviews Conducted in 2025***

126.    Defendant Noem failed to consult with other agencies as required by the TPS statute and disregarded objective and available evidence of country conditions in multiple terminations. Instead, she relied on pretextual justifications for the terminations. Just days after entering office,

---

[89]    Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 6:57 PM), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

Secretary Noem reversed Venezuela's TPS extension, an unprecedented action that a federal court later found to be a pretext to cover her "desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas.[90] This decision granting preliminary relief was stayed by the Supreme Court in a nonprecedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025). The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S. Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious.[91] That merits decision and the vacatur were then stayed by the Supreme Court in another nonprecedential decision with no analysis. *Noem v. Nat'l TPS All.*, No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

127.    Quickly after issuing the Venezuela termination, Defendant Noem then "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[92]  The same district court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions],"[93] and a separate district court also found the action unlawful and set it aside. *See Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 273 (E.D.N.Y 2025).

---

[90] *NTPSA I* PI Decision at 855.

[91] *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision").

[92] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].

[93] *NTPSA I* SJ Decision at *34.

38

128.    On May 12, 2025, DHS terminated Afghanistan's TPS designation despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[94] Secretary Noem claimed that conditions had "notabl[y] improve[d]." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025).

129.    In her terminations for Cameroon, Nepal, and Honduras, Defendant Noem claimed that notable country conditions improvements justified ending the designations, but she ignored entire categories of conditions that DHS had previously considered.[95]

130.    Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua [96] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua before drafters had reviewed USCIS country conditions reports.  For Nepal and Nicaragua, USCIS drafted decision memoranda without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidence Defendants' ends-oriented approach.

---

[94]    *Travel Advisory Afghanistan*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/afghanistan-advisory.html.

[95] *Compare* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), *with* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151; Compare Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697; Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304 (June 21, 2023); *see also* Honduras Termination Notice (not addressing political violence or crime).

[96] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").

39

131.    Each of these terminations and the failure to consult appropriate agencies demonstrates that the Trump Administration's aim of dismantling TPS has been implemented through decision-making that was predetermined, pretextual, and procedurally deficient.

***Impermissible Consideration of "National Interest" at the Periodic Review Stage***

132.    Defendant Noem also impermissibly based multiple TPS termination decisions primarily on U.S. national interest grounds, which cannot be considered at the periodic review stage of the TPS process.[97] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States.").

133.    Defendant Noem based her termination of Haiti on U.S. "national interest." Haiti, like Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions. The Secretary rested her termination decision on her finding that extension of TPS status was not in the U.S. "national interest."  This is procedurally inappropriate, and the facts used to justify the decision—the total societal collapse Haitian citizens are facing—weigh *in favor of* extending TPS status. *Id.* at 28,763.

134.    In her terminations for Afghanistan, Haiti, and Syria, Defendant Noem used verbatim language for each country, claiming that "DHS records indicate that there are . . .

---

[97] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042; Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513–14 (Feb. 24, 2025); Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697, 23,698 (June 4, 2025); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57).

nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security."[98]

135.     These terminations were the first to rely on a purported U.S. "national interest" to terminate a TPS designation. Until 2025, when the second Trump administration took power, no TPS designation for any country in the 35-year history of the TPS statute had ever been terminated based on "national interest." But in President Trump's second term alone, four countries' TPS designations have been terminated based exclusively or primarily on Secretary Noem's assessment of "national interest." 90 Fed. Reg. 9040 (Venezuela); 90 Fed. Reg. 20309 (Afghanistan); 90 Fed. Reg. 23697 (Cameroon); 90 Fed. Reg. 28760 (Haiti). These terminations were the first to rely on a purported U.S. "national interest" to terminate a TPS designation. There is a reason for this:  U.S. "national interest" is not a factor that can be considered at the periodic review stage, nor for TPS designations for countries facing armed conflict.[99] There is a reason for this:  U.S. "national interest" is not a factor that can be considered at the periodic review stage, nor for TPS designations for countries facing armed conflict.[100]

---

[98] *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398, 45,401 (Sept. 22, 20250; Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025).

[99] *See* 8 U.S.C. § 1254a(b)(1) (including "national interest" as a relevant consideration only under subsection (C)); 8 U.S.C. § 1254a(b)(3) (providing that the outcome of the periodic review of a designation depends solely on "whether the conditions for such designation under this subsection continue to be met"); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57) (reviewing the TPS statute and finding that "periodic review, including review for termination, is limited to consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions").

[100] *See* 8 U.S.C. § 1254a(b)(1) (including "national interest" as a relevant consideration only under subsection (C)); 8 U.S.C. § 1254a(b)(3) (providing that the outcome of the periodic review of a designation depends solely on "whether the conditions for such designation under this subsection continue to be met"); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57) (reviewing the TPS statute and finding that "periodic review, including review for

*Impermissible Breaks from Past Practice*

136.    Six of the nine terminated countries had been designated since at least 2015. Rather than adhere to DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there was any such practice. *See* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153–54 n.24. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she noted that "certain other TPS designations were terminated without allowing for an extended transition period." *Id*. That is incomplete and inaccurate. DHS maintained a clear practice over the prior twenty years of providing at least a six-month orderly transition period for any TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.

137.    In the past month, the Trump Administration has taken further action to systematically dismantle TPS. On November 25, 2025, Defendant Noem issued a termination for Burma. On November 28, 2025, the Administration issued a termination notice for Haiti. On December 12, 2025, the Administration announced the forthcoming termination for Ethiopia.

138.    The Administration has also signaled repeatedly its intent to terminate TPS for Somalis in Minnesota, despite the absence of any basis in the TPS statute or DHS practice to target TPS beneficiaries for termination on the basis of where they reside in the United States.[101]

---

termination, is limited to consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions").

[101] 8 U.S. Code § 1254a (notably missing any commentary on terminations that are limited to a specific city or state, while detailing the process for terminations); Donald J. Trump (@realDonaldTrump), Truth Social, (Nov. 21, 2025, 5:37 PM EST), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

*Decision-Making Based on Animus*

139.    The Trump Administration's ongoing policy of dismantling the TPS program, carried out through the pretextual terminations discussed above, is based on race, national origin, and ethnicity-based animus in violation of Fifth Amendment to the U.S. Constitution. While federal courts have yet to rule on the merits of the equal protection claims included in the previous litigation challenging the terminations discussed above, many interim rulings have recognized a likelihood of success on the merits of the claim that the Trump Administration's terminations are based on unconstitutional animus.[102] This same animus motivated the termination of TPS for South Sudan.

