# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

<table>
<tr>
<td>

AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,

<em>Plaintiffs</em>,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security;[1] U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,

<em>Defendants</em>.

</td>
<td>

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RENEWED EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

ORAL ARGUMENT REQUESTED

Civil Action No. 1:25-cv-13939-PBS

Pursuant to L.R. 5.1(c), Plaintiffs note they are requesting **emergency relief** against agency action.

</td>
</tr>
</table>

---

[1] The current Secretary of Homeland Security is automatically substituted as a defendant in place of the former Secretary, Kristi Noem. *See* Fed. R. Civ. P. 25(d).

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

LEGAL STANDARD.............................................................................................................. 4

ARGUMENT .......................................................................................................................... 5

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED BECAUSE CONGRESS
           VESTED TPS TERMINATION AUTHORITY EXCLUSIVELY IN THE
           ATTORNEY GENERAL ................................................................................... 5

          A.      The DHS Secretary Acted *Ultra Vires* in Purporting to Terminate
                South Sudan's TPS Designation .................................................................. 5

                1.      The TPS Statute Repeatedly and Unambiguously Vests
                           TPS Termination Authority in the Attorney General ..................... 6

                2.      The Homeland Security Act Did Not Transfer TPS
                           Termination Authority to the DHS Secretary ................................. 7

          B.      Plaintiffs' *Ultra Vires* Claim Is Reviewable Notwithstanding
                *Mullin* .................................................................................................... 10

    II.     PLAINTIFFS ARE LIKELY TO SUCCEED BECAUSE THEIR DUE
           PROCESS RIGHTS HAVE BEEN VIOLATED ................................................. 14

          A.      The Termination of TPS Status Implicates Significant Liberty and
                 Property Interests ..................................................................................... 14

          B.      The Government's Process Was Not Constitutionally Sufficient............. 16

          C.      Plaintiffs' Procedural Due Process Claim Is Reviewable......................... 18

    III.    THE REMAINING FACTORS OVERWHELMINGLY FAVOR
           PLAINTIFFS .................................................................................................. 19

          A.      Plaintiffs Will Face Irreparable Harm Absent a Postponement................ 19

          B.      The Balance of the Equities and the Public Interest Favor Plaintiffs ....... 19

CONCLUSION...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adame v. Holder*,
762 F.3d 667 (7th Cir. 2014) ...............................................................................16

*Aponte-Torres v. Univ. of P.R.*,
445 F.3d 50 (1st Cir. 2006).................................................................................14

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972)......................................................................................14, 15

*Belezos v. Bd. of Selectmen of Hingham*,
2019 WL 2870733 (D. Mass. July 3, 2019)........................................................15

*Bell v. Burson*,
402 U.S. 535 (1971)......................................................................................14, 15

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988).............................................................................................5

*California v. Kennedy*,
802 F. Supp. 3d 273 (D. Mass. 2025) ...................................................................5

*Capen v. Campbell*,
134 F.4th 660 (1st Cir. 2025)..............................................................................13

*Cervantes v. Holder*,
597 F.3d 229 (4th Cir. 2010) ................................................................................9

*Ching v. Mayorkas*,
725 F.3d 1149 (9th Cir. 2013) ............................................................................15

*City of Arlington, v. FCC*,
569 U.S. 290 (2013).............................................................................................5

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)............................................................................................17

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004)............................................................................................11

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
880 F.2d 603 (1st Cir. 1989)...............................................................................12

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019)...........................................................................................................11

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.,*
    591 U.S. 1 (2020)..............................................................................................................10

*Destino v. FCI Berlin, Warden,*
    2025 WL 4010424 (D.N.H. Dec. 24, 2025)..................................................................15

*Devitri v. Cronen,*
    289 F. Supp. 3d 287 (D. Mass. 2018) ...........................................................................19

*Guerrero Orellana v. Moniz,*
    802 F. Supp. 3d 297 (D. Mass. 2025) ...........................................................................19

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004).........................................................................................................17

*Inland Empire - Immigrant Youth Collective v. Nielsen,*
    2018 WL 4998230 (C.D. Cal. Apr. 19, 2018) ..............................................................14

*Jimenez v. Cronen,*
    317 F. Supp. 3d 626 (D. Mass. 2018) ...........................................................................16

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986).......................................................................................................2, 5

*Lackey v. Stinnie,*
    604 U.S. 192 (2025)....................................................................................................11, 13

*Landon v. Plasencia,*
    459 U.S. 21 (1982)...........................................................................................................15

*League of Women Voters of the U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)............................................................................................20

*Lincoln v. Vigil,*
    508 U.S. 182 (1993)...........................................................................................................5

*Mansor v. USCIS,*
    685 F. Supp. 3d 1000 (W.D. Wash. 2023)................................................................15, 16

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)..............................................................................................14, 16, 17

*Mejia Rodriguez v. Dep't of Homeland Sec.,*
    562 F.3d 1137 (11th Cir. 2009) ........................................................................................9

*Mullin v. Doe,*
  609 U.S. ----, 2026 WL 1825840 (June 25, 2026) ........................................................ *passim*

*Najera v. United States,*
  926 F.3d 140 (5th Cir. 2019) ..............................................................................................9

*Nat'l Ass'n of Broads. v. FCC,*
  39 F.4th 817 (D.C. Cir. 2022)........................................................................................5, 10

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,*
  595 U.S. 109 (2022)........................................................................................................5, 10

*New Jersey v. Trump,*
  131 F.4th 27 (1st Cir. 2025)...............................................................................................5

*Nken v. Holder,*
  556 U.S. 418 (2009)...........................................................................................................19

*Perez-Escobar v. Moniz,*
  792 F. Supp. 3d 224 (D. Mass. 2025) ..........................................................................17, 18