### DEFENDANTS' TERMINATION WAS MOTIVATED BY DISCRIMINATORY ANIMUS TOWARDS NON-WHITE, NON-EUROPEAN IMMIGRANTS GENERALLY AND BLACK AND AFRICAN IMMIGRANTS, SPECIFICALLY

140.    President Trump, Defendant Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed animus toward non-white people, particularly non-white immigrants, and, among them, particularly Black and African immigrants. This animus substantially motivated the Trump Administration's plan to end TPS designations and is evidenced by numerous statements made by

---

[102] Mem. Op., *CASA, Inc. v. Noem*, 2025 WL 1907378 (D. Md. July 10, 2025)(Docket No. 122), at 11 (noting "[a]t this early stage, the Court finds that CASA has adequately pleaded facts in several of these categories of direct and circumstantial evidence that, when read as a whole and in the most favorable light to CASA, permit a reasonable inferenced of a policy or practice of race discrimination in TPS determinations.); Mem. Order Granting Pl's Mot. to Postpone, *NTPSA I*, at [59], (Dkt. No. 93)(stating "[b]ased on the extensive record provided by Plaintiffs, the Court finds that Plaintiffs have raised a substantial claim of unconstitutional animus."); Order Granting Pl. Mot'n to Postpone, *NTPSA II*, at 29, (Dkt. No. 73) (stating "[i]n totality, Plaintiffs have produced sufficient evidence demonstrating racial and discriminatory animus in support of their Fifth Amendment claim. Color is neither a poison nor a crime. Therefore, Plaintiffs have provided sufficient evidence to establish that Plaintiffs will likely succeed on the merits of their Fifth Amendment claim.").

Defendant Noem, President Trump, and other Administration officials. A limited sample of those statements follows.

***Defendants Have Repeated White Nationalist and Racist Rhetoric***

141.     Defendants and their Administration have repeated rhetoric used within white nationalist, anti-immigrant ideology.

142.     The so-called "Replacement Theory" of white nationalism, for example, is a unifying theme of the Trump Administration's. This conspiracy theory turns on the idea that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.[103]

143.     Echoing the white nationalist Replacement Theory, President Trump and his administration have long expressed animus against non-white immigrants in general and non-white TPS-holders in particular.

144.     Secretary Noem has endorsed the core premise of Replacement Theory and has described irregular immigration across the southern border as an "invasion happening on purpose… to remake the foundation of this country."[104]

145.     Deputy Chief of Staff for Policy and Homeland Security Advisor to the President Stephen Miller has long "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[105] The Southern Policy Law Center reviewed 900 emails sent by Miller to media outlets going back to 2015, and found repeated themes of white genocide and a focus on

---

[103] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, https://forumtogether.org/article/the-great-replacement-theory-explained/.

[104] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately 4:57).

[105] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOUTHERN POVERTY LAW CENTER (Nov. 12, 2019).

interracial crime.[106] Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.[107]

146.     President Trump himself has repeatedly "retweeted" posts from avowed white nationalists, such as @WhiteGenocideTM, and publicly dined with prominent, self-declared white supremacists, implicitly endorsing their racist views and amplifying their racist message.[108]

147.     While campaigning in 2023 and 2024, President Trump explicitly adopted those racist views, and said that non-white, non-European immigrants "*from Africa*" and Asia are "poisoning the blood of our country."[109]

148.     In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants. Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United

---

[106] *Id.*

[107] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . Show Miller praising racist immigration reactions from a century ago, while bitterly lamenting the law that repealed them.").

[108] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sep. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[109] *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country"*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15) (emphases added); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YouTube (Sep. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

45

States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."[110]

149.     By contrast, President Trump told a predominantly white crowd at a Minnesota campaign rally, that they have "good genes."[111]

150.     President Trump has referred to non-white, non-European immigrants as "animals,"[112] and compared them to snakes that will bite and kill anyone foolish enough to shelter them.[113] When discussing undocumented immigrants during a March 2024 rally, he stated, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[114] Secretary Noem has referred to non-white immigrants as "dirt bags."[115]

---

[110] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271 .

[111] *Id.*

[112] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[113] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMESS (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . . And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").

[114] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/

[115] Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM EST), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings (@CBSMornings), *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YouTube (Jan. 29, 2025),

151.    In his speech at the Republican National Convention in July 2024, President Trump, repeating the white nationalist talking points discussed above, stated: "[t]he greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East…"[116]

152.    On September 23, 2025, President Trump used his platform at the U.N. General Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on Western countries and their borders," and warning of "the death of Western Europe."[117]

153.    As recently as November 27, 2025, Trump declared his intent to "permanently pause migration from all Third World Countries,"[118] and claimed that "most" of the 53 million "foreign" people in the United States "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels."[119]

154.    Over the past few months, the Trump Administration—including the Department of Homeland Security and Department of Labor—have ramped up their symbolic embrace of white nationalist ideology and the animus it carries with it.

---

https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem during the New York City raids she referenced has reported that nearly half of those arrested had no criminal history.

[116] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. TIMES (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[117] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un.

[118] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 11:26 PM), https://truthsocial.com/@realDonaldTrump/posts/115625427648743414.

[119] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

47

155.    On October 14, 2025, DHS posted a one-word tweet: "Remigrate."[120] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism," and "has been seen as a euphemism for ethnic cleansing."[121]

156.    President Trump has repeatedly embraced this white nationalist call.  Earlier in 2025, he stated: "America was invaded and occupied. I am reversing the Invasion. It's called Remigration."[122] President Trump "directed" the "entire Administration to put every resource possible behind this effort, and reverse the tide of Mass Destruction Migration that has turned once Idyllic Towns into scenes of Third World Dystopia. Our Federal Government will continue to be focused on the REMIGRATION of Aliens."[123]

157.    Also in 2025, President Trump called for "the Largest Mass Deportation Operation in History,"[124] saying "[i]t's called "REMIGRATION" and, it will, MAKE AMERICA GREAT AGAIN!"[125] (quotation marks in original). President Trump has repeatedly called for this "single largest Mass Deportation Program in History," [126] all while specifically encouraging the immigration of white people, from places like South Africa and Europe.