*Perry v. Sindermann,*
  408 U.S. 593 (1972)........................................................................................................10, 15

*Portillo-Rendon v. Holder,*
  662 F.3d 815 (7th Cir. 2011) .............................................................................................16

*Ramos v. Nielsen,*
  321 F. Supp. 3d 1083 (N.D. Cal. 2018) ............................................................................15

*Rodas v. Chertoff,*
  399 F. Supp. 2d 697 (E.D. Va. 2005) ................................................................................15

*Saget v. Trump,*
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...............................................................................15

*SEC v. Lemelson,*
  138 F.4th 618 (1st Cir. 2025)............................................................................................10

*Somerville Pub. Schs. v. McMahon,*
  139 F.4th 63 (1st Cir. 2025)..............................................................................................20

*Tenemasa-Lema v. Hyde,*
  810 F. Supp. 3d 244 (D. Mass. 2025) ...............................................................................15

*United States v. Ayala-Vazquez,*
  751 F.3d 1 (1st Cir. 2014).................................................................................................18

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981)..................................................................................................13

*Webster v. Doe*,
  486 U.S. 592 (1988)...............................................................................................4, 19

*Webster v. Fall*,
  266 U.S. 507 (1925)......................................................................................3, 11, 12, 13

*Whitman v. United States*,
  574 U.S. 1003, 135 S. Ct. 352 (2014).....................................................................12

*Withrow v. Larkin*,
  421 U.S. 35 (1975)..................................................................................................17

*Wright v. Moniz*,
  737 F. Supp. 3d 48 (D. Mass. 2024) ........................................................................14

*Zadvydas v. Davis*,
  533 U.S. 678 (2001)................................................................................................14

**Statutes**

5 U.S.C. § 705...................................................................................................1, 5, 20

5 U.S.C. § 706...............................................................................................2, 6, 10, 18

6 U.S.C. § 271.......................................................................................................2, 8

6 U.S.C. § 542(a) ....................................................................................................8

6 U.S.C. § 542 note..............................................................................................8, 9

6 U.S.C. § 552(d) ..............................................................................................9, 11

6 U.S.C. § 557.................................................................................................9, 11

8 U.S.C. § 1103(a) ...............................................................................................1, 7

8 U.S.C. § 1103(g) .................................................................................................8

8 U.S.C. § 1252(b)(9) .............................................................................................19

8 U.S.C. § 1254a............................................................................................. *passim*

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002)......................1, 7, 8

**Other Authorities**

8 C.F.R. § 244 ........................................................................................................................6

8 C.F.R. § 244.1 .....................................................................................................................7

8 C.F.R. § 244.2 .....................................................................................................................6

8 C.F.R. § 244.6 .....................................................................................................................6

8 C.F.R. § 244.7 .....................................................................................................................6

56 Fed. Reg. 618 (Jan. 7, 1991) ...........................................................................................6

57 Fed. Reg. 2,930 (Jan. 24, 1992) .......................................................................................7

58 Fed. Reg. 7,582 (Feb. 8, 1993) ........................................................................................7

63 Fed. Reg. 15,437 (Mar. 31, 1998).....................................................................................7

65 Fed. Reg. 52,789 (Aug. 30, 2000).....................................................................................7

68 Fed. Reg. 23,744 (May 5, 2003) .......................................................................................7

75 Fed. Reg. 3,476 (Jan. 21, 2010) .......................................................................................9

82 Fed. Reg. 47,228 (Oct. 11, 2017)......................................................................................9

90 Fed. Reg. 50,484 (Nov. 6, 2025).................................................................................3, 9

**INTRODUCTION**

Plaintiffs hereby renew their motion for an emergency postponement of the effective date of the termination of South Sudan's Temporary Protected Status ("TPS") designation (the "Termination"). *See* 5 U.S.C. § 705.[2] The Court should grant the request because Plaintiffs are likely to succeed on the merits of two newly added claims that have never been presented to the Supreme Court, and because the equitable factors continue to overwhelmingly favor relief.

*First*, Plaintiffs newly allege that the Termination is *ultra vires* because the Attorney General, not the Secretary of Homeland Security, has the authority to terminate a TPS designation. When Congress established TPS in 1990, it repeatedly and unambiguously made clear that the "Attorney General"—and only the "Attorney General"—possesses the authority to terminate a TPS designation. *See* 8 U.S.C. § 1254a(b)(3)(B), (d)(3). For more than a decade, the TPS statute was administered consistent with that statutory delegation, with the Attorney General alone terminating TPS designations. But in 2003, that changed. The Department of Homeland Security ("DHS") for the first time claimed that when Congress passed the Homeland Security Act the prior year, it had transferred *all* TPS-related authority from the Attorney General to the DHS Secretary. And from that point onward, the DHS Secretary—not the Attorney General—purported to make TPS designation decisions.

That shift was based on a fundamental misreading of the statutory scheme. The Homeland Security Act tasked the DHS Secretary with "the administration and enforcement of" immigration-related laws "*except insofar as . . . such laws relate to the powers, functions, and duties conferred upon the . . . Attorney General*" and a few other officials. 8 U.S.C. § 1103(a) (emphasis added).

---

[2] Plaintiffs also seek an administrative stay to the extent one is necessary to preserve the status quo while the Court considers Plaintiffs' postponement motion, along with an appropriate briefing schedule. *See* ECF 37 (entering administrative stay in this case for that same purpose).