---

[120]    Homeland    Security    (@DHSgov),    X    (Oct.    14,    2025,    3:06    PM), https://x.com/DHSgov/status/1978175527329358094.

[121] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate- homeland-security/; *see also* Chelsea Bailey, *DHS Issued a Call to 'Remigrate.' Here's the History of the Term Often Associated with Far-Right Groups*, CNN US (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained.

[122] Donald J. Trump (@realDonaldTrump), Truth Social (June 12, 2025, 6:45 PM), https://truthsocial.com/@realDonaldTrump/posts/114672816056718064.

[123] Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025, 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

[124] Donald J. Trump (@realDonaldTrump), Truth Social (July 5, 2025, 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/114801653749329102.

[125] *Id.*

[126] Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025, 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

158.     In the Fall of 2025, DHS posted a series of anti-immigrant posters that demonstrate discriminatory animus through their text and/or images. *See Figures A, B.* The Department of Labor has posted similarly charged symbolic language. *See Figures C, D, E, F.* Through Project Firewall, depicted in Figures C–F, the Department of Labor coordinates with DHS to constrain the availability of employment-based visas and immigration status.





*Figure A*[127]                                        *Figure B*[128]

---

[127] Graphic posted by U.S. Dep't of Homeland Security (@homelandgov.bskysocial), Bluesky (Oct. 18, 2025, 1:56 PM), https://bsky.app/profile/homelandgov.bsky.social/post/3m3iec6j2xs2m.
[128] Graphic posted by U.S. Dep't of Homeland Security (@homelandgov.bskysocial), Bluesky (Nov. 7, 2025, 11:48 AM), https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e, Bluesky (Nov. 7, 2025, 11:48 AM), https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e .







*Figure C[129]*                    *Figure D[130]*

---

[129] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 18, 2025, at 6:08 PM), https://bsky.app/profile/dol.gov/post/3m3isfbppcs2f.@dol.gov).

[130] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 17, 2025, at 6:24 PM), https://bsky.app/profile/dol.gov/post/3m3gcseptrs22 (post "pinned" to the top of the Department of Labor's Bluesky profile as of Dec. 9, 2025).





*Figure E*[131]

*Figure F*[132]

**Defendants' Animus Toward Black, African, and Other Non-White Immigrants**

159.    During his First Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[133]

---

[131] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 21, 2025, 6:14 PM), https://bsky.app/profile/dol.gov/post/3m3qe5ocyn22p.

[132] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 23, 2025, 10:06PM), https://bsky.app/profile/dol.gov/post/3m3vrz4sanc2h.

[133] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, WASH. POST. (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.

160.     During the 2024 election campaign, President Trump doubled down on those remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland . . . [and] Norway"—all of which are countries whose nationals are majority white—and non-European countries whose nationals are majority non-white, which he described as "unbelievable places and countries, countries that are a disaster."[134]

161.     On December 9, 2025, President Trump tripled down on his prior remarks at an event in Pennsylvania, in which "he boasted about pausing immigration applications from what he called 'third-world countries' including 'hellholes like Afghanistan, Haiti, Somalia and many other countries.'"[135]

162.     In response, someone in the audience yelled out "shithole!", to which President Trump responded by saying:

> "Remember, I said that to the senators. They came in, the Democrats, they wanted to be bipartisan, so they came in and they said, 'This is totally off the record, nothing mentioned here, we want to be honest,' because our country was going to hell."
>
> "And we had a meeting, and I say, 'Why is it we only take people from s---hole countries,' right? Why can't we have some people from Norway, Sweden? Just a few? Let's have a few from [] Denmark. Do you mind sending us a few people? Send us some nice people. Do you mind? But we always take people from Somalia, places that are a disaster, right? Filthy, dirty, disgusting, ridden with crime."[136]

---

[134] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[135] Lalee Ibssa and Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, ABC NEWS (Dec. 10, 2025), https://abcnews.go.com/Politics/trump-ramps-anti-immigrant-rhetoric-embraces-phrase-hole/story?id=128279166.

[136] *Id.; see also Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania – Dec. 9, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-mount-pocono-pennsylvania=december-9-2025/.

163.     The vitriol against Somalis was on ample display only one week prior, on December 2, 2025, during a Cabinet meeting, in which President Trump stated:

> I don't want them in our country, I'll be honest with you, OK? Somebody would say, oh, that's not politically correct. I don't care. I don't want them in our country. Their country is no good for a reason. Their country stinks and we don't want them in our country. I can say that about other countries too. We don't want them -- the hell -- we have to rebuild our country. You know, our country is at a tipping point. We could go bad; we're at a tipping point. I don't know if people mind me saying that, but I'm saying it. We could go one way or the other and we're going to go the wrong way if we keep taking in garbage into our country.[137]

164.     Only days before that Cabinet meeting, President Trump posted the following on social media: "I am, as President of the United States, hereby terminating, effective immediately,

---

[137] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-december-2-2025/. On December 2, 2025, the same day as this Cabinet meeting, USCIS instituted a new policy pausing all asylum processing in the U.S. and pausing the processing of immigration benefits applications from people in the U.S. who come from any of the 19 countries whose nationals are subject to entry bans that the President instituted effective June 9, 2025. The nationals of these countries are majority non-white, including those of 8 countries who are majority Black. *See* Policy Mem., U.S. Citizenship & Immigr. Serv., Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf (citing Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, Fed. Reg. 22491 (June 4, 2025), https://www.govinfo.gov/content/pkg/FR-2025-06-10/pdf/2025-10669.pdf). Days later, on December 16, 2025, President Trump announced an expansion of the entry bans, to take effect January 1, 2026. The newest entry bans extend to an additional 22 countries, the nationals of which are majority non-white. The nationals of 20 of those countries are majority Black. Of those 20 countries, 18 are African, including South Sudan. Presidential Proclamation, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, (Dec. 16, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/. On December 18, 2025, the Director of USCIS announced on social media that the processing pause on immigration applications would extend to applicants who are nationals of countries, including South Sudan, that President Trump had newly designated for entry bans only two days prior. *See* Camilo Montoya-Galvez, *Trump administration pauses immigration cases for people from another 20 countries*, CBS News, (Dec. 18, 2025), https://www.cbsnews.com/news/trump-administration-pauses-immigration-cases-another-20-countries/.

the Temporary Protected Status (TPS Program) for Somalis in Minnesota. Somali gangs are terrorizing the people of that great State, and BILLIONS of Dollars are missing. Send them back to where they came from. It's OVER! President DJT."[138] Notably, the TPS statute does not authorize the President to effect an immediate termination of TPS, let alone for a subset of beneficiaries within a given U.S. city, over social media.