In other words, the Act expressly *reserved* to the Attorney General immigration-related powers that were vested in the Attorney General prior to the Act's passage. The Act did separately transfer many immigration-related and even *some* TPS-related authorities to DHS, including those that had formerly been exercised by the Immigration and Naturalization Service ("INS") within the Department of Justice ("DOJ"). *See* 6 U.S.C. § 271. But the Attorney General—not INS—had consistently exercised the authority to terminate a TPS designation prior to the Act's passage. So TPS termination authority did *not* pass from DOJ to DHS by the same mechanism, contrary to DHS's understanding. Because "an agency literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986), the Termination is *ultra vires* and must be "set aside," 5 U.S.C. § 706(2).

*Second*, the Termination deprives Plaintiffs of protected liberty and property interests without constitutionally adequate procedures, in violation of the Due Process Clause. TPS status confers mandatory work authorization and removal protections upon TPS holders and TPS applicants who are *prima facie* eligible for TPS status. Such benefits are liberty and property interests that trigger mandatory procedural safeguards under the Constitution. Congress understood this. That is why the TPS statute is chock full of procedural protections that are designed to ensure that once a country has been designated for TPS, the designation (and thereby the corresponding status of those with TPS) cannot be summarily stripped away. Those procedures include a duty to "consult[] with appropriate agencies" and to provide "notice" of the *actual* "basis for the determination." 8 U.S.C. § 1254a(b)(3)(A). The Secretary flouted those safeguards when issuing the Termination.

The Supreme Court's decision in *Mullin v. Doe* did not address Plaintiffs' new claims, much less foreclose them. *Mullin* declined to extend the judicial review bar to constitutional claims, like

Plaintiffs' procedural due process claim. *See Mullin v. Doe*, 609 U.S. ----, 2026 WL 1825840, at \*11 (June 25, 2026). And as for Plaintiffs' *ultra vires* claim, the Supreme Court resolved more than a century ago that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Besides, *Mullin*'s rulings were self-avowedly "predictive," not "final," and therefore subject to being revisited in light of new arguments and claims. *Mullin*, 2026 WL 1825840, at \*11.

Plaintiffs have been unlawfully deprived of constitutionally protected interests by an official with no authority to take the challenged action. This Court should grant interim relief.

## BACKGROUND

On November 6, 2025, the Secretary issued a notice in the Federal Register purporting to terminate South Sudan's TPS designation, effective on January 6, 2026. 90 Fed. Reg. 50,484 (Nov. 6, 2025). If the Termination had taken effect as planned, it would have stripped TPS status from more than 232 South Sudanese and at least 73 South Sudanese with pending applications. Instead, following an administrative stay, on February 12, 2026, this Court granted Plaintiffs' motion for an order postponing the Termination's effective date. *See* ECF 65.[3]

The Court granted that relief after concluding that Plaintiffs were likely to succeed on their claims and that the other preliminary relief factors also favored Plaintiffs. The Court concluded that Plaintiffs were likely to prevail on their claims that the Secretary failed to comply with the statute's consultation requirements, *see id.* at 33–36, and that the Termination was pretextual, preordained, and driven by a politically motivated objective to dismantle the TPS program, *see id.*

---

[3] Plaintiffs incorporate by reference this Court's discussion of the relevant statutory and procedural background. *See* ECF 65 at 3–11. Additional background relevant to this motion is set forth below.

at 27–33. The remaining factors—including irreparable harm—also favored Plaintiffs, who would face removal to a country "in a state of crisis," inflicting a "loss of liberty" that would "itself 'constitute irreparable harm.'" *See id.* at 38–39 (citations omitted).

On June 25, 2026, the Supreme Court issued its decision in two consolidated cases challenging the terminations of TPS for Syria and Haiti. *See Mullin*, 2026 WL 1825840. Because the Court addressed the cases in a preliminary posture, the Court did "not make a final decision on any matter necessary to the ultimate judgment." *Id.* at *11. Instead, the Court made "only a predictive—not a final—decision about the outcome[s]" of the Syria and Haiti TPS cases by assessing the "likelihood" that the Court had jurisdiction over the claims in those cases and the "likelihood" that those claims were meritorious. *Id.* In that context, the Court concluded that the plaintiffs were not entitled to interim relief on their non-constitutional claims based on an interpretation of the word "determination" in the TPS statute's judicial review bar. *Id.* at *2. The Court declined to extend the review bar to constitutional claims, *id.* at *10–11, reaffirming the bedrock principle that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," *Webster v. Doe*, 486 U.S. 592, 603 (1988). The Court concluded that the plaintiffs were unlikely to succeed on their equal protection claim, the only constitutional claim that was before the Court. *See Mullin*, 2026 WL 1825840, at *10–13.

Following *Mullin*, Plaintiffs in this case sought leave to file an amended complaint, seeking to raise two new claims: that the DHS Secretary acted *ultra vires* when issuing the Termination because that authority is vested exclusively in the Attorney General; and that the Termination deprived Plaintiffs of their procedural due process rights. Neither claim was before the Supreme Court in *Mullin*.

**LEGAL STANDARD**

Under the Administrative Procedure Act ("APA"), courts may "issue all necessary and

4

appropriate process to postpone the effective date of an agency action or to preserve status or rights pending" judicial review. 5 U.S.C. § 705. The same standard governs the issuance of a stay under § 705 and the issuance of a preliminary injunction. *See, e.g.*, *California v. Kennedy*, 802 F. Supp. 3d 273, 281 (D. Mass. 2025). Under that standard, a § 705 stay is warranted "when the moving party demonstrates that 1) he is likely to succeed on the merits of his case, 2) he is likely to suffer irreparable harm in the absence of injunctive relief, 3) the 'balance of equities' favor him and 4) [preliminary relief] is in the public interest." *Id.* (quoting *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025)).