165.     President Trump's disregard for immigrants from majority Black countries, including African countries, is nothing new. On the campaign trail to his current presidency, then-candidate Trump often remarked disparagingly about African immigrants, including people from South Sudan's neighboring country, the Democratic Republic of the Congo.

166.     In September 2024, candidate Trump told a crowd in Uniondale, New York: "[t]hey are vicious, violent criminals that are being let into our country. They're people that their countries, who are very smart—they don't want them. That's why all over the world; a lot of people coming out of jails in the Congo, in Africa … They're coming from the Congo, they're coming from Africa, they're coming from the Middle East, they're coming from all over the world."[139]

167.     In August 2024, candidate Trump claimed:

> "We have criminals from all over the world pouring into our country right now. Your jobs will never be obsolete… She [then-Vice President Kamala Harris] has allowed millions of people—open border—to flow into our country totally unchecked, totally unvetted. This isn't just from South America — people think it's just South America — this is Africa, Asia, the Middle East. A lot of people coming from the Congo in Africa, the Congo, rough, rough, rough, and they're prisoners, they're prisoners, and we say 'where do you come from?' 'Africa' 'Where in Africa?' 'Prison' 'What did

---

[138] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 21, 2025, 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.
[139] Donald J. Trump (Shared by @TeamTrump), Truth Social (Sep. 18, 2024, 8:17 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335.

you do?' 'We don't want to say.' They turn out to be murderers, these are rough, these are rough people…"[140]

168.     In April 2024, at a speech to law enforcement officials in Grand Rapids, Michigan, candidate Trump claimed that immigrants have "wrecked our country," and that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists… from Congo, from Yemen, from Somalia, from Syria."[141]

169.     In June of 2024 candidate Trump said again, "[T]hey come from Africa. They come from Asia. They come from South America. They come from the Middle East. What's happening to our country is unbelievable. They're poisoning our country."[142]

170.     In October 2023, President Trump repeatedly boasted of his successes in excluding Black immigrants, stating for example: "I banned refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world… [s]ome very rough people, some very, very rough people come out of these areas."[143]

171.     In 2022, President Trump claimed that immigrants were "storming" the country, including from "all of Africa."[144]

---

[140] Donald J. Trump (Shared by @TeamTrump), Truth Social (Aug. 20, 2024, 3:46 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335.

[141] *Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/.

[142] *Speech: Donald Trump Attends a Club 47 Birthday Fundraiser in Florida - June 15, 2024*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-club-47-birthday-fundraiser-west-palm-beach-florida-june-14-2024/#108.

[143] *Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#101.

[144] *Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22, 2022*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-texas-october-22-2022/#20.

*Favorable Treatment of White Immigrants*

172.     In stark contrast, the Trump Administration has shown a strong bias in favor of immigrant populations it perceives to be white. On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Secretary Noem (among others) to: "[T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."[145]

173.     President Trump previously posted on Truth Social that "any Farmer (with family!) from South Africa, seeking to flee that country to reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!"[146]

174.     In October 2025, President Trump announced that the refugee cap for the coming year would be reduced from 125,000 last year, to just 7,500 people for 2026—the majority of whom will be white South Africans.[147]

## EXTRAORDINARY AND IRREPARABLE HARMS IF TPS FOR SOUTH SUDAN IS TERMINATED IMMINENTLY AND UNLAWFULLY

175.     Defendants' decision to terminate TPS imminently and unlawfully for South Sudan would strip TPS status from more than 230 South Sudanese TPS recipients, including the individual Plaintiffs and other members of Plaintiff ACT; at least 73 South Sudanese nationals with pending applications for TPS; and the U.S. citizen and lawful permanent resident dependents

---

[145] Exec. Order No. 14204, 90 Fed. Reg. 9497, 9497 (Feb. 12, 2025).
[146] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 7, 2025, at 9:05 AM), https://truthsocial.com/@realDonaldTrump/posts/112894686703859511.
[147] Rebecca Santana, *Trump Limits Annual U.S. Refugees to 7,500. It'll be mostly white South Africans,* PBS NEWS (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

and immediate relatives of recipients and applicants. Some of these people, such as the individual Plaintiffs, have lived in the United States for years and are otherwise deeply embedded in their communities. Should Defendants' unlawful and imminent Termination take effect beyond January 5, 2026, the harms caused to them and many others would be myriad and severe.

176.     For the TPS recipients, including all of the individual Plaintiffs, those harms can include: losing TPS as a sole source of immigration status; losing eligibility for related federal benefits (such as work authorization); losing eligibility for related state benefits (such as driver's licenses); facing the risk of deportation charges and of related immigration confinement; facing related, forced separation from loved ones and community in the U.S.; and facing forced removal to South Sudan and the risks of harm there, including deadly harm, on account of ongoing armed conflict and its ramifications, as well as other, compounded humanitarian crises, spanning severe flooding, a deadly cholera outbreak, mass internal displacement, acute food insecurity, and barriers to accessing humanitarian aid.

177.     For the TPS applicants, the harms include no longer having any basis for consideration of their pending application for TPS, losing related protection against deportation, and losing access to TPS.

178.     For the individual Plaintiffs and all other TPS recipients, TPS applicants, and their U.S.-based family members, the harms include the stress and torment of possible forced separation from loved ones and the fear that the applicants and recipients could face grave harm, including death, if forcibly removed to South Sudan.

179.     All of these harms are compounded by the fact that the Administration only provided a 60-day wind-down period for South Sudanese TPS recipients, which is insufficient for them, applicants, and their U.S.-based family members to respond or plan fairly.