## ARGUMENT

I. **PLAINTIFFS ARE LIKELY TO SUCCEED BECAUSE CONGRESS VESTED TPS TERMINATION AUTHORITY EXCLUSIVELY IN THE ATTORNEY GENERAL**

### A. The DHS Secretary Acted *Ultra Vires* in Purporting to Terminate South Sudan's TPS Designation

"It is axiomatic that an administrative agency's power . . . is limited to the authority granted by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).[4] Because agencies are creatures of statute, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress," so "when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington, v. FCC*, 569 U.S. 290, 297 (2013). Consistent with those principles, an agency bears the burden to "identify statutory authority for any action it takes." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022).

DHS has not done so here. When Congress established the TPS scheme in 1990, it unambiguously assigned the authority to terminate TPS designations to the Attorney General. And

---

[4] *See also, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities."); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022); *La. Pub. Serv. Comm'n*, 476 U.S. at 357.

Congress never transferred that authority to the DHS Secretary or any other official.  The DHS Secretary therefore acted *ultra vires* in purporting to terminate South Sudan's TPS designation, and the Termination must be "set aside."  5 U.S.C. § 706(2).

### 1.    *The TPS Statute Repeatedly and Unambiguously Vests TPS Termination Authority in the Attorney General*

Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General.  The TPS statute provides: "If the *Attorney General* determines . . . that a foreign state . . . no longer continues to meet the conditions for [TPS] designation . . . the *Attorney General* shall terminate the designation."  8 U.S.C. § 1254a(b)(3)(B) (emphases added).  The Secretary is not mentioned; nor is any other government official.  That delegation was consistent with Congress's choice to exclusively vest the "Attorney General" with other key TPS authorities, including the authority to "grant [an] alien temporary protected status in the United States" and "authorize the alien to engage in employment," 8 U.S.C. § 1254a(a)(1); to "designate any foreign state" for TPS status, *id.* § 1254a(b)(1); and to extend TPS designations, *id*. § 1254a(b)(3)(C).

For more than a decade, consistent with these statutory delegations, the Attorney General exercised key TPS authorities—including termination authority.  For example, in 1991, the DOJ and the former INS adopted regulations governing TPS.  *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (codified as amended at 8 C.F.R. § 244).  Those regulations delegated certain operational TPS functions to INS, including the authority to initially find individual aliens eligible and award protected status, *see id.* at 619 (codified as amended at 8 C.F.R. § 244.2), and to receive and process applications for protected status, *see id.* at 620 (codified as amended at 8 C.F.R. §§ 244.6, 244.7).  But the regulations did *not* authorize any subordinate official to exercise the *Attorney General*'s authority to terminate a foreign state's designation under 8 U.S.C. § 1254a.

6

Indeed, the regulations defined an eligible state to mean a "foreign country or part thereof as designated *by the Attorney General* pursuant to section 244A(b) of the Act." *See id.* at 619 (codified as 8 C.F.R. § 244.1) (emphasis added). And in practice, the Attorney General issued all TPS country designations and terminations.[5]

### 2. The Homeland Security Act Did Not Transfer TPS Termination Authority to the DHS Secretary

After Congress passed the Homeland Security Act and thus created DHS in 2002, Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002) ("the Act"), DHS asserted authority over TPS designations and terminations, claiming that the Act had transferred that authority. *See* Extension of the Designation of Honduras Under Temporary Protected Status Program, 68 Fed. Reg. 23,744 (May 5, 2003). But the Act did no such thing. It provided that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter [*i.e.,* the Immigration and Nationality Act] and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the* President, *Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers." 8 U.S.C. § 1103(a)(1) (emphasis added). In other words, the Homeland Security Act made clear that "powers, functions, and duties" expressly "conferred upon" the "Attorney General"—even those "relating to the immigration and naturalization of aliens"—would remain vested in the Attorney

---

[5] *See, e.g.,* Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52,789, 52,791 (Aug. 30, 2000) ("By the authority vested in me as Attorney General under section 244(b)(3) of the Act . . . I have determined that Bosnia-Herzegovina no longer meets the conditions for designation of TPS . . ."); Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension, 63 Fed. Reg. 15,437, 15,438 (Mar. 31, 1998); Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7,582 (Feb. 8, 1993); Termination of Designation of Kuwait Under Temporary Protected Status Program, 57 Fed. Reg. 2,930, 2,931 (Jan. 24, 1992).

General notwithstanding the transfer of *other* such authorities to DHS.  Other provisions similarly confirmed that particular immigration-related powers would remain with the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(g) (providing that Attorney General would retain authority over functions "exercised by the Executive Office for Immigration Review").

To be sure, the Homeland Security Act did transfer many immigration-related functions and even *some* TPS-related functions from DOJ to DHS.  For example, the Act created the Bureau of Citizenship and Immigration Services as a branch of DHS and "transferred" specific INS functions "from the Commissioner of Immigration and Naturalization [within DOJ] to the Director of the Bureau of Citizenship and Immigration Services" within DHS.  *See* 6 U.S.C. § 271(b). Among the functions transferred were "all . . . adjudications performed by the [INS] immediately before" the effective date of the act.  *Id.* § 271(b)(5).  That included the authority to initially find individual aliens eligible and award protected TPS status, since those adjudications were performed by *INS* rather than the Attorney General before the Homeland Security Act was passed. *See supra* section I.A.1.  But TPS country designations and terminations were *not* "performed by [INS] immediately before" the Homeland Security Act's "effective date," and so those broader authorities were *not* transferred to DHS by operation of 6 U.S.C. § 271.