57

180.     The unfairness of the 60-day wind-down is exacerbated by other severe policy changes that the Administration has implemented, including:

A) A December 2, 2025, set of policy changes that the Administration announced that (1) pauses all asylum processing within the U.S., and (2) pauses the processing of immigration benefits applications for applicants who come from countries whose nationals are subject to the entry bans instituted effective June 9, 2025;

B) A December 16, 2025, Presidential Proclamation that extends the entry bans to nationals of South Sudan, effective January 1, 2026; and

C) A December 18, 2025, expansion of the processing pause on immigration benefits applications to applicants in the U.S. who are South Sudanese nationals.[148]

181.     The blanket pause on asylum processing that is currently in place renders impossible any access to asylum for South Sudanese TPS holders and/or applicants, ahead of the January 5, 2026, termination date for TPS for South Sudan.

182.     The blanket pause on the processing of other immigration benefits for applicants in the U.S. who are South Sudanese nationals renders impossible for South Sudanese TPS holders and/or applicants any access to another immigration status in the U.S., ahead of the January 5, 2026, termination date for TPS for South Sudan.

183.     Defendants' actions also threaten deportation and related immigration confinement for TPS holders and applicants who are not presently eligible for alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot

---

[148] Camilo Montoya-Galvez, *Trump administration pauses immigration cases for people from another 20 countries*, CBS NEWS, (Dec. 18, 2025), https://www.cbsnews.com/news/trump-administration-pauses-immigration-cases-another -20-countries/.

safely return to South Sudan but may not fit the specific legal requirements of asylum and related forms of humanitarian protection.

184.    And the loss of TPS in some instances can also limit the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible but for which maintenance of or current legal status is a prerequisite.[149]

185.    TPS holders, including all of the individual Plaintiffs, who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[150] And the recent institution of a new entry ban against South Sudanese nationals, effective January 1, 2026, could separately frustrate or render impossible the ability of the individual Plaintiffs and every other South Sudanese TPS holder or applicant to be able to come back into the U.S. on another immigration status.

186.    TPS holders who may be entitled to a fear-based form of immigration relief— such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The current Trump Administration has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. *Id.*

---

[149] *See Temporary Protected Status: An Overview*, AMERICAN IMMIGRATION COUNCIL, (Nov. 25, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/temporary-protected-status-tps-overview/ (noting some TPS recipients may be eligible to adjust status).
[150] 8 U.S.C. § 1182(a)(9)(A)(ii), (B)(i)(II).

187.     TPS holders also face the prospect of losing employment authorization. This can result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes or other material assets, leading to further economic harm.

188.     Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.[151] In addition, because the Defendant Noem's termination goes into effect so quickly, TPS holders, including all of the individual Plaintiffs, have been afforded almost no time to make alternative arrangements for themselves and their families.

189.     Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

190.     The risk of deportation renders TPS holders and applicants vulnerable to separation from U.S. citizen dependents, immediate relatives, and other family and loved ones. There are many South Sudanese TPS holders and applicants in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders and applicants face the risk of having to choose between being forced to leave their family members behind, without any ability to reunite with them in the U.S., given the newest entry bans taking effect agains South Sudanese nationals effective January 1, 2026,  or bringing their U.S. citizen children

---

[151] *See, e.g., REAL ID Checklist*, California DMV, https://www.dmv.ca.gov/portal/driverlicenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

(or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

191.     TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security, TPS holders also face the loss of this crucial benefit.

192.     Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. South Sudanese TPS holders, including the individual Plaintiffs, have been experiencing tremendous emotional and psychological harm since the announcement of the Termination, giving rise to the risk of heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

193.     South Sudanese TPS holders and applicants have also suffered the additional dignitary harm of being subject to an agency action motivated by racial, ethnic, or national-origin discrimination.

## CLASS ACTION ALLEGATIONS

194.     This case seeks class-action status pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of the following, proposed classes of people who face harm because of the termination of TPS for South Sudan, scheduled to take effect beyond January 5, 2025:

> A) All current recipients of TPS for South Sudan (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan) who are present in the U.S.;

B) All people, present in the U.S., who have pending applications for TPS that reflect their prima facie eligibility for it (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan);

C) The U.S. citizen dependents or immediate relatives of U.S.-based recipients of TPS for South Sudan (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan); and

D) The U.S. citizen dependents or immediate relatives of U.S.-based people with pending applications for TPS that reflect their prima facie eligibility for it (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan).

195.    The proposed classes are each sufficiently numerous so as to make joinder impracticable. Based on Defendants' own accounting in the Federal Register notice, the recipient class consists of 232 TPS holders and the applicant class consists of 73 applicants. There are common questions of law and fact affecting the members of each proposed class, including: (a) whether Defendants' decision to terminate of South Sudanese TPS was preordained and/or pretextual, without regard to country conditions and prior to consulting with other appropriate agencies in violation of the TPS statute; (b) whether the TPS statute authorizes the Secretary to consider "national interest" as a sole justification to terminate TPS; (c) whether Defendants' decision to terminate TPS was impermissibly motivated by animus based on race, ethnicity, or national origin; and (d) whether Defendants' failure to provide more than the minimum 60-day notice before terminating South Sudan's TPS designation violates the APA.

**CAUSES OF ACTION**

**COUNT ONE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(D)**
**(All Plaintiffs Against All Defendants)**
*(Failure to Follow Procedures Required by Law)*

196.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

197.    The Administrative Procedure Act (APA), 5 U.S.C. 701 et seq., ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

198.    Secretary Noem's Termination constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. 704, because the Defendants' Termination results in the TPS holders' loss of TPS "automatically and without further notice or right of appeal."[152]

199.    Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

200.    The TPS statute requires the Secretary to "consul[t] with appropriate agencies of the Government", "review the conditions in the foreign state… for which a designation is in effect under this subsection," and "determine whether the conditions for designation" continue to be met. 8 U.S.C. § 1254a(b)(3)(A).

---

[152] 8 C.F.R. § 244.19.

201.    Secretary Noem's Termination was procedurally improper in numerous ways, each of which constitutes a violation of the APA.