The Act also required the President to submit an executive Reorganization Plan to Congress by "[n]ot later than 60 days after November 25, 2002" detailing "[t]he transfer of agencies, personnel, assets, and obligations to" DHS.  6 U.S.C. § 542(a).  In accordance with that provision, the President issued an executive Reorganization Plan, which purported to "[t]ransfer the . . . functions of [INS]"—including delegated functions "performed by" INS "immediately before" the transfer—to DHS.  *See* 6 U.S.C. § 542 note (Department of Homeland Security Reorganization Plan).  But the Plan made no mention of TPS; nor did it address those immigration-related powers

8

expressly vested in the Attorney General as opposed to the INS or other subsidiary divisions.  By contrast, other portions of the Plan did specifically address the transfer of particular Attorney General functions.  *See, e.g.*, *id.* (transferring "the National Domestic Preparedness Office of the FBI, *including the functions of the Attorney General relating thereto*" (emphasis added)).

Here, when issuing the Termination, DHS cited no statutory provision purporting to transfer termination authority from the Attorney General.  *See* 90 Fed. Reg. at 50,484–87.  In the past, however, DHS has cited 6 U.S.C. § 552(d) and 6 U.S.C. § 557.[6]  And in dicta, various courts have done the same (in addition to citing the provisions addressed above).[7]  But those provisions did not independently transfer any authority at all; they just streamlined the process of amending the code by providing that certain "references" would be "deemed to refer" to the Secretary *to the extent that* they relate to functions that were *actually transferred* to the Secretary.  For example, 6 U.S.C. § 557 provides: "*With respect to any function transferred by or under this chapter . . .* and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office *the functions of which are so transferred* shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred."  (Emphases added.)  And 6 U.S.C. § 552(d) similarly provides: "References *relating to an agency that is transferred* to the Department in statutes, Executive orders, rules, regulations, directives, or delegations of authority that precede such transfer or the effective date of this chapter shall be deemed to refer, as appropriate, to the

---

[6] *See, e.g.*, Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3,476, 3,477 n.1 (Jan. 21, 2010); Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47,228, 47,229 n.1 (Oct. 11, 2017); Pet'rs' Appl. for Stay 5 n.2, *Noem v. Nat'l TPS All.*, No. 24A1059 (U.S. May 1, 2025).

[7] *See, e.g.*, *Najera v. United States*, 926 F.3d 140, 142 (5th Cir. 2019); *Cervantes v. Holder*, 597 F.3d 229, 231 n.2 (4th Cir. 2010); *Mejia Rodriguez v. Dep't of Homeland Sec.*, 562 F.3d 1137, 1140 n.3 (11th Cir. 2009).  In none of these cases did the courts grapple with any argument that the Attorney General's TPS termination authority was not actually transferred to DHS.

9

Department, to its officers, employees, or agents, or to its corresponding organizational units or functions." (Emphasis added.) These are housekeeping provisions, not substantive grants of authority.

"Administrative agencies . . . possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117. Yet here, the DHS Secretary has purported to terminate South Sudan's TPS designation without carrying its burden to identify a valid statutory grounding for that authority. *See Nat'l Ass'n of Broads.*, 39 F.4th at 819. Plaintiffs are thus likely to succeed on their claim that the Secretary's decision to terminate TPS for South Sudan was *ultra vires* and contrary to law. *See* 5 U.S.C. § 706(2).[8]

### B.      Plaintiffs' *Ultra Vires* Claim Is Reviewable Notwithstanding *Mullin*

There is no obstacle to this Court's review of Plaintiffs' *ultra vires* claim. Just as the TPS statute vests termination authority exclusively in the Attorney General, its review bar applies exclusively to TPS terminations carried out by "the Attorney General." 8 U.S.C. § 1254a(b)(5)(A). Nor is review foreclosed by *Mullin* because the Supreme Court had no occasion to consider Plaintiffs' *ultra vires* claim or any of the related arguments that Plaintiffs now advance.

1.      The TPS statute poses no bar to reviewing Plaintiffs' *ultra vires* claim. As with all questions of statutory interpretation, the Court "begin[s] with the text." *SEC v. Lemelson*, 138 F.4th 618, 623 (1st Cir. 2025) (quoting *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025)). Here, the

---

[8] If the Court agrees that the DHS Secretary lacked the authority to issue the Termination, that would not also invalidate the initial TPS *designation* for South Sudan, for at least three reasons. First, this APA suit challenges only one final agency action—the Termination—and any challenge to the initial TPS designation would need to be considered in the context of a separate and otherwise justiciable lawsuit. Second, even when the cited basis for an agency program turns out to be invalid, the APA requires the government to explore alternatives to outright termination. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 24–28 (2020). Third, "mutually explicit understandings" related to TPS status and the legitimate reliance interests of TPS holders and applicants give rise to vested due process interests notwithstanding any statutory violation. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *see also infra* section II.

text could not be more straightforward.  The TPS statute's review bar provides: "There is no judicial review of any determination *of the Attorney General* with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."  8 U.S.C. § 1254a(b)(5)(A) (emphasis added).  Congress's chosen language means what it says.  At most, the TPS statute's review bar forecloses review of "determination[s] of the Attorney General."  But Plaintiffs are not challenging any "determination of the Attorney General."  Their lawsuit is directed exclusively at the *DHS Secretary*'s unlawful TPS termination.

Presumably, the Government will argue that the phrase "Attorney General" should be replaced with "Secretary" by operation of 6 U.S.C. § 552(d) and 6 U.S.C. § 557.  But again, those housekeeping provisions did not independently transfer any authority from DOJ to DHS.  *See supra*, I.A.2.  They apply only to the extent there was an independent transfer of authority, and no such transfer exists.  Because Congress vested TPS termination authority in the Attorney General, the TPS statute's corresponding review bar simply has no application to the DHS Secretary.[9]

**2.**      Nor does *Mullin* foreclose Plaintiffs' *ultra vires* claim.  For one, the statutory authority issue that Plaintiffs now advance was never presented, disputed, or addressed in *Mullin*.  And it is well-established that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  *Webster v. Fall*, 266 U.S. at 511 (prior ruling was not precedential because relevant issue was not "suggested or decided" in that case); *see also Cooper Indus., Inc. v. Aviall*

---

[9] Indeed, because the TPS statue's review bar does not apply to *any* determinations rendered by the Secretary, it does not in any way limit judicial review of the *Secretary*'s actions.  The court therefore retains jurisdiction to consider the merits of Plaintiffs' claims that arise directly under the APA, including their contention that the Secretary's stated rationale was pretextual and based on a deficient periodic review process.  The APA independently demands that an agency official "disclose the basis" for an action—which must be the "genuine" basis. ECF 65 at 21 (citing *Dep't of Com. v. New York*, 588 U.S. 752 (2019)).  That obligation applies regardless of whether the TPS statute's procedural requirements govern the Secretary's conduct.