202.    Secretary Noem failed to consult with appropriate agencies as required by the periodic review procedures. Secretary Noem additionally failed to review the conditions in South Sudan as required by the periodic review procedures.

203.    Secretary Noem failed to base her Termination on "whether the conditions for designation" continue to be met and based it instead on a predetermined domestic policy of the Trump administration to restrict access to TPS for non-white, non-European, African immigrants.

204.    Secretary Noem's Termination relied on "national interest" considerations divorced from the conditions inside South Sudan, which are procedurally improper during a periodic review.

205.    Secretary Noem's Termination of South Sudan's designation based on ongoing armed conflict under 8 U.S.C. § 1254a(b)(1)(A) was procedurally improper because it was based on her consideration of "national interest" as a factor, in violation of the TPS statute.

206.    The specific national interest factors Secretary Noem considered (ensuring South Sudan's compliance with lawful deportations, for example) had no nexus to the continued temporary, *lawful* presence of fewer than four hundred South Sudanese nationals in the United States, as required under the statute.

207.    Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

208.    Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT TWO**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A)**
**(All Plaintiffs Against All Defendants)**
*(Departing from Prior Policy Sub Silentio, Without Good Reason)*

209.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

210.     To engage in procedurally appropriate decision-making, an agency must "display awareness that it is changing position."[153] Agencies "may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books."[154] And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[155]

211.     Defendants' Termination of the TPS designation for South Sudan with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures.

212.     Separately and independently, Defendants' Termination of the TPS designation for South Sudan violated the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures in which domestic U.S. "national interest" divorced from consideration of objective and available evidence of relevant conditions in the designated country were not invoked as a basis for terminating a TPS designation.

213.     Separately and independently, Defendants' Termination of the TPS designation for South Sudan violated the APA because it was an unacknowledged and unreasoned departure from

---

[153] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).
[154] *Id.*
[155] *Id.*, at 516.

65

decades of decision-making practices and procedures in which the Secretary's country conditions consideration during periodic review included an assessment of intervening conditions since the most recent designation, redesignation, or extension.

214. Plaintiffs will suffer irreparable injury resulting from the unlawful departure from the prior policy.

215. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT THREE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A) & (C)**
**(All Plaintiffs Against All Defendants)**
***(Arbitrary and Capricious, Abuse of Discretion, Contrary to Law)***

216. All the foregoing allegations are repeated and realleged as though fully set forth herein.

217. Under the APA, the Court must hold unlawful and set aside an agency action, finding, or conclusion found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A) & (C).

218. Defendants' Termination was arbitrary and capricious, not in accordance with the law, and in excess of statutory authority and limitations for the following reasons, each of which constitutes an independent violation of the APA:

    A) Defendants did not consider objective, available evidence of relevant country conditions—including ongoing armed conflict, imminent risk of full-scale civil war, and myriad extraordinary and temporary conditions, including severe

66

flooding, a deadly cholera outbreak, significant internal population displacement, acute food insecurity, and barriers to accessing humanitarian aid;

B) Defendants failed to consult appropriate agencies in the course of their periodic review, including by disregarding relevant and available country conditions findings by the U.S. Department of State;

C) In the Termination of the armed-conflict-based designation, Defendants improperly disregarded and directly contradicted the Department's recent, explicit determination that an conditions short of an official or full-blown civil war are still relevant for periodic review of an armed conflict designation under 8 U.S.C. 1254a(b)(1)(A);

D) Defendants' Termination of the extraordinary and temporary conditions designation failed to address the specific conditions in South Sudan that the Department had otherwise previously deemed relevant to its periodic review;

E) Defendants' Termination was infected by undue political influence;

F) Defendants' Termination was motivated by impermissible racial preferences rather than any rational justification; and

G) Defendants' Termination was predicated on the legally incorrect belief that TPS designations, including the designations of South Sudan, are themselves illegal, and the belief that TPS holders are present in the United States illegally.

219.    Plaintiffs will suffer irreparable injury resulting from the unlawful Termination;

220.    Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT FOUR**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B)**
**(All Plaintiffs Against All Defendants)**
*(Contrary to Constitutional Right, Power, Privilege, or Immunity)*

221.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

222.     Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

223.     Defendants' Termination was impermissibly motivated by racial and/or national origin animus against African and other non-white or non-European immigrants, and their pattern of TPS cancellations described herein cannot be explained other than by reference to race and/or national origin.

224.     As such, Defendants' Termination violates Plaintiffs' rights to Equal Protection under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." *Id.*

225.     Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

226.     Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT FIVE**
**Fifth Amendment**
**U.S. Constitution, Am. 5**
**(All Plaintiffs Against All Defendants)**
*(Equal Protection Under the Law)*

227.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

228.    The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that motivated in part by a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin.[156]

229.    Defendants' decision to terminate South Sudan's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race and/or national origin.

230.    Defendants' Termination was motivated by racial and/or national origin animus against African and other non-white or non-European immigrants, and their pattern of TPS cancellations described herein cannot be explained other than by reference to race and/or national origin.

231.    Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

232.    Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful as violative of the Fifth Amendment's guarantee of equal protection.

---

[156] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

## COUNT SIX
### Administrative Procedure Act
### 5 U.S.C. § 706(2)(B)
### (All Plaintiffs Against All Defendants)
### [*Contrary to Constitutional Right, Power, Privilege, or Immunity*]

233.     All the foregoing allegations are repeated and incorporated as though fully set forth herein.

234.     Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

235.     Due process protections extend to "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

236.     To state a procedural due process claim "a plaintiff must 'identify a protected liberty or property interest' and show the defendants deprived him of that interest 'without constitutionally adequate process.'" *Wright v. Moniz*, 737 F. Supp. 3d 48, 61 (D. Mass. 2024) (Saris, J.) (quoting *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)).

237.     TPS holders and applicants have significant liberty and property interests, protected by the Due Process Clause, in obtaining and maintaining TPS status and in the attendant benefits that come with that status.