*Servs., Inc.*, 543 U.S. 157, 170 (2004) (referencing *Webster v. Fall* and declining to resolve an issue based on a prior Supreme Court decision which "did not address" key, relevant considerations); *Whitman v. United States*, 574 U.S. 1003, 135 S. Ct. 352, 353–54 (2014) (prior decision's "drive-by ruling . . . deserve[d] little weight" in part because the decision included "scarcely any explanation" on the issue).

In *Mullin*, no party advanced the argument that Plaintiffs press now—*i.e.*, the contention that the Attorney General alone has the authority to terminate a TPS designation.  No party disputed that the DHS Secretary lacked authority to issue a TPS termination by virtue of her *office*.  To the contrary, the parties expressly *agreed*, with scarcely any explanation, that the DHS Secretary possessed the requisite TPS authority and could at some point issue a valid TPS termination as long as the action adhered to the statute's *procedural* requirements.[10]  In short, no "party in [*Mullin*] briefed or argued the question" that Plaintiffs now present.  *See, e.g.*, *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 608 (1st Cir. 1989) (declining to interpret a Supreme Court case as deciding an unpresented and unaddressed issue).

Nor did the Supreme Court in any way consider Plaintiffs' *ultra vires* argument.  In addressing the scope of the judicial review bar, the Court focused on the meaning of the term "determination."  *See, e.g.*, *Mullin*, 2026 WL 1825840, at *2.  The Court did not interpret—or even mention—the statute's language limiting the review bar to actions "of the Attorney General."  8 U.S.C. § 1254a(b)(5)(A); *see Mullin*, 2026 WL 1825840, at *2.  As a result, *Mullin* addressed the entirely different question whether the review bar reaches non-constitutional claims challenging

---

[10] *Compare, e.g.*, Br. for Pet'rs at 6 n.2 (noting in passing that "Congress has transferred the authority to the Secretary of Homeland Security"), *with* Br. for Resp'ts Doe, et al., at 5 ("The TPS statute gives the Secretary authority to provide humanitarian relief to people"), *and* Brief for Resp'ts Miot, et al., at 5 (listing procedural requirements the "Secretary" must follow to "terminate a country's TPS designation").

*how* the Secretary exercised her (in that case) unchallenged TPS authority, not *whether* the Secretary could exercise that authority *at all*. The Supreme Court stated in passing that the DHS Secretary exercises TPS authority, *see Mullin*, 2026 WL 1825840, at *7, but that was merely a "drive-by" statement about an unpresented question that was "lurk[ing]" in the background; it therefore carries no precedential effect. *Webster v. Fall*, 266 U.S. at 511.

*Mullin* was also decided in a preliminary posture, such that the Supreme Court is free to revisit its conclusions in *Mullin*, including based on the consideration of new arguments. *Mullin* itself said that it "ma[de] only a predictive—not a final—decision about the outcome of the case" based on the Court's view of "the likelihood-of-success question." 2026 WL 1825840, at *11. And the Supreme Court has explained that because "courts determine if a plaintiff is likely to succeed on the merits" in awarding preliminary relief, those decisions "do not conclusively resolve legal disputes." *Lackey*, 604 U.S. at 200; *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (explaining that "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" at final judgment). The Court has therefore "cautioned against improperly equating likelihood of success with success and treating preliminary injunctions as tantamount to decisions on the underlying merits." *Lackey*, 604 U.S. at 201 (citation modified) (noting that courts have "reach[ed] a different conclusion upon full consideration of the merits"); *see also Capen v. Campbell*, 134 F.4th 660, 676 & n.10 (1st Cir. 2025) (holding that appellant was unlikely to succeed on the merits to obtain a preliminary injunction but cautioning that "future developments in the record (*and in the parties' arguments*) may possibly warrant a different outcome beyond the preliminary-injunction stage" (emphasis added)).

Because *Mullin* was decided in a preliminary posture and did not even consider the argument that the Secretary lacks TPS termination authority, the Supreme Court's ruling in no way

forecloses Plaintiffs' *ultra vires* claim.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED BECAUSE THEIR DUE PROCESS RIGHTS HAVE BEEN VIOLATED

Plaintiffs are also likely to succeed on their procedural due process claim because the Termination has deprived Plaintiffs of constitutionally protected property and liberty interests without constitutionally adequate process.

The Due Process clause applies "to all 'persons' within the United States, including aliens," *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests," *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). *See also Bell v. Burson*, 402 U.S. 535, 539 (1971). To state a procedural due process claim "a plaintiff must 'identify a protected liberty or property interest' and show the defendants deprived him of that interest 'without constitutionally adequate process.'" *Wright v. Moniz*, 737 F. Supp. 3d 48, 61 (D. Mass. 2024) (Saris, J.) (quoting *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)). Plaintiffs are likely to succeed at both steps of that analysis.

### A.    The Termination of TPS Status Implicates Significant Liberty and Property Interests

Plaintiffs have significant liberty and property interests in their TPS status and its attendant benefits, which include removal protection and work authorization.