238.     Specifically, TPS holders and applicants have liberty interests in the work authorization and removal protections that TPS status confers. *See, e.g.*, *Saget*, 375 F. Supp. 3d at 333 ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law[.]"); *Destino v. FCI Berlin, Warden*, 2025 WL 4010424, at *11 (D.N.H. Dec. 24, 2025) (finding that plaintiff had "weighty" liberty interests in "working in the United States" and "living alongside his fiancée and infant child"); *Tenemasa-Lema v. Hyde*, 810

70

F. Supp. 3d 244, 258 (D. Mass. 2025) (The "disruption of established family ties further compounds [a plaintiff's] deprivation of liberty.") (Murphy, J.); *Bridges v. Wixon*, 326 U.S. 135, 155 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." (quoting *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982))).

239.     TPS holders and applicants also have property interests in the work authorization and removal protections that TPS status confers. *See, e.g.*, *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) ("a prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections"); *see also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018); *Rodas v. Chertoff*, 399 F. Supp. 2d 697, 702 (E.D. Va. 2005).

240.     TPS holders and applicants also have protected interests in the related state benefits conferred through TPS status, such as driver's licenses. *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) (A driver's license is a protected interest that, once issued, cannot be revoked or suspended "without that procedural due process required by the Fourteenth Amendment." (citations omitted)); *Mackey v. Montrym*, 443 U.S. 1, 11 (1979) (A person's interest in continuing to hold a valid driver's license "is a substantial one."); *Belezos v. Bd. of Selectmen of Hingham*, 2019 WL 2870733, at *6 (D. Mass. July 3, 2019) ("In general, the 'Due Process Clause applies to the deprivation of a driver's license by the State.'" (quoting *Dixon v. Love*, 431 U.S. 105, 112 (1977))); *Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir. 1973) ("freedom to make use of one's own property, here a motor vehicle, as a means of getting about from place to place, whether in pursuit

71

of business or pleasure, is a 'liberty' which under the Fourteenth Amendment cannot be denied or curtailed by a state without due process of law" (citation omitted)).

241. Once the government grants TPS to an individual, benefits such as protection from removal and employment authorization are mandatory. *See* 8 U.S.C. § 1254a(a)(1)(A)–(B) (providing that, once the Attorney General grants an individual TPS, the Attorney General "shall not remove the alien from the United States" and "shall authorize the alien to engage in employment in the United States"). The use of the compulsory term "shall" makes clear that the Attorney General has no discretion about providing removal and work authorization for those granted TPS. *Compare, e.g.*, *id.* (the Attorney General "*may* grant the alien temporary protected status" (emphasis added)).

242. Similarly, once an individual applies for TPS and makes a prima facie showing of eligibility, the government must grant that person protection from removal and temporary employment authorization. *See* 8 U.S.C. § 1254a(a)(4)(A) ("In the case of an alien who can establish a prima facie case of eligibility . . . the Attorney General shall provide for the benefits of [protection from removal and work authorization]."); *see also Mansor*, 685 F. Supp. 3d at 1013–14.

243. The Termination deprived South Sudanese TPS holders and applicants of liberty and property interests without constitutionally adequate safeguards.

244. Congress included procedural safeguards in the TPS statute in order to protect the liberty and property interests of TPS holders and thus conform with the requirements of the Due Process Clause. *See, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and . . . a

petitioner may have a legal claim when she can show statutory procedural shortfalls[.]") (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011)).

245.     Those procedures reflect the application of the "three-part balancing test articulated in *Mathews*[]," *D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102, 148 (D. Mass. 2026), namely "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail,'" *Hernandez-Lara v. Lyons*, 10 F.4th 19, 28 (1st Cir. 2021) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

246.     For example, 8 U.S.C. § 1254a provides that TPS status may be terminated only "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A)-(B).

247.     But prior to the Termination, the Secretary did not meaningfully consult with appropriate federal agencies, as otherwise required by the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(A); *supra* ¶¶ 64–65, 124–130.

248.     Similarly, the decision to terminate TPS designations must be based on a "review [of] the conditions in the foreign state," and the statute requires publication of the actual "basis for the determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A)–(B).

249.     But here, the Secretary's decision-making was predetermined, pretextual, and procedurally deficient. *See supra* ¶¶ 95–98, 112–130, 136–173; *see also supra* ¶¶ 102–108.

250.     Accordingly, Defendants' Termination violates Plaintiffs' liberty and property rights guaranteed by the Due Process Clause under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

251. Defendants' Termination of South Sudan's TPS designation must therefore be held unlawful and set aside.

### COUNT SEVEN
**Fifth Amendment**
**U.S. Constitution, Am. 5 (All Plaintiffs Against All Defendants)**
[*Due Process Clause*]

252. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

253. The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

254. Plaintiffs have significant liberty and property interests, protected by the Due Process Clause, in a non-arbitrary decision as to the continuation of TPS for South Sudan.

255. Defendants' termination of TPS arbitrarily deprives Plaintiffs of the process to which they are entitled, as shown by, for example, the Administration's departure from and apparent disregard of the process for termination of TPS set forth in 8 U.S.C. § 1254a.

256. Plaintiffs will suffer irreparable injury resulting from the termination of the TPS designations without due process of law.

257. Defendants' Termination of South Sudan's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

### COUNT EIGHT
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(C)**
**(All Plaintiffs Against All Defendants)**
[*Agency Action in Excess of Statutory Authority*]

258. As authorized by Federal Rule of Civil Procedure 8(d)(2)–(3), Plaintiffs plead in the alternative and incorporate the foregoing allegations to the extent they are consistent with the allegations that follow.

74

259.     Federal agencies are creatures of statute; they may act only in accordance with authority that Congress bestows. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022); *see also La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

260.     The APA directs that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" issued "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

261.     The DHS Secretary's Termination of South Sudan's TPS status was unlawful and must be set aside because it exceeded the Secretary's statutory authority. Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General.

262.     Specifically, the TPS statute provides that a foreign-state designation "shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B)." 8 U.S.C. § 1254a(b)(2)(B); *see also Nat'l TPS Alliance v. Noem*, 166 F.4th 739, 762–63 & n.12 (9th Cir. 2026) (paragraph (3)(B) supplies the sole process for ending a TPS designation). And paragraph (3)(B) names who may act: "[i]f the *Attorney General* determines under subparagraph (A) that a foreign state . . . no longer continues to meet the conditions for designation . . . the *Attorney General* shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B) (emphases added).