"[A] person receiving . . . benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972); *see also, e.g.*, *Inland Empire - Immigrant Youth Collective v. Nielsen*, 2018 WL 4998230, at *19 (C.D. Cal. Apr. 19, 2018) (collecting similar cases).

Here, TPS holders and applicants plainly have liberty and property interests in the removal protections and work authorizations that the TPS statute confers upon them. Courts have

14

repeatedly recognized that such benefits are cognizable as liberty and property interests within the meaning of the Due Process Clause. *See, e.g.*, *Destino v. FCI Berlin, Warden*, 2025 WL 4010424, at \*11 (D.N.H. Dec. 24, 2025) (plaintiff had "weighty" liberty interests in "working in the United States" and "living alongside his fiancee and infant child"); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." (quoting *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982))); *cf. Tenemasa-Lema v. Hyde*, 810 F. Supp. 3d 244, 258 (D. Mass. 2025) (The "disruption of established family ties further compounds [a plaintiff's] deprivation of liberty.").

Indeed, courts have reached similar conclusions in the TPS context specifically. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 333 (E.D.N.Y. 2019) ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law."); *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) ("[A] prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections."); *see also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018); *Rodas v. Chertoff*, 399 F. Supp. 2d 697, 702 (E.D. Va. 2005).[11]

Those benefits are not a mere "unilateral expectation." *Roth*, 408 U.S. at 577. They are subject to "rules or mutually explicit understandings" that further confirm their constitutional significance. *See Perry*, 408 U.S. at 601. TPS benefits are *mandatory* for individuals granted TPS. *See* 8 U.S.C. § 1254a(a)(1)(A)–(B). Similarly, once an individual applies for TPS and makes a

---

[11] TPS holders and applicants also have protected interests in the related state benefits conferred through TPS status, such as driver's licenses. *See, e.g.*, *Bell*, 402 U.S. at 539 (A driver's license is a protected interest that, once issued, cannot be revoked or suspended "without that procedural due process required by the Fourteenth Amendment." (citations omitted)); *Belezos v. Bd. of Selectmen of Hingham*, 2019 WL 2870733, at \*6 (D. Mass. July 3, 2019) ("In general, the 'Due Process Clause applies to the deprivation of a driver's license by the State.'" (citation omitted)).

15

*prima facie* showing of eligibility, the government "shall" grant that person protection from removal and temporary employment authorization. *See* 8 U.S.C. § 1254a(a)(4)(B); *see also Mansor*, 685 F. Supp. 3d at 1013–14. While the Government has initial discretion whether to *designate* a foreign state for TPS, *see* 8 U.S.C. § 1254a(b)(1) (providing that "[t]he Attorney General, after consultation with appropriate agencies of the Government, *may* designate any foreign state" (emphasis added)), the statute cabins that discretion when deciding whether to *terminate* a designation already made.

## B.     The Government's Process Was Not Constitutionally Sufficient

Because Plaintiffs possess protected liberty and property interests associated with their TPS status, they are constitutionally entitled to procedural safeguards to guard against "the risk of an erroneous deprivation of such interest[s]." *Mathews*, 424 U.S. at 335. Congress recognized as much, and thus included procedural safeguards in the TPS statute in order to protect the liberty and property interests of TPS holders and thus conform with the requirements of the Due Process Clause. *See, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and . . . a petitioner may have a legal claim when she can show statutory procedural shortfalls . . . .") (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011)); *see also Jimenez v. Cronen*, 317 F. Supp. 3d 626, 638 (D. Mass. 2018) ("When regulations are promulgated to protect a fundamental right derived from the Constitution or a federal statute, . . . the Due Process Clause *requires* federal agencies to follow them[.]").

Several of the TPS statute's procedural requirements directly align with core due process requirements. For example, to mitigate "the risk of an erroneous deprivation," *Mathews*, 424 U.S. at 335, the statute provides that a TPS designation may be terminated only after "consultation with appropriate agencies of the Government" and a "review" of "the conditions in the foreign state."

16

8 U.S.C. § 1254a(b)(3)(A).  These basic safeguards impose a minimal administrative burden on the government, while reducing the risk that termination decisions will be based on inaccurate information.  *See Mathews*, 424 U.S. at 343–49 (emphasizing that the risk of erroneous deprivation was mitigated by extensive information gathering, agency review, and administrative reconsideration procedures).

The TPS statute also requires DHS Secretary to publish the actual "basis for the determination" in the Federal Register.  8 U.S.C. § 1254a(b)(3)(A).  That requirement serves a separate but equally important due process function: providing notice of the reasons for the government's decision.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004).  Common sense dictates that "meaningful notice" requires the government to adequately state its actual rationale.  *Perez-Escobar v. Moniz*, 792 F. Supp. 3d 224, 226 (D. Mass. 2025) (Saris, J.).  Disclosure of the true basis for a termination ensures that TPS holders and applicants may assess and potentially challenge errors in the agency's reasoning.  Relatedly, the statute fosters due process by affording the right to a neutral decisionmaker who has not made a preordained decision *before* reviewing the evidence.  *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (due process forbids practice that poses "risk of actual bias or prejudgment").