263.     In 1991, the Department of Justice ("DOJ") and the former Immigration and Naturalization Service ("INS") adopted regulations governing TPS. *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (codified at 8 C.F.R. part 244) ("This interim rule implements a new section, 244A of the Immigration and Nationality Act, established by

75

section 302."). Those regulations delegated significant operational aspects of TPS to INS, including the authority to initially find individual aliens eligible and award protected status, *see id.* at 619 (codified as 8 C.F.R. § 244.2), and the authority to receive and process applications for protected status, *see id.* at 620 (codified as 8 C.F.R. §§ 244.6, 244.7).

264.     The regulations, however, did not authorize any subordinate official to exercise the Attorney General's authority to designate or terminate foreign states pursuant to 8 U.S.C. § 1254a. On the contrary, they defined an eligible state to mean a "foreign country or part thereof as designated *by the Attorney General* pursuant to section 244A(b) of the Act." *See id.* at 619 (codified as 8 C.F.R. § 244.1) (emphasis added).

265.     In practice, the Attorney General made all country designations, extensions, and terminations under the Act. *See, e.g.*, Extension of Designation of Somalia; Under Temporary Protected Status Program, 60 Fed. Reg. 39005 (July 31, 1995); Termination of Designation of Angola Under the Temporary Protected Status Program, 68 Fed. Reg. 3896 (Jan. 27, 2003).

266.     In 2002, Congress passed the Homeland Security Act, which created DHS. Homeland Security Act of 2002, Pub L. No. 107-296, 116 Stat. 2135.

267.     The Homeland Security Act charged the DHS Secretary "with the administration and enforcement of this chapter [*i.e.*, the INA] and all other laws relating to the immigration and naturalization of aliens *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the* President, *Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers[.]" 8 U.S.C. § 1103 (emphases added).

268.     At the time, the termination of TPS status was a "power[]," "function[]," or "dut[y]" "conferred upon the . . . Attorney General," and so was expressly reserved to that office.

269.     The Act also created the Bureau of Citizenship and Immigration Services as a branch of DHS and "transferred from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services" specific functions of INS. *See* 6 U.S.C. § 271. Among the functions transferred were "all . . . adjudications performed by the Immigration and Naturalization Service immediately before" the effective date of the act. *Id.* § 271(b)(5).

270.     TPS terminations were not "performed by [INS] immediately before" the Homeland Security Act's "effective date," and so that function was not transferred to DHS by operation of 6 U.S.C. § 271.

271.     In addition, the Act required the President to submit an executive reorganization plan to Congress detailing "[t]he transfer of agencies, personnel, assets, and obligations to the Department" of Homeland Security. 6 U.S.C. § 542(a)(1).

272.     In accordance with that provision, the President issued an executive reorganization plan, which purported to "[t]ransfer the . . . functions of the Immigration and Naturalization Service"—including delegated functions "performed by" INS "immediately before" the transfer— to DHS. *See* 6 U.S.C. § 542 note. But the reorganization plan made no mention of TPS; nor did it address those powers expressly vested in the *Attorney General* under the INA. *See id*.

273.     DHS has pointed to 6 U.S.C. § 557 as a source of TPS authority. *See* 6 U.S.C. § 557 ("With respect to any function transferred by or under this chapter (including under a reorganization plan that becomes effective under section 542 of this title) and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be

77

deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.").

274. But that provision does not independently transfer any authority. It just simplified the process of amending the code by altering certain statutory "references" to "any function" that was actually "transferred by or under" the Homeland Security Act. *See* 6 U.S.C. § 557. TPS termination authority was not so "transferred."

275. Beginning in spring 2003, and through to the present, the DHS Secretary began to issue foreign-state designations pursuant to the Attorney General's authority under 8 U.S.C. § 1254a. *See* Extension of the Designation of Honduras Under Temporary Protected Status Program, 68 Fed. Reg. 23744 (May 5, 2003).

276. In the first TPS designation following the implementation of the Homeland Security Act of 2002, the DHS Secretary addressed "what authority . . . the Secretary of the Department of Homeland Security ha[s] to extend the designation of Honduras under the TPS program." *Id.* (capitalization altered). The DHS Secretary took the position that: "On March 1, 2003, the Immigration and Naturalization Service (INS) transferred from the Department of Justice to the Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002, Public Law 107–296. The responsibilities for administering the TPS program were transferred to the Bureau of Citizenship and Immigration Services (BCIS)." *Id.* The DHS Secretary cited no other source of authority for exercising the Attorney General's power to issue, extend, or terminate TPS designations.

277. Because no statute authorizes the DHS Secretary to exercise TPS termination authority, the DHS Secretary exceeded her statutory authority by purporting to terminate South Sudan's TPS status.

278.     The Termination constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. § 704, because the Defendants' Termination results in the TPS holders' loss of TPS automatically and without further notice or right of appeal.

279.     The Termination must be set aside because it was issued "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

280.     Declare that the termination of TPS for South Sudan was unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;

281.     Declare that the decision to provide only 60 days' notice before the termination of TPS for South Sudan take effect was unlawful under the APA;

282.     Immediately postpone or stay the termination of TPS for South Sudan from taking effect or being put into effect beyond January 5, 2026;

283.     Set aside or otherwise vacate the termination of TPS for South Sudan as beyond Defendants' authority and/or unlawful under the APA;

284.     Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for South Sudan;

285.     Order Defendants to take all steps necessary to ensure that the TPS designation for South Sudan remains in full force and effect unless and until it lawfully expires lawfully or is terminated lawfully;

286.     Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

287.	Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: July 13, 2026

Respectfully Submitted,

/s/ Paul Killebrew
Mark H. Lynch (*pro hac vice*)
Stephen Petkis (*pro hac vice*)
Daniel G. Randolph (*pro hac vice* admission pending)
Paul Killebrew (*pro hac vice*)
Ayana M. Lindsey (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
MLynch@cov.com
SPetkis@cov.com
DRandolph@cov.com
PKillebrew@cov.com
ALindsey@cov.com

/s/ Nargis Aslami
Nargis Aslami (BBO No. 714848)
Melissa Keaney (*pro hac vice* admission pending)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

/s/ Erik Crew
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

*Counsel for Plaintiffs African Communities Together, Mary Doe, David Doe, Peter Doe, Jacob Doe, and the Proposed Class*

81