The Secretary flouted these procedural safeguards and thus rendered the Termination in violation of due process.  There was no "consultation with appropriate agencies."  8 U.S.C. § 1254a(b)(3)(A).  Instead, as this Court found, "no communications between DHS and State Department officials about country conditions are included in the administrative record," save for a "single email chain" pointed to by Defendants that this Court found to be "plainly [] inadequate" evidence of consultation.  ECF 65 at 34.  Accordingly, the Court concluded that Plaintiffs were

17

likely to establish that the DHS Secretary "acted contrary to law by failing to consult with appropriate agencies" before terminating TPS for South Sudan. *Id*. at 35–36. Nor did the Secretary provide notice of the actual "basis for the determination." 8 U.S.C. § 1254a(b)(3)(A). Rather, the Court found a "disconnect between the Federal Register notice and her own administrative record [that provided] further evidence of pretext, ECF 65 at 31, and therefore concluded that Plaintiffs were "likely to succeed on their argument that Secretary Noem failed to disclose the true 'basis for [her] determination' in the Federal Register, *id.* at 33 (quoting 8 U.S.C. § 1254a(b)(3)(B)) (alteration in original). Plaintiffs were thus deprived of genuine notice, *Perez-Escobar*, 792 F. Supp. at 226, and the neutral decisionmaker that due process requires, *see, e.g.*, *United States v. Ayala-Vazquez*, 751 F.3d 1, 23 (1st Cir. 2014) ("[A] fair tribunal is a basic requirement of due process.").

Defendants' Termination thus violates Plaintiffs' liberty and property rights guaranteed by the Due Process Clause under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

### C.  Plaintiffs' Procedural Due Process Claim Is Reviewable

Plaintiffs' procedural due process claim is reviewable because the TPS statute's review bar does not bar Plaintiffs' constitutional claims. The Government conceded at oral argument in *Mullin* that it would "have to be fighting with [Supreme Court precedent] . . . to argue that there's no judicial review of [] constitutional claims" under Section 1254a(b)(5)(A). Tr. of Oral Arg. 26:22–27:8, *Mullin*, No. 25-1083 (U.S. Apr. 29, 2026). And in its opinion, the Supreme Court declined to extend the review bar to constitutional claims. *Mullin*, 2026 WL 1825840, at \*7–10. Instead, the Court proceeded directly to the merits of the equal protection challenge, reaffirming the bedrock principle that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. at 603. Congress expressed no

18

"clear" intent to bar constitutional claims here, as it has elsewhere. *Cf., e.g.*, 8 U.S.C. § 1252(b)(9) (precluding "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions").

## III.    THE REMAINING FACTORS OVERWHELMINGLY FAVOR PLAINTIFFS

### A.    Plaintiffs Will Face Irreparable Harm Absent a Postponement

"Plaintiffs easily me[t] their burden" of demonstrating irreparable harm in their first postponement motion, *see* ECF 65 at 38, and remain likely to suffer irreparable harm in the absence of postponement of the effective date of the Termination, *see* ECF 7-1 at 17–19; ECF 52 at 21–24; ECF 62 at 15–17.  The same is still true—Plaintiffs and other South Sudanese TPS holders and applicants face irreparable harm from an imminent and procedurally defective Termination because it would (1) immediately strip them of immigration status and access to related federal and state benefits, including work authorization, driver's licenses, and healthcare coverage and (2) subject them to deportation proceedings and related immigration confinement that would tear them apart from loved ones and community and expose them to forced removal to South Sudan or other third countries where they will face serious and even deadly danger.  As this Court recognized, because so many TPS holders "have TPS as their sole form of status," removal would inflict a "loss of liberty" that would "itself 'constitute irreparable harm.'"  ECF 65 at 39 (citing *Guerrero Orellana v. Moniz*, 802 F. Supp. 3d 297, 312 (D. Mass. 2025)).  And even where removal does not occur, this Court determined TPS holders face irreparable harm where a gap in immigration status could cause loss of work authorization and ineligiblity for certain immigration relief.  *Id*. at 39–40.

### B.    The Balance of the Equities and the Public Interest Favor Plaintiffs

The final considerations—the balance of the equities and public interest—merge when the government is the party opposing the relief.  *Id.* at 40 (citing *Nken v. Holder*, 556 U.S. 418, 435

(2009)); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (Saris, J.).  As this Court has concluded before, "these factors too, favor Plaintiffs" because the "many irreparable harms that South Sudanese TPS holders imminently face upon termination of South Sudan's TPS designation outweigh the largely unsubstantiated concerns raised by Defendants."  ECF 65 at 40–41.  And despite the Defendants' claim of "a general[ized] public interest in allowing the government to enforce statutes," *id*. at 40, this Court has been unequivocally clear that "there is 'no public interest in the perpetuation of unlawful agency action,'" *id*. (citing *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016))).  Thus, as before, "[b]ecause all factors relevant to the § 705 analysis favor Plaintiffs," ECF 65 at 41, this Court should grant Plaintiffs' motion to postpone.

## CONCLUSION

Plaintiffs respectfully ask the Court to postpone the effective date of the Termination pending final judgment and issue an administrative stay pending resolution of this motion.

Dated: July 13, 2026                    Respectfully Submitted,

                                        */s/ Paul Killebrew*
                                        Mark H. Lynch (*pro hac vice*)
                                        Stephen Petkis (*pro hac vice*)
                                        Daniel G. Randolph (*pro hac vice* admission pending)
                                        Paul Killebrew (*pro hac vice*)
                                        Ayana M. Lindsey (*pro hac vice*)
                                        COVINGTON & BURLING LLP
                                        One CityCenter
                                        850 Tenth Street, NW
                                        Washington, D.C. 20001
                                        (202) 662-6000
                                        MLynch@cov.com
                                        SPetkis@cov.com
                                        DRandolph@cov.com

20

PKillebrew@cov.com
ALindsey@cov.com

/s/ Nargis Aslami
Nargis Aslami (BBO No. 714848)
Melissa Keaney (*pro hac vice* admission pending)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362,
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

/s/ Erik Crew
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

*Counsel for Plaintiffs African Communities
Together, Mary Doe, David Doe, Peter Doe, Jacob
Doe, and the Proposed Class*

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Paul Killebrew*
Paul Killebrew
